IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID R. BURT, *et al.*,

    *Plaintiffs,*

v.

    Civil Action No.: ELH-12-0464

WOLFGANG MAASBERG, *et al.*,

    *Defendants.*

**MEMORANDUM OPINION**

Plaintiffs David R. Burt ("Burt"), a former Chief Executive Officer ("CEO") of Lyris, Inc. ("Lyris" or "the Company"), and his wife, Janet Burt, filed a 103-page Complaint (ECF 1)[1] against fourteen defendants, alleging that between 2007 and 2011 the defendants engaged in a fraudulent scheme to take control of Lyris, a technology company that develops, markets and sells online marketing tools for small and medium businesses. Compl. ¶¶ 2-3. In particular, plaintiffs, who are Lyris stockholders, allege that defendants, who are officers, directors, and/or stockholders of Lyris, amassed 87 percent of Lyris's stock through various manipulative actions, without disclosing their plan to other stockholders or to the Securities and Exchange Commission ("SEC"). Plaintiffs claim, *inter alia*, that, as a result, they sold a significant

---

[1] Plaintiffs, who are non-practicing attorneys, filed the Complaint *pro se*. Although they subsequently retained counsel, no amended complaint was filed. The Complaint is replete with redundancy. *See, e.g.*, Compl. ¶¶ 15, 101 (both alleging that defendant Richard McDonald "bragged" about purchasing shares of Lyris stock below their true value). It also contains several scurrilous or irrelevant accusations. *See, e.g., id.* ¶ 1 (asserting that the case is about "blue-blooded . . . penny stock manipulators; about people who believe" that they can violate securities laws "because they are richer and more privileged than others" and "can prey on others . . . to steal from them"); *id.* ¶ 21 (stating that defendants sought "to prey" on plaintiffs because of their ill health "and not being wealthy like the Comforts"); *id.* ¶ 39 (alleging that defendant Stuyvesant Pierpont Comfort is a descendant of Peter Stuyvesant and JP (John Pierpont) Morgan).

percentage of their Lyris stock to defendants at artificially depressed prices, and without receipt of a control premium.[2]

Of the fourteen defendants named in the Complaint, five serve as officers and/or directors of Lyris (collectively, the "O&D Defendants").  They are Wolfgang Maasberg, the Company's current CEO and a director of Lyris, *id.* ¶ 35; William T. Comfort, III ("Ty Comfort"), the Chairman of the Lyris Board of Directors, *id.* ¶ 41; Jamie Urry, a Lyris director, *id.* ¶ 42; Richard Blair, also a Lyris director, *id.* ¶ 43; and Richard McDonald, the Director of Investor Relations at Lyris since approximately 2005, *id.* ¶ 36.  Four defendants are Lyris stockholders (collectively, the "SH Defendants").  They are William T. Comfort, Jr. ("Bill Comfort"), *id.* ¶ 37; Stuyvesant Pierpont Comfort, who served as a director of Lyris between 2000 and 2002, *id.* ¶ 40; LDN Stuyvie Partnership ("LDN" or "LDN Stuyvie"), an Oklahoma partnership in which Stuyvesant and Ty Comfort are partners, *id.* ¶ 44; and Meudon Investments Partnership ("Meudon"), a New York partnership allegedly controlled by Urry, *id.* ¶ 45.  The Complaint also names five corporate John Doe defendants, referred to as the "Hidden Comfort Entities," which are "believed to be partnerships or other entities whose investments are controlled directly or indirectly (in whole or in part) by Defendants Bill Comfort, Ty Comfort, Stuyvesant Comfort, Urry and/or Blair." *Id.* ¶ 46.

---

[2] "Control premium" means the "premium paid for shares carrying the power to control a corporation." BLACK'S LAW DICTIONARY 1300 (9th ed. 2009); *see, e.g.*, *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994) ("Once control has shifted, the current . . . stockholders will have no leverage in the future to demand another control premium.  As a result, the . . . stockholders are entitled to receive, and should receive, a control premium and/or protective devices of significant value.").  "The control premium is often computed by comparing the aggregate value of the controlling block of shares with the cost that would be incurred if the shares could be acquired at the going market price per share." BLACK'S LAW DICTIONARY 1300-01.

Bill, Ty, and Stuyvesant Comfort, as well as Urry, are members of the same family (collectively, the "Comforts").  In particular, Ty and Stuyvesant Comfort are brothers, and the sons of Bill Comfort; Urry is Bill Comfort's son-in-law and the brother-in-law of Ty and Stuyvesant Comfort.  *Id.* ¶¶ 40-42.

The Complaint contains eight claims.[3]  The first three counts allege violations of federal securities laws and regulations.  In Count I, plaintiffs allege that, by engaging in a scheme to take control of Lyris and misrepresenting or failing to disclose their plan to do so, defendants violated § 10(b) of the Exchange Act of 1934 ("§ 10(b)"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5.  *See* Compl. ¶¶ 260-62.  In Count II, plaintiffs allege that defendants conspired to violate § 10(b) and Rule 10b-5.  *Id.* ¶¶ 263-65.  Count III alleges that defendants violated § 14(a) of the Exchange Act of 1934 ("§ 14(a)"), 15 U.S.C. § 78n(a), and SEC Rules 14a-3 and 14a-9 ("Rule 14a-3" and "Rule 14a-9"), 17 C.F.R. §§ 240.14a-3 & 240.14a-9, by causing Lyris to issue false proxy statements that failed to disclose the defendants' plan.  *Id.* ¶¶ 266-69.

The remaining five counts allege violations of Maryland and Delaware law.  In Count IV, plaintiffs allege that defendants violated the Maryland Securities Act, § 11-703[4] of the Corporations & Associations Article ("C.A.") of the Maryland Code (2007 Repl. Vol., 2012 Supp.).  Compl. ¶¶ 270-72.  Count V alleges that Maasberg, Ty Comfort, Urry, and Blair breached their duty of loyalty under Delaware law.  *Id.* ¶¶ 273-78.  In Count VI, plaintiffs allege

---

[3] The parties have referred to the claims as counts and, for convenience, I have delineated each claim as a count.  For example, the "First Claim" is identified as Count I.

[4] The Complaint incorrectly cited C.A. § 11-301, which does not provide for civil liability under the Maryland Securities Act.  In their later submissions, the parties corrected the statutory citation.

that Ty Comfort, Urry, and Blair engaged in self-dealing, by purchasing shares of Lyris stock at artificially depressed prices, in violation of their fiduciary duties under Delaware law. *Id.* ¶¶ 279-93. Count VII alleges that the Maasberg, Ty Comfort, Urry, and Blair breached their duty of care under Delaware law. *Id.* ¶¶ 294-300. In Count VIII, plaintiffs allege that Ty Comfort, Urry, Blair, McDonald and Bill Comfort are liable for intentional infliction of emotional distress, based on their purchase of Lyris stock from plaintiffs at artificially depressed prices, when they knew that the Burts needed the proceeds for Janet Burt's medical care. *Id.* ¶¶ 301-06. Plaintiffs claim damages "in excess of $1,000,000" for Counts I through VI, *id.* ¶¶ 262, 265, 269, 272, 278, 293; damages "in excess of $100,000" for Count VII, *id.* ¶ 300; and an unspecified amount of damages for Count VIII, *id.* ¶ 306. They appended voluminous exhibits to the Complaint

The SH Defendants and O&D Defendants each filed a motion to dismiss, *see* ECF 13 ("SH Motion"); ECF 14 ("O&D Motion"), along with a supporting memorandum of law, *see* ECF 13-1 ("SH Memo"); ECF 14-1 ("O&D Memo"). They claim that, pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(3)(A), plaintiffs have failed to state a claim as to each count. They also assert affirmative defenses based on the various statutes of limitations applicable to each claim. In addition, they claim that plaintiffs previously released all of their claims through an agreement signed by Burt when he resigned as CEO of Lyris. And, the defendants argue that, because plaintiffs have failed to state a claim under the federal securities laws, this Court lacks personal jurisdiction over defendants as to the remaining state law claims, which are subject to dismissal pursuant to Fed. R. Civ. P.

12(b)(2).[5]

Plaintiffs, through counsel, filed a consolidated response in opposition ("Opposition" or "Opp.," ECF 21). They concede that Count II, for conspiracy to violate § 10(b), fails to state a claim. But, they contend that the release does not apply to plaintiffs' claims, that plaintiffs' claims are not barred by limitations, and that the Complaint is otherwise sufficient to survive defendants' motions. However, they do not dispute the argument that, if plaintiffs' federal securities claims are dismissed, this Court lacks personal jurisdiction over defendants with respect to the remaining state law claims. Both the SH Defendants and the O&D Defendants filed replies. *See* ECF 26 (""SH Reply"); ECF 27 ("O&D Reply").

The motions to dismiss have been fully briefed,[6] and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I will grant defendants' motions with respect to Counts I, II and III, and will grant leave to amend Counts I and III. Additionally, because plaintiffs have not opposed the argument that this Court lacks personal jurisdiction over

---

[5] As to plaintiffs' federal claims, they assert subject matter jurisdiction under 28 U.S.C. § 1331. Supplemental jurisdiction may be exercised over plaintiffs' state law claims under 28 U.S.C. § 1367.

Section 78aa of 15 U.S.C. has been interpreted as authorizing a federal court to exercise personal jurisdiction over defendants if they have "sufficient contacts with the United States." *Mates v. N. Am. Vaccine, Inc.*, 53 F. Supp. 2d 814, 820 (D. Md. 1999); *accord Sec. Investor Protection v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). Defendants do not dispute the existence of such contacts. Therefore, as long as plaintiffs' federal claims are viable, supplemental personal jurisdiction may be exercised with respect to plaintiffs' state law claims, which arise from the same nucleus of operative facts. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 627-29 (4th Cir. 1997). However, as discussed, *infra*, if plaintiffs' federal claims are dismissed, personal jurisdiction is governed by the requirements of Maryland's long-arm statute and constitutional due process. *See id.*

[6] The parties were granted leave to file memoranda in excess of the fifty-page limit set forth in Local Rule 105.3. Defendants also filed exhibits in support of their motions. Because defendants have incorporated, by reference, the arguments of other defendants, *see* SH Memo at 27; O&D Memo at 32 n.13, I will refer to the defendants collectively, unless otherwise indicated.

defendants absent viable federal claims, I will also dismiss, without prejudice, plaintiffs' claims arising under Maryland and Delaware law (*i.e.*, Counts IV, V, VI, VII, and VIII).

## Factual Background

<u>The Company</u>

As indicated, Lyris is a "technology company that develops, markets, and sells online [or internet] marketing tools to small and medium businesses." Compl. ¶ 3; *see also id.* ¶ 47. It is headquartered in Emeryville, California and incorporated under the laws of Delaware. *Id.* ¶¶ 2, 65.[7] Lyris formerly operated as a healthcare company under the name J.L. Halsey Corporation. *Id.* ¶ 48; Compl. Exh. 12; O&D Exhs. 2, 3. It gradually sold off its healthcare businesses and accumulated cash reserves through "litigation and claims activities." Compl. ¶ 48. Lyris also "had" a valuable asset, consisting of a "net operating loss ['NOL'] carryforward of approximately $180 million," which "would allow Lyris to buy a company and not pay federal corporate income tax on $180 million dollars of federal income." *Id.* ¶ 49.[8]

Lyris is publicly-traded via the Over-the-Counter ("OTC") market. *Id.* ¶ 3. From early 2006 to early 2007, Lyris stock traded at prices between $0.75 and $1.75 per share. According to a "Google finance" graph of Lyris stock prices attached to the Complaint, *see* Exh. 6, prices hovered between $0.75 and $1.00 for all of 2006, and increased to $1.75 in early 2007. *See* Compl. ¶ 24; Compl. Exh. 6. Since mid 2007, however, Lyris's stock has suffered a gradual

---

[7] Although Lyris is a Delaware corporation, based in California, Compl. ¶¶ 2, 65, plaintiffs assert that venue is proper in Maryland because they live in Maryland and the actions of the defendants "were aimed at defrauding Plaintiffs in the state of Maryland . . . ." *Id.* ¶ 33.

[8] The Complaint does not indicate when or how Lyris acquired the NOL.

decline and, by the end of 2011, it traded at between 10 and 33 cents per share.  Compl. ¶ 24; Compl. Exh. 6.[9]

<u>The Parties</u>

David Burt served as CEO of Lyris from approximately June 2000 to January 2007. Compl. ¶¶ 7, 47, 53.[10]  During his tenure as CEO, Burt oversaw much of Lyris's transition to its present business, including the identification of acquisition targets for Lyris.  *Id.* ¶¶ 49, 51. Lyris's proxy statements reflect that, as part of Burt's compensation package as CEO, he acquired 20,850,000 shares of Lyris common stock in 2002.  *See* Compl. Exh. 12, Jan. 3, 2008 Proxy Statement, at 19; *see also* SH Memo at 18; O&D Memo at 23.

Between April 2007 and December 1, 2011 (the "Fraud Period"), Compl. ¶ 2, plaintiffs allegedly owned from 4% to 7% of Lyris's stock, either directly or indirectly through Addison LP, their investment vehicle.  Compl. ¶ 7.[11]  However, the Burts sold "nearly all" of these shares

---

[9] Defendants point out that public filings, included in Exhibits 13 and 14 of the Complaint, show that Lyris's economic performance between 2007 and 2011 has been "quite weak."  *See* O&D Memo at 13-15 (summarizing "Lyris's quarterly financial performance as reported in Exhibits 13 and 14 of Plaintiffs' Complaint"); ECF 14-2 (table summarizing financial performance).  Defendants assert that, between 2007 and 2011, "Lyris's gross revenues have generally been flat or in decline," and "[i]n only three of the nineteen quarterly periods . . . did Lyris generate a net profit."  O&D Memo at 14.  Defendants state that these filings also show that "Lyris has suffered negative income, *i.e.*, losses" for "each of the fifteen consecutive quarters" between the second quarter of 2008 and the fourth quarter of 2011, totaling approximately $46 million. *Id.*

[10] The SH Defendants assert: "Burt is a sophisticated businessman and an attorney . . . ." SH Memo at 17.  The O&D Defendants claim: "Both Mr. Burt and Ms. Burt are non-practicing lawyers."  O&D Memo at 8 n.1.  Although the Court may only consider allegations of the Complaint at this juncture, the allegations in the Complaint suggest that Burt is an experienced businessman.

[11] According to plaintiffs, "David Burt is the President of Texas Barrington LLC, the general partner of Addison LP."  Compl. ¶ 7.  Further, the Burts are "the only limited partners of Addison LP."  *Id.*  As of January 2012, Addison LP assigned all of its rights related to its

in 2010 and 2011. *Id.* ¶ 7. Specifically, in March 2010, Addison LP sold 3,000,000 shares of Lyris stock to Ty Comfort and Meudon for $0.33 per share, totaling $1,000,000. *Id.* ¶ 248. And in or about May 2011, Addison LP sold 5,000,000 shares to the "Comfort Defendants" at $0.24 per share, totaling $1,200,000.[12] *Id.* ¶¶ 242, 247, 249. According to plaintiffs, they sold these shares to finance "expensive" medical treatment for Janet Burt, who "suffers from a significant illness" that she has "been battling . . . for more than eight years," which required hospitalization. *See id.* ¶¶ 18, 249.d, 256.[13] Plaintiffs aver that they were among the victims of defendants' conduct, because they sold their Lyris stock to defendants at artificially depressed prices, and without receipt of a control premium. *Id.* ¶¶ 22-24, 249.

Plaintiffs also sold Lyris stock before the Fraud Period. Documents that I may consider in connection with defendants' motions show that on March 8, 2007, the Burts, through Addison LP, sold 4,166,667 shares of Lyris stock to LDN and 333,333 shares to Blair at $0.75 per share, for an aggregate of $3,375,000. *See* SH Motion, Exh. 3 (March 8, 2007 Agreement and Mutual Release). Thus, between March 2007 and May 2011, the Burts sold approximately 12,500,000 shares of Lyris stock for $5,575,000. *See also* SH Motion, Exh. 2 (ECF 13-3) (March 8, 2007 Schedule 13D filed by Burt, representing ownership of 12,510,000 shares). From the

ownership of Lyris stock to Janet and David Burt, including the right to bring this suit. *Id.* ¶ 7 n.1.

The body of the Complaint identifies Addison LP as a plaintiff. *See, e.g.*, Compl. ¶¶ 7, 247 & 248. However, Addison LP is not listed in the caption of the Complaint, and it does not appear that Addison LP is otherwise regarded as a plaintiff by the parties. Indeed, only the Burts filed an Opposition to defendants' motions to dismiss. *See* Opp. And, in the section of plaintiffs' Opposition titled "The Parties," Addison LP is not mentioned. *See id.* at 10-11.

[12] The Complaint does not identify the particular defendants to whom these shares were sold. However, based on the allegations, it appears that Urry was one of the purchasers. *See* Compl. ¶ 249.d.

[13] Plaintiffs identify Janet Burt's illness as depression. Compl. ¶¶ 256, 304.

Complaint's exhibits, it also appears that in 2002 and 2003 plaintiffs sold 4,170,000 shares to Ty Comfort and 4,170,000 shares to LDN.  *See* Exh. 12, Jan. 3, 2008 Proxy Statement, at 19-20. Plaintiffs do not seek damages for their sale of Lyris stock on or before March 8, 2007.  The status of plaintiffs' remaining Lyris stock is not detailed in the Complaint.

As noted, the defendants include several members of the Comfort family, some of whom have served or now serve as directors at Lyris, and all of whom are Lyris stockholders.  Bill Comfort, who is "approximately 75 years old," is the Chairman of Court Square Capital Partners ("Court Square"), a private equity investment firm, and the former Chair of Court Square's predecessor, Citicorp Venture Capital.  *Id.* ¶¶ 37-38.  He is "believed" to own "just under 5% of the common stock of Lyris."  *Id.* ¶ 38.[14]  Urry, Bill Comfort's son-in-law, is "approximately 54 years old."  Compl. ¶ 42.  He is also a partner at Court Square, serves as a director of Lyris, and "controls" Meudon, which is a stockholder of Lyris.  *Id.* ¶¶ 42, 45.  A Schedule 13D for Meudon, attached to the Complaint in Exhibit 11, states that Urry has sole voting power with respect to Meudon's shares of Lyris stock.  Stuyvesant Comfort, who is "approximately 42 years old," is a partner in Stirling Square Capital Partners, as well as "LDN Stuyvie, . . . a partnership that is the largest shareholder of Lyris."  *Id.* ¶ 40.  He served as a director of Lyris from 2000 to 2002.  *Id.* Ty Comfort, who is "approximately 45 years old," is the Chairman of the Lyris Board of Directors and a partner in LDN.  *Id.* ¶¶ 41, 44.

Plaintiffs allege: "The Comforts are believed to have more than one billion dollars in investable assets.  All of them are professional investors."  *Id.* ¶ 143.  Ty Comfort allegedly told

---

[14] Plaintiffs add that Bill Comfort "was considered so powerful at Citicorp that he was viewed as 'untouchable'" and was among "the most highly compensated people at Citibank." Compl. ¶ 38.

Burt that he, Stuyvesant Comfort, and Urry jointly manage their investments.  *See id.* ¶ 142.

Further, the Comforts hold daily conference calls "to discuss, and make decisions on, managing

their . . . investments."  *Id.* ¶ 143.

Defendant Maasberg has served as CEO of Lyris since 2010, and is a Lyris stockholder.

*Id.* ¶¶ 6, 15, 35.  Defendant McDonald has been the head of investor relations for Lyris since

2005, and is also a Lyris stockholder.  *Id.* ¶¶ 6, 36.  Defendant Blair, who is 77 years old, is a

Lyris director, a Lyris stockholder, and, according to the Complaint, a longtime stockbroker for

Bill Comfort and others, with expertise in trading "small stocks."  *Id.* ¶¶ 43, 54, 64.a.i, 210-11.

He is also "a principal of the stock brokerage firm Freimark, Blair."  *Id.* ¶ 6.  According to

plaintiffs, "Bill Comfort, Ty Comfort, Stuyvesant Comfort, Urry and/or Blair" control, "directly

or indirectly," secret investments in Lyris stock through various "Hidden Comfort Entities."  *Id.*

¶ 46.  Those entities are named as Corporate John Doe defendants.  *Id.* ¶¶ 59-62.

The Alleged Take-Over Scheme

Plaintiffs allege that between April 2007 and December 2011, defendants "enrich[ed]

themselves illegally at the expense of other shareholders of Lyris . . . , by secretly amassing an

astounding 87% of control of the stock of Lyris without notifying the SEC as required by law."

*Id.* ¶ 2.[15]  Exhibit 6 to the Complaint contains a graph that purports to chart the increase in

defendants' cumulative ownership of Lyris stock from 2006 through the end of the Fraud Period,

"according to their filings, statements, actions, and admissions."  *See* Compl. ¶¶ 114-16.  The

graph shows that by June 2008 defendants collectively owned more than 50% of Lyris's

_____

[15] According to the Complaint, "Defendants now have closer to 90% control of the stock
of Lyris."  Compl. ¶ 24 n.2.

outstanding shares.  Plaintiffs assert: "Defendants have not told the SEC the total amount of stock they control or that they were taking over control of Lyris." *Id.* ¶ 11.  They claim that, as a result, defendants were able to take control of Lyris "without paying a control premium." *Id.* ¶ 249.f.  Further, plaintiffs allege that "The NOL change of control rules have provided additional motivation for the Comforts and Defendants not to disclose their joint intentions to the SEC as required.  Doing so would reduce the value of the NOLs to almost nothing." *Id.* ¶ 50.

Plaintiffs aver that defendants surreptitiously took control of Lyris by engaging in "a sophisticated version of a penny stock fraud scheme referred to as 'poop and scoop.'" *Id.* ¶ 13. They explain that defendants valued Lyris highly, but took "actions that ma[de] [Lyris] stock look unattractive and ma[de] materially false and misleading statements and omissions so that they [could] 'scoop' up a lot of shares for themselves at prices that have been artificially lowered by their conduct." *Id.* ¶ 14.  The Complaint states: "At the beginning of the Fraud Period, Defendants owned approximately 18 million shares of Lyris stock, which traded from $0.75 to $1.75 per share. . . .  By the end of the Fraud Period, Defendants collectively owned more than 100 million shares[] and had bought the additional 60 million shares for, generally, prices at approximately 10.5 to 33 cents per share." *Id.* ¶ 24.

According to plaintiffs, defendants executed their fraudulent scheme to gain control of Lyris through "a variety of illegal and manipulative means." *Id.* ¶¶ 14, 25.  A summary of the allegations follows.

*Market Manipulation*: The Complaint alleges that Blair, directly or indirectly, executed manipulative stock trades intended to depress the price of Lyris stock, which involved "hitting the bid" and "hitting the ask."  Compl. ¶¶ 202-12, 221-25.  "Hitting the bid" involves selling

shares immediately upon market opening, at the best available "bid" price, *i.e.*, the highest price that an investor is offering to pay at that time.  *Id.* ¶¶ 221-23; *see* NASDAQ.com Glossary of Stock Market Terms, Hit the Bid, http://www.nasdaq.com/investing/glossary/h/hit-the-bid ("A dealer who agrees to sell at the bid price quoted by another dealer is said to 'hit' that bid.  Antithesis of take the offer.") (last visited March 10, 2013).  "Hitting the ask" involves buying "a very small amount of stock at the Ask price – a high price."  *Id.* ¶¶ 208, 225; *see* NASDAQ.com Glossary of Stock Market Terms, Take the Offer, http://www.nasdaq.com/investing/glossary/t/take-the-offer ("Buy stock by accepting a floor broker's (listed) or dealer's (OTC) offer at an agreed-upon volume.  Antithesis of hit the bid.") (last visited March 10, 2013).  According to plaintiffs, by repeatedly "hitting the bid" each morning over a period of time, defendants signaled to the market that Lyris stock was an unattractive investment.  *Id.* ¶¶ 204-06, 222.  By "hitting the ask," defendants could "conceal the decline [in Lyris stock price] and manage it over time."  Compl. ¶ 226.[16]

The Burts assert that Blair once allegedly told Burt "that one of the most important things he had learned in his career as a stock trader . . . is 'that the buyers are the sellers and the sellers are the buyers.'"  *Id.* ¶ 213.  According to Burt, Blair "described how traders and investors who want to buy a stock, sell small amounts of it to keep the price low and disguise their buying intentions."  *Id.*  Burt claims that "Blair admitted that he believed that the afternoon trades [identified] by Burt had been 'manipulated.'  But [Blair] denied that he and the Comforts had done it."  *Id.* ¶ 227.

---

[16] To illustrate, the Complaint attaches diagrams of "Square S patterns" from the daily trading of Lyris stock.  *See* Compl. Exhs. 15-17.

By plaintiffs' own estimation, the stock manipulation began during or before mid-2006. In January 2009, Burt sent Bill Comfort "a detailed analysis of the trading of Lyris stock over much of the previous 18 months."  *Id.* ¶ 202; *see* Compl. Exh. 18.  Burt claimed in January 2009 that "the price for the common stock of Lyris . . . has been manipulated lower for at least the past two-and-one-half years by some very clever traders."  Compl. Exh. 18, at 1.  Although Burt "asked the Comfort Defendants and the Board of Directors of Lyris to investigate the manipulative trading in Lyris stock in 2009," Compl. ¶ 237, no investigation was undertaken.  *Id.* ¶ 238.

Plaintiffs allege that the stock manipulation is consistent with the admissions and conduct of the defendants, including Urry, Ty Comfort, and McDonald.  These defendants allegedly indicated that "they do not want other people investing in Lyris stock," *id.* ¶ 230; wanted "to keep the price of Lyris stock low"; did not want "to market Lyris to potential investors other than Defendants"; desired to "squeeze out" other stockholders; and sought to "buy as much of the stock at low prices as possible."  *Id.* ¶ 233.

*Misleading Public Filings*: As discussed more fully, *infra*, § 13(d) of the Exchange Act of 1934 requires any investor or group of investors holding or acquiring beneficial ownership of more than 5% of an issuer's stock to file a "Schedule 13D," disclosing, *inter alia*, any plans with respect to the stock, including any intent to take over the company.  *See* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-101; *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009). The Complaint alleges that, during the Fraud Period, defendants either filed false and misleading Schedule 13Ds that disclaimed any intent to take over Lyris as a group, or failed to file required

Schedule 13Ds.  *See* Compl. ¶¶ 94, 126-27.  Plaintiffs identify the following Schedule 13Ds as false:[17]

> *Ty Comfort*: March 10, 2008; March 19, 2010; April 12, 2010; June 3, 2011, *id.* ¶ 152;
>
> *LDN Stuyvie*: March 10, 2008; March 19, 2010; April 12, 2010; June 3, 2011, *id.* ¶ 156;
>
> *Urry*: April 12, 2010; August 28, 2010; June 8, 2011, *id.* ¶ 161;
>
> *Meudon*: April 12, 2010; August 28, 2010; June 8, 2011, *id.* ¶ 165.

Further, the Complaint alleges that Bill Comfort, Stuyvesant Comfort, Blair, McDonald, Maasberg, and the "Hidden Comfort Entities" failed to file Schedule 13Ds during the Fraud Period, despite being a part of the group.  *See id.* ¶¶ 169-179.

The Complaint also avers that defendants caused Lyris to issue false public filings. Section 14(a) of the Exchange Act of 1934, 15 U.S.C.A. § 78n(a), and Rules 14a-3 and 14a-9 thereunder, 17 C.F.R. §§ 240.14a-3 & 240.14a-9, require an annual "Proxy Statement" to be filed and sent to stockholders.  According to the Complaint, defendants "knowingly caused Lyris to make false statements in each of the Proxy Statements" issued by Lyris between 2008 and 2011, because the Proxy Statements "failed to disclose material information about Defendants' common plans, objectives, understandings, their actions and their ownership of Lyris stock."  *Id.* ¶¶ 187-88; *see* Compl. Exh. 12.  Additionally, plaintiffs allege that, during the Fraud Period, information regarding defendants' accrual of stock was not disclosed in the Company's Form 10-Ks (annual financial reports filed with the SEC, *see* 17 C.F.R. § 240.310) and Form 10-Qs

---

[17] The Schedule 13Ds filed by the defendants are attached as exhibits to the Complaint. Exhibit 8 contains Schedule 13Ds filed by Ty Comfort, beginning January 3, 2003 and ending June 3, 2011.  Exhibit 9 contains Schedule 13Ds filed by LDN Stuyvie on the same dates. Exhibit 10 contains Schedule 13Ds filed by Urry, beginning April 12, 2010 and ending June 7, 2011. Exhibit 11 contains Schedule 13Ds filed by Meudon on the same dates.

(quarterly financial reports filed with the SEC, *see* 17 C.F.R. § 249.308a).  *See* Compl. ¶¶ 190-96.

*Marketing of Lyris*: Plaintiffs allege that defendants failed to market Lyris stock to potential investors.  *Id.* ¶ 231.  They claim that, since "approximately 2005," McDonald "has not presented or marketed Lyris at a single investor conference," *id.* ¶¶ 92, 96, and "Lyris attended zero investor conferences during the Fraud Period," while "Lyris' public company competitors" attended conferences and made presentations to investors.  *Id.* ¶ 73.  McDonald allegedly told Burt that "Stock[s] are sold.  They're not bought."  *Id.* ¶ 97.  Burt understood this to mean that companies must actively market their stock to attract investors.  *Id.*  McDonald also told Burt that if Lyris marketed itself to investors, the price of its stock would increase to more than one dollar per share.  *Id.* ¶ 98.

Additionally, Urry and Ty Comfort admitted that they did not want other people to invest in Lyris.  *Id.* ¶¶ 81, 230.  Ty Comfort directed both Burt and Luis Rivera, Burt's successor as CEO, not to make presentations about Lyris at investor conferences.  *Id.* ¶¶ 73, 81.  Similarly, when a venture capitalist expressed an interest in investing in Lyris, "Urry said that Lyris would not accept equity financing from the venture capitalist and that David Burt should not pursue it." *Id.* ¶¶ 81-82.  According to the Complaint, "Urry said that the way he looks at raising capital for a company like Lyris is to think of Lyris as a very nice house," and that "if you think you can have a nice house to yourself, you do not want roommates."  *Id.* ¶ 82.

*Statements to David Burt*: Plaintiffs allege that defendants misrepresented to Burt that they had no intention of obtaining more Lyris stock.  *See, e.g.*, *id.* ¶ 80.  To illustrate, McDonald allegedly informed Burt that the Comforts did not want to take control of Lyris because, under

IRS tax rules, if the Company experienced a "change in control" it would lose its $180 million "net operating loss" carryforward. *Id.* ¶¶ 49, 80.  In 2009 and 2010, McDonald told Burt "on numerous occasions that Lyris would 'soon' or 'next quarter' begin to market the Company and its stock and that Plaintiffs' 8 million shares would be worth $10 to $16 million or more (i.e., $1.25 to $2 per share or better – which would be in or near the same range as the stock traded before the Defendants' illicit actions – $1.00 to $1.75)." *Id.* ¶ 249.a.

*Accumulation of Lyris Stock*: According to the Complaint, defendants accumulated approximately 87% of Lyris's stock over the course of the Fraud Period at prices below its true value. *Id.* ¶¶ 11, 24.  Several transactions are described in the Complaint, in addition to the sales by plaintiffs.  For example, in April 2010 "Defendants, including Ty Comfort and Urry, arranged to have the Company sell them 18 million shares of Lyris stock for a price equal to 33 cents per share," knowing that the price was "artificially low." *Id.* ¶ 78.  In February 2011, McDonald "bragged" to Burt, stating that he, Maasberg, and "the Comforts" had purchased Lyris stock from Raging Bull Capital for 19 cents per share, even though the stock was "worth more than $1 per share." *Id.* ¶ 15; *see also* ¶¶ 101-02.  In November 2011, "an entity controlled by Ty Comfort" purchased 20 million shares from Lyris directly, for approximately 10.5 cents per share. *Id.* ¶¶ 78-79.

Plaintiffs included as exhibits to the Complaint various public filings by several defendants revealing their individual holdings of Lyris stock at certain times.  For example, a Schedule 13D filed by LDN and Ty Comfort indicated that, as of March 5, 2008, they owned "approximately 41.1% of the outstanding shares" of Lyris's stock.  *See* Compl. Exh. 8 (March 5, 2008 Schedule 13D).  As of May 20, 2011, LDN and Ty Comfort held approximately 48.3% of

Lyris's outstanding shares.  *See id.* (May 20, 2011 Schedule 13D).  A Schedule 13D filed by

Urry and Meudon on April 12, 2010, reflected that they held 6.2% of Lyris's outstanding shares.

*See* Compl. Exh. 9 (Apr. 12, 2010 Schedule 13D).  Additionally, Lyris's proxy statements in

2008 and 2011 represented that Lyris's officers and directors held, collectively, 48.9% of Lyris's

outstanding stock as of December 31, 2007 (including 8.3% owned by Burt), and 54.1% of

Lyris's outstanding stock as of March 31, 2011.  *See* Compl. Exh. 12.

No facts are alleged indicating that any defendants, individually or collectively, misused

their "control" of the Company.  Further, plaintiffs do not allege that the price of Lyris stock has

appreciated since plaintiffs sold their shares.  And, no defendants are alleged to have realized a

profit on their shares of Lyris stock through any transaction.

The "Released Claims"

In March 2007, in connection with Burt's resignation as CEO of Lyris, Burt and Addison

LP entered into an Agreement and Mutual Release (the "Release," SH Exh. 3).  *See* Compl. ¶

257.[18]  It states, in part:

> [Burt] . . . and Addison, hereby generally releases and forever discharges the
> Company Parties from any and all Claims, known or unknown, of any kind and
> every nature whatsoever, and whether or not accrued or matured, which any of
> them may have, arising out of or relating to any transaction, dealing, relationship,
> conduct, act or omission, or any other matters or things occurring or existing at
> any time prior to and including the time of the Closings . . . in all cases arising out
> of or relating to [Burt's] employment by the Company or any subsidiary thereof
> or [Burt's] or Addison's investment in the Company or any subsidiary thereof.

Plaintiffs state: "This Complaint hereby excludes any damages related to Released

Claims as defined in the Settlement Agreement."  Compl. ¶ 257.  However, plaintiffs claim that

---

[18] In ¶ 257 of the Complaint, plaintiffs refer to the document as the "Settlement and
Release Agreement."  I have used the title that actually appears on the document.

"[t]he Fraud Period covers damages incurred by the Plaintiffs after the date of the Settlement Agreement and thereby excludes any Released Claims." *Id.*

## Standard of Review

1. <u>Fed. R. Civ. P. 12(b)(6)</u>

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *see Aschroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

Whether a complaint adequately states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Twombly*, 550 U.S. at 554-55.  Rule 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although a plaintiff need not include "detailed factual allegations," the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555. To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Id.* at 556 (brackets in original) (internal quotation marks omitted).   A complaint is insufficient if it provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.* at 555.

In considering a Rule 12(b)(6) motion, the court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  However, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009).  And, a court "owe[s] no allegiance to 'unwarranted inferences, unreasonable conclusions, or arguments' drawn from those facts." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (quoting *Monroe*, 579 F.3d at 385-86).  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted).

Typically, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion.  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6).  *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). But, under Fed. R. Civ. P. 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion [to a summary judgment motion], or to reject it or simply not consider it." 5C Wright & Miller, Fed. Prac. & Pro. § 1366, at 159 (3d ed. 2004, 2011 Supp.); *see Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).

Generally, if a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are some limited exceptions, however. For instance, the court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted). Thus, I may consider the various exhibits appended to the Complaint, which include, *inter alia*, each of the allegedly false Schedule 13Ds filed by defendants; the Proxy Statements and other public filings made by Lyris; and the Release. Additionally, facts and documents subject to judicial notice may be considered by a court, without converting the motion under Rule 12(d). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle*, 637 F.3d at 466; *see, e.g.*, *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering stock analyst reports cited in complaint);

*Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n. 4 (4th Cir. 2004) (taking judicial notice

of published stock prices).  Furthermore, I may consider the public filings submitted to the SEC

that defendants have included as exhibits, "because 'no serious question as to their authenticity

can exist,'" but "'only to determine *what* the documents stated,' and '*not to prove the truth of

their contents.*'"  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time

Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)) (emphasis in *Roth*).[19]

    2.  Fed. R. Civ. P. 9(b)

Plaintiffs' allegations of fraud implicate the heightened pleading standard under Fed. R.

Civ. P. 9(b).  *Cozzarelli*, 549 F.3d at 629.  It states: "In alleging fraud . . . a party must state with

particularity the circumstances constituting fraud . . . ."  Under the rule, a plaintiff alleging

claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the

false representations, as well as the identity of the person making the misrepresentation and what

he obtained thereby.'"  *United States ex rel. Owens v. First Kuwaiti Gen'l Trading &

Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted); *see also Harrison v.

Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  In other words, "'Rule

9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any

newspaper story.'"  *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation

omitted).

---

[19] In this regard, I note that, in order to refute plaintiffs' allegations, defendants cite to
public filings on a number of occasions for the truth of their contents.  *See, e.g.*, SH Memo at 10
(asserting that Stuyvesant Comfort is not a beneficial owner of Lyris stock) (citing Jan. 10, 2003
Schedule 13D filed by LDN, ECF 33-5); *id.* at 10-11 ("The [LDN Stuyvie] Partnership was
formed to, and is principally engaged in, the business of investing in [Lyris].") (citing ECF 33-
5).  I will not consider these filings for the truth of these assertions.

As the Fourth Circuit has said, Fed. R. Civ. P. 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery.  Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

*Harrison*, 176 F.3d at 784 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).

By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind.  It states, in part:  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'"  *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle Int'l*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).  Thus, "[i]n cases involving concealment or omissions of material facts, . . . meeting Rule 9(b)'s particularity requirement will likely take a different form."  *Piotrowski v. Wells Fargo Bank, N.A.*, Civ. No. DKC 11-3758, 2013 WL 247549 (D. Md. Jan. 22, 2013) (citing *Shaw*, 973 F. Supp. at 552).  And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Harrison*, 176 F.3d at 784.

3.  Private Securities Litigation Reform Act

Although Fed. R. Civ. P. 9(b) already imposes a heightened pleading standard on a plaintiff seeking to bring a claim of fraud, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), sets forth a "special pleading standard" for "certain elements of a securities fraud claim brought under Section 10(b) of the Exchange Act." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 625 (D. Md. 2012).  The PSLRA was enacted to discourage frivolous securities claims by imposing stringent pleading requirements with regard to allegations of securities fraud.  *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 171-72 (4th Cir. 2007); *cf.* H.R. Rep. 104-369, at 31 (1995), *reprinted at* 1995 U.S.C.C.A.N. 730, 730 (criticizing "abusive" practices in securities fraud litigation, including "the routine filing of lawsuits . . . with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action").  In other words, "[t]hrough the '[e]xacting pleading requirements' of the PSLRA, Congress charged courts to be vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation." *Cozzarelli*, 549 F.3d at 623 (quoting *Tellabs*, 551 U.S. at 313).

First, the PSLRA requires that a plaintiff asserting a violation of the federal securities laws based on a false or misleading statement "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, state with particularity *all facts* on which that belief is formed."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  By using the words "all facts," the PSLRA departs from the pleading standard of Fed. R. Civ. P. 8(a).  *See generally Hunter*, 477 F.3d at 170-74.

Ordinarily, "consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery." *Id.* at 170.  As the *Hunter* Court explained, "under the generally applicable notice pleading rules, . . . the court [must] ask whether *any conceivable set of facts* could be proved consistent with the complaint's allegations that would permit relief to be granted." *Id.* at 173.  In contrast, under the PSLRA, a court should evaluate the sufficiency of the claim by "assum[ing] that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Id.* at 171.  The standard is "whether the complaint states *sufficient facts* to permit a *reasonable* person to find that . . . the defendant made a false or misleading statement." *Id.* at 173 (emphasis in original).  Thus, "[i]f the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element." *Id.* at 174 (citing *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)) (emphasis in *Hunter*).

Under the PSLRA, a complaint must "specif[y] the statements alleged to have been misleading and the reasons why they were misleading." *Id.* at 174.  And, the facts alleged must also "support a reasonable belief that the statements were in fact misleading." *Id.* at 175.  The Fourth Circuit has explained, *id.* at 174, that applying this standard

> necessarily entails a case-by-case assessment of the complaint as a whole.  [A court] will consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading.

Second, the PSLRA requires that "in any private action . . . in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission . . . , state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  The PSLRA requires a showing that each defendant—or, in the case of a corporate defendant, at least one authorized agent of the corporation—acted "intentionally or with 'severe recklessness.'"  *Hunter*, 477 F.3d at 184 (citation omitted); *see Cozarelli*, 549 F.3d at 623.  A "strong inference" under the PSLRA arises "'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 131 S. Ct. 1309, 1324 (2011) (quoting *Tellabs*, 551 U.S. at 323).  Reviewing "'all the allegations holistically,'" a court must therefore "take into account 'plausible opposing inferences.'"  *Matrixx*, 131 S. Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 323, 326).  Allegations supporting the presence of a motive are relevant, but not dispositive.  *Matrixx*, 131 S. Ct. at 1324 (citing *Tellabs*, 551 U.S. at 325).

Notably, the PSLRA does not allow for "group pleading."  Rather, plaintiffs "must allege facts supporting a strong inference of scienter as to *each* defendant."  *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009) (emphasis added); *see Lefkoe v. Jos. A. Bank Clothiers*, Civil No. WMN-06-1892, 2008 WL 7275126, at *6 (D. Md. May 13, 2008) ("[T]he Fourth Circuit has rejected group pleading under the PSLRA . . . ."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 234, 370 (D. Md. 2004) (rejecting "group pleading" doctrine as "inconsistent with particularity and specificity required by the PSLRA and Rule

9(b)").   Additionally, "specific statements must be attributed to specific individuals."   *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 960 (D. Md. 1995).   And, the allegations must show "how the individual Defendants were involved in any alleged schemes . . . or, assuming such . . . scheme[s] existed, how each individual Defendant knew of the alleged fraud."   *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 573 (D. Md. 2005); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) ("[U]nder the [PSLRA], we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute.").

If a complaint does not meet these pleading requirements, the PSLRA provides that a district court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).   However, the PSLRA does not mandate dismissal with prejudice.

## Discussion

### I.        Count One: Section 10(b) and Rule 10b-5

In Count One, plaintiffs assert claims for violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

Section 10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).   Section 10(b) is implemented by way of Rule 10b-5, 17 C.F.R. § 240.10b-5.   *See Matrix*, 576 F.3d at 181.   Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

 "Section 10(b) affords, by implication, a right of action to securities purchasers or sellers injured by its violation."  *Matrix*, 576 F.3d at 181 (citing *Tellabs*, 551 U.S. at 318).   The traditional elements of a private § 10(b) action, when based on a misrepresentation or omission, are:

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission).

*Matrix*, 576 F.3d at 181 (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008)) (emphasis in *Matrix* omitted); *see Katyle*, 637 F.3d at 466 n.1.   As indicated, the PSLRA's heightened pleading standards apply to the first two elements of such a claim.  *See In re Mun. Mortg. & Equity*, 876 F. Supp. 2d at 625-26.  The remaining elements of a securities claim sounding in fraud are governed by Fed. R. Civ. P. 9(b).  *Cozzarelli*, 549 F.3d at 629; *see Katyle*, 637 F.3d at 471 & n.5 (applying Rule 9 to element of loss causation).

Although the language of Rule 10b-5(b) requires an affirmative misrepresentation or an omission, a plaintiff is "not so restricted" when pleading a claim under Rule 10b-5(a) or 10b-5(c), which, by their terms, encompass any "device, scheme or artifice to defraud" or fraudulent "act, practice course of business." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128,

153 (1972); *see In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 372 (D. Md. 2004).  Thus, "[i]t is apparent from Rule 10b-5's language and the case law interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004) (citing, *inter alia*, *Affiliated Ute*, 406 U.S. at 152-53; *S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002)).  Still, such claims "must include some element of deception." *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 245 (4th Cir. 1988).

Accordingly, the elements of a claim asserted under Rule 10b-5 differ, depending on whether the claim is premised on a defendant's course of manipulative conduct under 10b-5(a) or (c), as opposed to a specific misrepresentation or omission under 10b-5(b).  In a claim based on manipulative conduct under 10b-5(a) and (c), the elements are as follows:

> [P]laintiffs must plead that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendants' deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter."

*In re Royal Ahold*, 351 F. Supp. 2d at 372 (quoting *In re Global Crossing*, 322 F. Supp. 2d at 335).  Claims under Rules 10b-5(a) and (c), like claims under Rule 10b-5(b), "are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA[] and, as a result, the plaintiffs must specify, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *In re Royal Ahold*, 351 F. Supp. 2d at 372 (footnote omitted) (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y.1997)).

In essence, plaintiffs claim that, in violation of § 10(b) and Rule 10b-5(b), defendants made misrepresentations and/or omissions in Schedule 13Ds, and to Burt, including that they were not acting as a group with the intent of taking control of Lyris.  Moreover, they allege that defendants engaged in a fraudulent scheme to obtain control of Lyris, by depressing its stock price, and to avoid payment of a control premium, in violation of § 10(b) and Rules 10b-5(a) and 10b-5(c).  *See* Opp. at 22-24.  Defendants argue that: (1) under the PSLRA, plaintiffs have not alleged sufficient facts to support a reasonable belief that defendants made any actionable misrepresentations or omissions, or that defendants engaged in the alleged fraudulent scheme; (2) under the PSLRA, plaintiffs have not alleged facts sufficient to support a "strong inference" that each defendant acted with the requisite scienter; (3) plaintiffs have not adequately pleaded reliance; and (4) plaintiffs cannot show loss causation.

    1.  *Alleged Violations of Rule 10b-5*

        a.  Rule 10b-5(b): Material Misrepresentation or Omission

To establish their claims under § 10(b) and Rule 10b-5(b), plaintiffs rely on defendants' alleged misrepresentations and/or omissions in public filings required under § 13(d) of the Exchange Act of 1934,[20] 15 U.S.C. § 78m(d)(1), and directly to Burt, denying that they intended to take over the Company.  *See generally* Opp. at 24-33.  The centerpiece of these claims is the contention that defendants acted in concert, and pursuant to an agreement, to secretly obtain control of Lyris.  In my view, plaintiffs have not satisfied the stringent requirements of the PSLRA in regard to a claim of fraud based on misrepresentations and omissions.

---

[20] Although the Complaint lists other allegedly false filings as predicates for violations of § 10(b) and Rule 10b-5, the parties concentrate their arguments on the Schedule 13Ds for purposes of Count I.  *See* SH Memo at 20; O&D Memo at 18-19; Opp. at 28-33.

The Williams Act amended the Securities Exchange Act of 1934 to add § 13(d). *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 51 & n.1 (1975).  The statute requires certain disclosures, such as the filing of a Schedule 13D, by "any person" who "is directly or indirectly a beneficial owner" of more than 5% of the securities of an issuer.  15 U.S.C. § 78m(d)(1).  Under the Williams Act and its implementing rules, 17 C.F.R. § 240.13d-101, a Schedule 13D

> "requires the filer to (1) state the purpose of the acquisition of the covered securities, including any purpose to acquire control and (2) certain specifically listed 'plans or proposals' which relate to or would result in (a) the acquisition or disposition of additional shares; (b) any change in the board of directors or management; or (c) any material change in the business or corporate structure of the issuer."

*Vladimir*, 606 F. Supp. 2d at 491 (quoting *Rosen v. Brookhaven Capital Mgmt. Co., Ltd.*, 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000)).  Under SEC regulations, "[t]he term 'control' . . .  means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2.

Although the Williams Act does not create a private right of action, however. Nevertheless, the failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b-5(b).  *Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995); *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009).  If a duty to disclose was imposed under the Williams Act, the failure to file or disclose information in a Schedule 13D is actionable.  *Vladimir*, 606 F. Supp. 2d at 491 ("As with any alleged 10b-5 violation, the touchstone is the existence of a duty to disclose.") (citing *Azurite*, 52 F.3d at 18).

Schedule 13D's disclosure obligations are triggered by a person's initial acquisition of beneficial ownership of more than 5% of an issuer's securities, in which case a Schedule 13D

must be filed within 10 days of the acquisition.  15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1(a).

If a person already holds beneficial ownership of more than 5% of an issuer's securities, an

amended Schedule 13D must be filed "promptly" upon any material change in the purpose of

ownership, per 17 C.F.R. § 240.13d-2(a).   Disclosure is intended "to insure that public

shareholders who are confronted with a cash tender offer for their stock will not be required to

respond without adequate information regarding the qualifications and intentions of the offering

party."  *Rondeau*, 422 U.S. at 59; *see Mates*, 53 F. Supp. 2d at 823 (citing *Piper v. Chris-Craft*

*Indus., Inc.*, 430 U.S. 1, 26 (1977)).

      The disclosure obligations imposed by the Williams Act extend to both individual

investors and "groups."   "[A]ny person" under the Williams Act is defined to include "two or

more persons act[ing] as a partnership, limited partnership, syndicate, or other group for the

purpose of acquiring, holding, or disposing of securities of an issuer."  15 U.S.C. § 78m(d)(3).

This "prevent[s] a group of persons who seek to pool their voting or other interests in the

securities of an issuer from evading the provision of the statute because no one individual owns

more than [5 percent] of the securities."  H.R. Rep. No. 90-1711 (1968), *reprinted in* 1968

U.S.C.C.A.N. 2811, 2814.  And, under SEC regulations, "beneficial ownership" of the securities

held by any group member will be attributed to all members of the group.  17 C.F.R. § 240.13d-

5(b)(1) ("When two or more persons agree to act together . . . , the group formed thereby shall be

deemed to have acquired beneficial ownership . . . as of the date of such agreement, of all equity

securities of that issuer beneficially owned by any such persons.").  Consequently, the Williams

Act "requires a group that has acquired, directly or indirectly, beneficial ownership of more than

five percent of a class of registered equity securities, to file a [Schedule] 13D . . . with the issuer,

with the exchanges on which the security is traded, and with the SEC, disclosing, among other things, *the identity of its members and the purpose of its acquisition*." *Hallowood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617 (2d Cir. 2002) (citing 15 U.S.C. § 78m(d)(3)) (emphasis added); *see, e.g.*, *Rondeau*, 422 U.S. at 51-53 & n.1; *Vladimir*, 606 F. Supp. 2d at 491.

As noted, Ty Comfort, Urry, LDN, and Meudon were the only defendants to file Schedule 13Ds during the Fraud Period.  Plaintiffs allege that each defendant in this case is liable under § 10(b), either for filing a Schedule 13D without disclosing membership in a "group" seeking to take control of Lyris, or by failing altogether to file a Schedule 13D, despite being part of such a "group."  Defendants counter that plaintiffs "fail to properly allege the existence of any 'common objectives or understandings' or any 'group,' and [therefore] their Count I claims must be dismissed."  SH Motion at 21; *accord* O&D Motion at 21-22.  In their Opposition, plaintiffs respond, at 28: "[T]he only question for purposes of determining whether Count One adequately alleges defendants filed false Schedule 13Ds is whether it adequately alleges that they acted as a group in acquiring an 87% stake in Lyris, such that they were required to disclose their plans to control the company."

The existence of personal or professional relationships between individuals does not establish a "group" under § 13(d).  Rather, "'the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective.'"  *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007) (quoting *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982)).  Put another way, group members must "'agree[] to act together for the purpose of acquiring, holding or disposing of'" an issuer's securities. *Morales v. Quintel Entertainment,*

*Inc.*, 249 F.3d 115, 124 (2d Cir. 2001) (quoting 17 C.F.R. § 240.13d-5(b)(1)); *see Corenco Corp. v. Schiavone & Sons*, 488 F.2d 207, 217 (2d Cir. 1973) ("[A]bsent an agreement between them a group would not exist.").

Because the existence of a group requires an agreement, "'there must be evidence that indicate[s] an intention to act in concert over and above the prior and continuing relationships between the various parties.'" *Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988) (quoting *K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756, 765 (D. Colo. 1983)). To allege the existence of an agreement, it is not enough that the defendants are "related through blood, marriage, business or social relationships." *Bixby*, 708 F. Supp. at 1083; *accord Texasgulf, Inc. v. Can. Dev. Corp.*, 366 F. Sup. 374, 403 (S.D. Tex. 1974) ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person.   There must be agreement to act in concert."). Moreover, the existence of a group will not be inferred solely because defendants explored business dealings or exchanged information related to the issuer.  *See Vladimir*, 606 F. Supp. 2d at 493-94 (""[T]he fact that [the CEO] may have been in constant contact with Bioenvision board members is neither unusual nor inappropriate—board members of a public company may speak with officers of the company about any number of topics pertaining to that company's business."); *K-N Energy*, 607 F. Supp. at 767 (finding that sharing of information regarding issuer, among alleged members of group, "provides little support" for claim that alleged group members "agreed to act in concert with others to acquire [issuer's] stock").

To be sure, a group need not formally memorialize its objective in writing, and direct evidence, let alone a "smoking gun," is not required.  *Hallwood*, 286 F.3d at 617.  The existence

of a group may be shown by circumstantial evidence, including "prior relationships and trading patterns," "discussions between the defendants," and evidence of "a particular *modus operandi*." *Id.* at 617-18. Courts have also recognized that "[m]atters of group purpose are . . . difficult to discern, for intent may not always be fully formed, but may mature and manifest at any point in a continuum." *Rosen*, 113 F. Supp. 2d at 632. To this end, a plaintiff need not allege "every term of a 13D filer's plan or purpose." *Vladimir*, 606 F. Supp. 2d at 491. At the motion to dismiss stage, "courts may find that 'purpose and intent may not be divined without some investigation and discovery.'" *Id.* (quoting *Rosen*, 113 F. Supp. 2d at 632).

Nevertheless, the alleged plan or purpose must be "more definite than vaguely formed thoughts for the future," *Azurite*, 52 F.3d at 18. In other words, a Schedule 13D does not require disclosure of "'preliminary and tentative' discussions." *Vladimir*, 606 F. Supp. 2d at 491 (quoting *Todd Shipyards Corp. v. Madison Fund, Inc.*, 547 F. Supp. 1383, 1389 (S.D.N.Y. 1982)). Indeed, "'[i]t would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them.'" *Vladimir*, 606 F. Supp. 2d at 491 (quoting *Elec. Specialty Co. v. Int'l Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969)) (alteration in *Vladimir*); *see E.ON AG v. Acciona, S.A.*, No. 06 Civ. 8720 (DLC), 2007 WL 316874, at *8 (S.D.N.Y. Feb. 5, 2007) ("[T]he disclosure of 'contingent or indefinite' plans may prove misleading to investors.") (quoting *Chromalloy Am. Corp. v. Sun Chem. Corp.*, 611 F.2d 240, 248 (2d Cir. 1979)). Rather, the duty to disclose arises "if the shareholder had a purpose of acquiring control and had the requisite intent, defined as 'a determination [to acquire control] made with an element of resolve.'" *Vladimir*, 606 F. Supp. 2d at 491 (quoting *Azurite*, 52 F.3d at 18) (alteration in *Vladimir*).

In their Opposition, at 28-29, plaintiffs highlight the following facts in support of their claim that they have adequately pleaded that defendants formed a group to take control of Lyris:

(1) Members of the Comfort family, each of whom owns Lyris stock, held daily conference calls "to discuss, and make decisions on, managing their considerable investments," *see* Compl. ¶ 143;

(2) Ty Comfort stated the he, Stuyvesant Comfort, and Urry jointly manage their investments, *see id.* ¶ 142;

(3) Ty Comfort and Stuyvesant Comfort are both partners in LDN Stuyvie, the largest stockholder of Lyris, and the third partner in LDN Stuyvie is their sister, Nathalie Comfort Urry, who is Urry's wife, *id.* ¶ 44;

(4) Urry is a partner of Meudon, a major stockholder in Lyris, and holds "sole voting power" with respect to Lyris shares owned by Meudon, *id.* ¶ 45; Compl. Exh. 11;

(5) Bill Comfort allegedly owns more than 5% of the stock of Lyris, which Burt believes is held through hidden offshore entities, *see* Compl. ¶¶ 38, 61-62;

(6) In or about February 2011, McDonald and Maasberg both bought Lyris stock from Raging Bull at 19 cents per share, a price 80% less than what defendants considered the shares to be worth, *id.* ¶ 6; Compl. Exh. 6;

(7) In or about February 2011, McDonald told Burt that "the Comforts control 80%" of Lyris stock, Compl. ¶¶ 64.vi, 170; and

(8) "On a number of occasions from April 2007 until May 2011," McDonald told Burt that Lyris stock was worth more than the price at which it was trading, and would rise

to $1 per share or more if marketed to investors, *id.* ¶¶ 64.a.ix-64.a.x.[21]

In my view, plaintiffs' allegations fail to meet the stringent pleading standards imposed under the PSLRA.   Assuming, as I must, that the Complaint pleads "all facts" known to plaintiffs, the facts alleged are not sufficient to permit a "reasonable belief" that defendants acted as a group to take control of Lyris, such that they were obligated to disclose the group's existence and its purpose under the Williams Act.  *See Hunter*, *supra*, 477 F.3d at 170-75 (setting forth PSLRA's "all facts" standard of review).   A careful review of the Complaint reveals little more than surmise and innuendo based on defendants' close family and business connections.

*Vladimir*, 606 F. Supp. 2d 473, is instructive.  In that case, plaintiffs were shareholders in Bioenvision who sold their securities in the company prior to a merger with Genzyme, unaware that a merger was about to occur.  *See id.* at 482-83.   Plaintiffs sued several of the company's officers and directors, along with the company's largest shareholder—a fund operating under the name "Perseus-Soros"—alleging securities fraud.  *See id.*   They claimed, *inter alia*, that Perseus-Soros had entered into a secret agreement with directors of both Bioenvision and Genzyme to effectuate the merger, but had intentionally failed to disclose its plan in a Schedule 13D prior to the merger announcement.  *See id.* at 491-92.

The plaintiffs relied on circumstantial evidence of an agreement.   In particular, the complaint alleged that, at a meeting with a Genzyme director, a manager at Perseus-Soros had said, "it may be an appropriate time to discuss an acquisition of [Bioenvision] and that Genzyme

---

[21] Plaintiffs also rely on the fact that in 1998 Ty Comfort, Stuyvesant Comfort, and Blair disclosed that they were acting as a group in attempting to take control of the Sybron Chemical Company.   *See* Opp. at 22 (citing Compl. ¶ 128).   This fact is not probative of whether defendants formed a group in this instance.

should take the matter up directly with the Company." *Id.* at 492. Finding the conversation "at best, preliminary and tentative," the court determined that it did not "evidence a definitive plan on Perseus-Soros's part to work for a change in control of the company." *Id.* The Complaint also alleged that "Bioenvision board members with Perseus-Soros connections were in constant contact with [the CEO of Bioenvision]." *Id.* Finding this allegation insufficient, the court explained: "[T]he fact that [the CEO] may have been in constant contact with Bioenvision board members is neither unusual nor inappropriate—board members of a public company may speak with officers of the company about any number of topics pertaining to that company's business." *Id.* In addition, the plaintiffs claimed that, based on an "anonymous source," Perseus-Soros and Genzyme held a secret meeting "where the Perseus-Soros directors 'determined' to accept Genzyme's offer to acquire Bioenvision." *Id.* at 491. Because the court was "unable to determine whether [the] source was in a position to know what he is alleged to [have known], or, in fact, whether or not [the] anonymous source even exists," it declined to credit this allegation. *Id.*

Finally, the plaintiffs alleged that "the Perseus-Soros-connected board members 'insisted' at a secret board meeting that Bioenvision management agree to sell their shares of Bioenvision stock to Genzyme." *Id.* at 492. Although the court recognized that "this allegation does lend itself more than the others to the possibility that the Perseus-Soros-connected board members had decided upon a plan to change control of Bioenvision," it nonetheless found it insufficient. *Id.* at 494. The court reasoned: "[N]one of the Bioenvision director defendants with the alleged connections to Perseus-Soros actually worked for Perseus-Soros. Plaintiffs imply that Perseus-Soros controlled the Bioenvision board through these directors, but they never allege how that

happened."   *Id.*   And, "this allegation d[id] not set forth the contours of any plan," *i.e.*, "'a determination [to acquire control] made with an element of resolve.'"   *Id.* (quoting *Azurite*, 52 F.3d at 18).   Because the plaintiffs "alleged little more than that individuals on the Bioenvision board who may have been controlled by Perseus-Soros encouraged the other directors to take a step that could lead to a merger with Genzyme," the claim was dismissed.   *Vladimir*, 606 F. Supp. 2d at 495.

*Bixby*, *supra*, 708 F. Supp. 1070, is also informative as to the adequacy of the pleading of a  group for purposes of the Williams Act.   In *Bixby*, the plaintiffs had unsuccessfully attempted a takeover of Kansas City Life Insurance Company ("KCL") through a tender offer and a merger proposal.   *Id.* at 1072.   The plaintiffs alleged that four members of the Bixby family, all of whom were significant shareholders of KCL stock, along with members of the KCL board of directors, "engaged in an unlawful, ongoing scheme to entrench management and consolidate majority control of KCL in the hands of the Bixby family."   *Id.*

Plaintiffs had approached a member of the Bixby family, W.E. Bixby, offering to purchase a controlling interest in KCL.   *Id.* at 1073.   W.E. Bixby rejected the offer and told plaintiffs "that his stock was not for sale and that he believed his brother, J.R. Bixby, had no interest in selling his KCL shares."   *Id.* at 1073.   The plaintiffs subsequently proposed to the KCL board the acquisition of KCL through a merger, subject to approval of KCL's directors and stockholders.   *Id.* at 1074.   At a board meeting called by KCL, each of the Bixbys, along with various directors, signed "a unilateral and non-binding 'statement of intention'" advising the board that they had no intention of selling their shares to the plaintiffs.   *Id.*   The plaintiffs claimed that the signing of these statements was evidence of the formation of a group, which

triggered a duty to disclose under the Williams Act.  *Id.*

The plaintiffs claimed, *inter alia*, that the defendants had violated the Williams Act by failing to file a Schedule 13D while operating as a "group" in rejecting plaintiffs' tender offer. *Id.* at 1079-80.  The court rejected the plaintiffs' argument, reasoning that the evidence did not establish that the defendants "were acting in concert when each individually and separately signed a Statement of Intention."  *Id.* at 1083.  In particular, the court found that there was "[n]o evidence of coercion or domination by the Bixbys, or cooperation among the signatories in the submission of the[] signed statements."  *Id.* n.17.  Rather, plaintiffs had relied solely on the "fact that defendants were related through blood, marriage, business or social relationships," *id.* at 1083, which the court found insufficient as to the existence of a group.  *Id.*

As in *Vladimir* and *Bixby*, plaintiffs offer only speculation and surmise—not facts—as to an agreement to take control of Lyris, predicated on the close familial ties among the Comforts and the business relationships of all the defendants.  Although Lyris may well have been a topic of discussion by members of the Comfort family during the alleged conference calls, the Complaint does not indicate when or in what respect Lyris might have featured in any such discussions.  Moreover, such conference calls would hardly be surprising or inappropriate, given the common professional interests, the respective positions at or holdings of Lyris, and the family relationships.  *See Vladimir*, *supra*, 606 F. Supp. 2d at 492; *K-N Energy*, 607 F. Supp. at 767.  Further, although Ty Comfort allegedly told Burt that some of the Comforts jointly managed their investments, the Complaint makes clear that the Comforts hold significant investments outside of Lyris.  *See* Compl. ¶ 143 ("The Comforts are believed to have more than one billion dollars in investable assets.  All of them are professional investors.").  Joint

management of investments does not warrant the belief that defendants orchestrated a plan to gain control of Lyris; if one hears hoofbeats, it is more likely horses than zebras.

Plaintiffs also place weight on McDonald's "admission" in February 2011 that "the Comforts control 80% of Lyris stock." Compl. ¶ 10; *see* Opp. at 29. But, this statement does not, by itself, evince an agreement. McDonald's statement could readily mean that the Comforts, while acting individually, collectively owned 80 percent of Lyris's stock. Ultimately, none of these facts "set forth the contours of any plan," let alone demonstrate that the defendants, acting together, held "'a determination [to acquire control] made with an element of resolve.'" *Vladimir*, 606 F. Supp. 2d at 492-94 (quoting *Azurite*, 52 F.3d at 18).

As plaintiffs observe, "control" may be exercised with as little as 20 percent of a company's stock. *See* Opp. at 27 (citing *E.ON AG*, 2007 WL 316874, at *8). Since February 2007, Ty Comfort and LDN have held over 30 percent of Lyris's stock, *see* Compl. Exh. 8 (Feb. 6, 2007 Schedule 13D filed by Ty Comfort and LDN), and in June 2008, defendants collectively acquired a majority of Lyris's stock. *See* Compl. Exh. 6; *cf. Hunter*, *supra*, 477 F.3d at 184-85 ("The complaint does not allege that defendants [to insider trading claim] timed their sales to profit from any particular disclosures, and defendants' sales generally occurred at prices that were not especially high for the class period."). Yet, plaintiffs have not alleged any facts showing defendants acted in concert with respect to their ownership of shares of Lyris.

In the context of the analysis, it is also salient that it was the Burts who sought out defendants to buy their stock; there is no allegation that defendants actively pursued the Burts to purchase their Lyris stock. Further, not all of the defendants increased their holdings in Lyris during the Fraud Period. For example, there are no facts alleged to support plaintiffs' belief that

Bill Comfort purchased Lyris stock during the Fraud Period. Additionally, plaintiffs do not allege that Stuyvesant Comfort participated in any Lyris stock transaction. Nor have plaintiffs included any substantive allegations about the Hidden Comfort Entities. And, that the other defendants purchased Lyris stock is not surprising, given their positions, their financial strength, or their alleged belief that Lyris is a valuable company. Indeed, LDN was formed for the purpose of investing in Lyris. *See* Compl. Exh. 8, LDN Schedule 13D, Jan. 3, 2003, at 5.

Equally important, the Complaint does not allege facts to show that the remaining defendants joined or participated in any alleged plan. For example, Maasberg did not become CEO of Lyris until 2010, well into the Fraud Period, and there are no facts alleged as to when or how he joined the "group." Rather, plaintiffs allege, in a wholly conclusory manner, that Maasberg "agreed with the other defendants" not to market Lyris to other investors, without specifying which defendants, or the basis for that belief. Compl. ¶ 88. Even if marketing Lyris would have improved its stock price, Maasberg's decision as CEO not to market Lyris does not show that he joined a group to take over the Company.

Moreover, even if the failure to market Lyris stock constitutes a breach of the O&D Defendants' fiduciary duties, it is not actionable as a securities fraud claim, absent "deception, misrepresentation or nondisclosure." *Sante Fe Indus. v. Green*, 430 U.S. 462, 476 (1977); *see also United States v. O'Hagan*, 521 U.S. 642, 656 (1997) ("[Section] 10(b) is not an all-purpose breach of fiduciary duty ban; rather, it trains on conduct involving manipulation or deception."); *e.g., Merino Calenti v. Boto*, 24 F.3d 335, 338 (1st Cir. 1994) (declining to recognize a § 10(b) claim for directors' breach of fiduciary duties in failing to notify shareholders of their "relative

ownership of preferred and common stock," because "the Court has expressly refused to extend section 10(b) to causes of action based on breaches of state law corporate fiduciary duties").

With regard to Blair, who is alleged to have been Bill Comfort's stockbroker, there is no allegation, beyond that relationship, his position as a Lyris director, and his status as an "expert" trader, to suggest his participation in a "group."  Although plaintiffs assert, "upon information and belief," that Blair "either directly or indirectly" executed manipulative trades in Lyris stock, Compl. ¶ 221, the PSLRA requires that allegations made upon information and belief must be supported by "all facts."   15 U.S.C. § 78u-4(b)(1).   Plaintiffs have offered *no* facts that reasonably support their allegation, other than the claim that Blair once described to Burt generally a way of market manipulation, and agreed that some of the trades of Lyris stock appeared to be manipulative.  However, there is no allegation that Blair admitted that he or any of the defendants were the ones who engaged in the manipulation.  To the contrary, plaintiffs indicate that Blair denied such allegations.  *See* Compl. ¶ 227.  Blair's discussion of market manipulation with Burt does not indicate that he was part of a group seeking to control Lyris, or that he (or any of the defendants) was responsible for the alleged manipulative trading.

McDonald served as Director of Investor Relations.  That McDonald "bragged" to Burt that he and other defendants had purchased Lyris stock for only $0.19 per share, and claimed that Lyris stock was worth more than $1.00 per share, Compl. ¶¶ 15, 64.a.ix-64.a.x, warrants nothing more than the conclusion that McDonald believed Lyris stock to be undervalued.  It does not reasonably lead to an inference that McDonald acted in concert with the other defendants to depress the price of Lyris stock and take control of the Company.  Nor does defendants' belief as to Lyris's value demonstrate that Lyris stock was, in fact, worth $1 or more per share.  As the

Fourth Circuit has explained, "[s]peculation and conjecture, even a well-educated guess, in the context of market prognostication does not suffice to establish a fact." *Katyle*, 637 F.3d at 477.

Similarly, that Lyris held a valuable asset—the NOL—does not warrant an inference that defendants secretly planned to control Lyris because of the NOL. Many companies have valuable assets. This hardly suggests that the officers, directors, and shareholders were engaged in fraud.

As plaintiffs observe, "matters of group purpose are . . . difficult to discern, for intent may not always be fully formed, but may mature and manifest at any point in a continuum." *Rosen*, 113 F. Supp. 2d at 632. But, based on the PSLRA's "all facts" standard, I am unable to conclude that the Complaint contains sufficient facts to support a "reasonable belief" that the defendants, or some subset of them, formed a group to gain control of Lyris. In essence, plaintiffs offer *ex post facto* speculation that because several of the defendants increased their holdings of Lyris stock during the Fraud Period, they did so according to an agreement that involved all of the defendants. The PSLRA requires more than "pleading fraud by hindsight." *Hunter*, 477 F.3d at 183. There is no basis to infer that defendants made material misrepresentations or omissions regarding a plan to take control of Lyris.

### b. Claims under 10b-5(a) and 10b-5(c)

Plaintiffs contend that they also state viable claims under Rules 10b-5(a) and 10b-5(c), in that defendants engaged in market manipulation and orchestrated a fraudulent scheme to take control of Lyris. *See* Opp. at 33-34. These claims are largely duplicative of plaintiffs' claims under Rule 10b-5(b). For similar reasons, they have not met the stringent pleading requirements of the PSLRA.

i.      *Market Manipulation*

As discussed, plaintiffs allege that "defendants," and, in particular, Blair, engaged in market manipulation.  Market manipulation "refers generally to practices . . . that are intended to mislead investors by artificially affecting market activity."  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *accord Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (characterizing market manipulation as "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities").

Plaintiffs claim, on information and belief, that Blair "hit the bid" at market opening, and "hit the ask" at market closing, in order to conceal the group's intentions of buying Lyris stock, to drive away other investors, and to depress the price of Lyris stock.  *See* Compl. ¶¶ 199-229. In my view, the facts alleged are not sufficient to support a reasonable belief that defendants were involved in the alleged market manipulation.

As noted, the only factual support offered by plaintiffs for their belief stems from Blair's expertise as a stockholder, his description to Burt of manipulative trades, and his agreement that the trades identified by Burt appeared to be manipulative.  Based on these facts, plaintiffs claim that Blair, either directly or indirectly, executed the manipulative trading on behalf of defendants, *see* Compl. ¶¶ 202-05, 221-25, and they then attribute his conduct to the other defendants as a "logical conclusion."  *Id.* ¶ 64.iii.  For the reasons explained earlier, these averments fall short of the PSLRA's pleading standards.  Indeed, even if plaintiffs had adequately pleaded the existence of a "group" under the Williams Act, the facts alleged would not permit a reasonable belief that Blair or the other defendants were responsible for these trades.  *See In re Royal Ahold*, 351 F. Supp. 2d at 372; *cf. In re Medimmune*, 873 F.3d at 960-61 ("Comparable specificity is required

where, as here, Plaintiffs attempt to fix liability on every Defendant for every statement made by every other Defendant . . . .").

   *ii.*   *Scheme to take over Lyris*

Plaintiffs also allege that defendants engaged in a scheme to assume control of Lyris. This claim essentially repeats the premise for plaintiffs' claims under Rule 10b-5(b), as well as the premise for plaintiffs' market manipulation claim.  Having determined that plaintiffs did not adequately allege the formation of a group to take control of Lyris, there is no basis to find that they participated in a broader fraudulent scheme.

*  *  *

 Accordingly, plaintiffs have failed to state a claim under Rule 10b-5.  Therefore, I will dismiss Count I, with leave to amend.  Because plaintiffs may attempt to amend their Complaint, I will address some (but not all) of defendants' remaining arguments as to Count I, in the interest of efficiency and judicial economy.  By doing so, it may enable plaintiffs to cure other defects in pleading, and avoid renewal of defendants' motions, thereby facilitating the progress of the case.

 *2. Scienter*

Defendants challenge the sufficiency of the allegations as to scienter.  Plaintiffs insist that they have adequately alleged the element of scienter because, "if defendants planned to seize control of Lyris, they acted knowingly when they denied – or failed to disclose – that they had such a plan."  Opp. at 35.

Under the PSLRA, scienter requires "'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Cozzarelli*, 549 F.3d at 623.  As

discussed, the "strong inference" standard is met if "'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Matrix*, 576 F.3d at 182 (quoting *Tellabs*, 551 U.S. at 324).

I concluded that plaintiffs failed adequately to allege the existence of a "group" with a plan to take over Lyris. Therefore, plaintiffs' contention as to scienter necessarily fails, because it is premised on the existence of a group plan. *See Hunter*, 477 F.3d at 184 (agreeing with district court that "[b]ecause no misleading statement or omission was sufficiently alleged, the defendants could not have made misrepresentations or omissions intentionally or with sufficient recklessness"). In any event, as to each defendant, the facts do not show how each one acted intentionally or recklessly with respect to the alleged manipulative trading or marketing of Lyris stock. *See In re Acterna Corp.*, 378 F. Supp. 2d at 574; *see Lefkoe*, 2008 WL 7275126, at *6; *In re Royal Ahold*, 351 F. Supp. 2d at 369. Therefore, the Complaint does not offer a sufficient factual basis to support a reasonable belief that defendants possessed the requisite scienter.

*3. Reliance*

Defendants argue that plaintiffs did not rely on any misrepresentations or omissions in selling Lyris stock. *See* SH Memo at 44-46; O&D Reply at 12 n.6. Plaintiffs respond that reliance is presumed at the pleadings stage, where the alleged fraud consists primarily of omissions. *See* Opp. at 40. And, plaintiffs assert that, even if reliance is not presumed, they have met their burden of notice pleading. *Id.*

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge*, *supra*, 552 U.S. at 159. A showing of reliance "ensures that there is a proper 'connection between a defendant's misrepresentation and a

plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, ___ U.S. ___, 131 S. Ct. 2179, 2184 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).   Reliance is often referred to as "transaction causation," because it concerns "the investor's decision to engage in the transaction" in which the alleged loss was suffered.  *Erica P. John Fund*, 131 S. Ct. at 2186.

> The Supreme Court has said, *id.* at 2185:

> The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific representation.  In that situation, the plaintiff plainly would have relied on the company's deceptive conduct.  A plaintiff unaware of the relevant statement, on the other hand, could not establish reliance on that basis.

> However, in certain cases, a plaintiff need not affirmatively show—or plead—reliance.

As the Supreme Court explained in *Stoneridge*, 552 U.S. at 159 (citations omitted):

> We have found a rebuttable presumption of reliance in two different circumstances.  First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance.  Second, under the fraud-on-the-market theory, reliance is presumed when the statements at issue become public.  The public information is reflected in the market price of the security.  Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement.

Here, plaintiffs rely on the first presumption, initially set forth in *Affiliated Ute*, *supra*, 406 U.S. at 153.  In *Affiliated Ute*, the Supreme Court held that in cases involving "*primarily* a failure to disclose, positive proof of reliance is not a prerequisite to recovery."  *Id.* (emphasis added).  Rather, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [the] decision."  *Id.* at 153-54.  In such a case, a plaintiff need only show an "obligation to disclose and [a] withholding of a material fact."  *Id.* at 154.  The Court in *Basic* reasoned: "Requiring a plaintiff to show a speculative state of facts, *i.e.*, how he would have acted if omitted material information

had been disclosed, or if the misrepresentation had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Basic*, 485 U.S. at 245 (internal citations omitted).

The reach of the *Affiliated Ute* presumption is somewhat uncertain in cases involving both misrepresentations and omissions. For example, as defendants observe, the Fourth Circuit has instructed that "[t]he *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b–5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure as in *Affiliated Ute*." *Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir. 1993). But, based upon an examination of the cases cited by the Fourth Circuit in *Cox*, Judge J. Frederick Motz has explained: "[A] more precise and accurate statement of the rule is that the *Affiliated Ute* presumption applies only where a plaintiff's claim is *primarily* based upon material omissions." *In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d 845, 863-64 (D. Md. 2005) (citing *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 756 (11th Cir. 1984) *and Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987)) (emphasis in *In re Mut. Funds Inv. Litig.*); *see* Bromberg & Lowenfels on Securities Fraud § 7:431, at 7-881 (2d ed. 2007) (stating that the *Cox* decision "rests in part on a misconstruction"). Accordingly, "[a] court must . . . analytically characterize a 10b-5 action as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case." *Finkel*, 817 F.2d at 359; *see also Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("We must therefore analyze the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations in order to determine whether the *Affiliated Ute* presumption should apply.").

Plaintiffs insist that their claims are "based primarily on material omissions – namely, defendants' failure to disclose their intent to seize control of Lyris." Opp. at 43 n.17. I agree. Therefore, at this juncture, I am persuaded that the *Affiliated Ute* presumption applies. To be sure, the presumption is rebuttable. *Stoneridge*, 552 U.S. at 159. And, as defendants note, plaintiffs allege that they sold their Lyris stock to defendants to fund medical expenses for Janet Burt, and that David Burt was CEO of Lyris for seven years. These facts may cut against a finding of reliance by a fact finder. *See, e.g.*, *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991) (outlining factors to consider in evaluating justifiable reliance, including sophistication and expertise of plaintiff, access to relevant information, and opportunity to detect the fraud). But, at this stage, I cannot conclude that such facts rebut the *Affiliate Ute* presumption.

### 4. Loss Causation

Under the PSLRA, a plaintiff asserting a claim under § 10(b) bears the burden of proving "loss causation," *i.e.*, "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see Katyle*, 637 F.3d at 465. Reading this provision of the PSLRA in conjunction with Fed. R. Civ. P. 9(b), the Fourth Circuit "requires that a plaintiff, as a precursor to proof, allege loss causation in the complaint 'with sufficient specificity to enable the court to evaluate whether the necessary causal link exists.'" *Katyle*, 637 F.3d at 465-66 (quoting *Hunter*, 477 F.3d at 186). In other words, "the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Katyle*, 637 F.3d at 472 (citing *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004)).

Notably, a plaintiff need only allege facts to "show that the defendant's conduct was a *substantial* cause of its injury; other contributing forces to the loss will not bar recovery under the loss causation requirement." *In re Mun. Mortg. & Equity*, 876 F. Supp. 2d at 645 (citing *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 119 (4th Cir. 2009), *rev'd on other grounds*, *Janus Capital Grp., Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296 (2011)); *see Miller*, 364 F.3d at 232 (explaining that loss causation requires a showing that "defendant's misrepresentation was a *substantial* cause of the loss," not that it was the "sole cause"). But, "'if the [alleged] connection is attenuated . . . a fraud claim will not lie. That is because the loss causation requirement—as with the foreseeability limitation in tort—is intended to fix a legal limit on a person's responsibility, even for wrongful acts.'" *Katyle*, 637 F.3d at 472 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)). In *Miller*, 364 F.3d at 230, the Fourth Circuit explained: "For purposes of liability in a Rule 10b-5 case, a plaintiff's proof of damages proximately caused by the defendant seems to function as a gate-keeping requirement designed to forestall attenuated, and difficult to prove, claims."

Loss causation is a "fact dependent" inquiry, and "the specificity sufficient to plead loss causation" must be evaluated on a case-by-case basis. *Katyle*, 637 F.3d at 471. Stock prices are influenced by a "tangle of factors," including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Consequently, plaintiffs' potential amendment of the Complaint will necessarily affect their theories of loss causation. Therefore, although the parties dispute whether plaintiffs have adequately pleaded loss causation, I decline to resolve their arguments at this juncture.

## II.        Count Three: Section 14(a)

In Count III, plaintiffs allege that defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.154a-9(a),[22] through Lyris's issuance of false or misleading proxy statements.   Section 14(a)-9, provides, at 15 U.S.C. § 78n(a):

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title.

Rule 14a-9, codified at 17 C.F.R. § 240.14a-9(a), applies to misrepresentations or omissions in proxy statements.   It provides, *id.*:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

 "A shareholder establishes a violation of Rule 14a-9, which is promulgated under Section 14(a) of the Securities Exchange Act by establishing: (1) the proxy statement contains a material misrepresentation or omission; (2) the defendants were [at least] negligent; and (3) the proxy was the essential link in completing the transaction in question."   *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 701 (M.D.N.C. 1992); *see Hayes v. Crown Central Petroleum*

---

[22] Although plaintiffs also allege that defendants violated Rule 14a-3, plaintiffs do not advance that contention in their Opposition.  Rather, the parties focus on Rule 14a-9.

*Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam) (listing same elements of § 14(a) claim

under Rule 14a-9).

Under the first element, an omission in a proxy statement is not material unless "there is a

substantial likelihood that a reasonable shareholder would consider it important in deciding how

to vote." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

> [This] standard [] contemplate[s] [] a showing of a substantial likelihood that,
> under all the circumstances, the omitted fact would have assumed actual
> significance in the deliberations of the reasonable shareholder.  Put another way,
> there must be a substantial likelihood that the disclosure of the omitted fact would
> have been viewed by the reasonable investor as having significantly altered the
> 'total mix' of information made available.

*Id.*  Additionally, under the third element, "[t]he complainant must show that he suffered harm

from the infringement of his corporate suffrage rights or from a corporate transaction that was

approved because of inadequate disclosure in a proxy solicitation."  *Ash v. GAF Corp.*, 723 F.2d

1090, 1094 (3d Cir. 1983) (cited with approval in *Allen v. Lloyd's of London*, 94 F.3d 923, 931

(4th Cir. 1996)).

Courts have treated claims under § 14(a) based on a misrepresentation or omission as

subject to the pleading requirements of the PSLRA.  *See, e.g.*, *Cal. Pub. Empls. Ret. Sys. v.*

*Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004); *see also In re JP Morgan Chase Sec. Litig.*,

363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) ("[P]laintiffs' Section 14(a) claim rests on the same

charges of fraudulent conduct as their Section 10(b) claim. . . .  When plaintiffs assert Section

14(a) claims grounded in alleged fraudulent conduct, they are subject to the heightened pleading

requirements [of the PSLRA] even if they disclaim reliance on a fraud theory.") (citations

omitted).  To my knowledge, the Fourth Circuit has not had occasion to address the matter.  But,

this approach comports with the plain language of the PSLRA, which applies "[i]n *any private*

*action arising under this chapter* in which the plaintiff alleges that the defendant . . . made an

untrue statement of a material fact; or  . . . omitted to state a material fact necessarily in order to

make the statements made . . . not misleading."  15 U.S.C. § 78u-4(b)(1) (emphasis added).

Plaintiffs' claims target the proxy statements issued by Lyris in 2008, 2009, 2010, and

2011, which served as the vehicles for the re-elections of Ty Comfort, Urry, and Blair to the

Lyris board of directors.  *See* Opp. at 46 (citing Compl. Exh. 12).  They assert that defendants

caused Lyris to issue false proxy statements that omitted their plan to take over Lyris,

notwithstanding a duty to disclose such a plan in those proxy statements, and that, as a result,

defendants were able to retain their positions on the Lyris board and further their plan to gain

control of Lyris.  *See* Opp. at 45-46 (citing Compl. ¶¶ 183-89).  According to plaintiffs, "the

complaint sets forth sufficient detail to conclude that they did have such a plan," and, "[a]s a

result, it adequately states a claim for violating Section 14(a)."  Opp. at 45.  Thus, plaintiffs'

claims in Count III hinge on the viability of their allegations that, in fact, such a plan existed.

Defendants maintain that plaintiffs' claims fail because, *inter alia*, "Plaintiffs rely on the

same underlying alleged fraud in the Section 14(a) claims which supports their Section 10(b)

claims – namely the alleged failure to disclose alleged common objectives or plans among an

undefined group of individuals and entities."   SH Memo at 44; *accord* O&D Memo at 31.

Defendants also insist that plaintiffs have failed to plead Count III with the specificity required

by the PSLRA and Fed. R. Civ. P. 9(b).  SH Memo at 42-43; O&D Memo at 30-31.

I have already concluded that the Complaint fails to plead adequately the existence of a

group with a plan to take control of Lyris.  Similarly, plaintiffs have failed to plead adequately

the existence of a common plan or scheme for purposes of Count III.  Additionally, I agree with

defendants that Count III does not offer the particularized allegations as to the alleged involvement of each SH Defendant in Lyris's issuance of the proxy statements, as required under the PSLRA.  *See* SH Motion at 42-43. As the SH Defendants observe, "there is no allegation in the Complaint that any specific Stockholder Defendants had any involvement in the preparation or filing of any proxy statements on behalf of Lyris, Inc."  *Id.* at 42.  Furthermore, given their status as stockholders, as opposed to officers and directors, there is no basis to infer the participation of the SH Defendants in the issuance of the proxy statements.  *See In re Acterna*, 378 F. Supp. 2d at 574 (explaining that plaintiff must plead facts indicating "how the individual Defendants were involved in any alleged schemes . . . or, assuming such [] scheme[s] existed, how each individual Defendant knew of the alleged fraud").  Accordingly, Count III will be dismissed, with leave to amend.

## III.    Affirmative Defenses

### 1.  Statute of Limitations

Claims alleging securities fraud under § 10(b) of the Exchange Act are governed by the statute of limitations set forth in 28 U.S.C. § 1658(b).  It provides:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contravance in contravention of a regulatory requirement concerning the securities law, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of:
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

However, claims alleging violations of § 14(a) of the Exchange Act are governed by the one-year statute of limitations set forth in § 9(e) of the Securities Exchange Act.  15 U.S.C. § 78i(f); *see Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 360 (1991)

("In adopting the 1934 Act, the 73d Congress also amended the limitations provision of the 1933 Act, adopting the 1-and-3-year structure for each cause of action contained therein."); *In re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d 189, 197 (3d Cir. 2007) (concluding that "Congress did not intend to include § 14(a) claims within the scope of § 1658(b), but rather intended that provision to apply to § 10(b) claims and other claims requiring proof of fraudulent intent").  In defining the limitations period, § 9(e) employs language similar to 28 U.S.C. § 1658(b), but differs temporally.  It states: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation."  15 U.S.C. § 78i(f).[23]

Under the standard adopted by the Supreme Court in *Merck & Co. v. Reynolds*, 559 U.S. 633, 130 S. Ct. 1784, 1793 (2010), "discovery" under § 1658(b)(1) "refers not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered."  Accordingly, "the limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first."  *Id.* at 1798 (quoting 28 U.S.C. § 1658(b)); *see*, *e.g.*, *Csabai v. Martek Bioscience Corp.*, Civ. No. CCB-09-2280, 2009 WL 5206477, at *2 (D. Md. Dec. 23, 2009) (dismissing securities claim as time-barred because plaintiff's own correspondence with a defendant showed that, more than two years before bringing the claim, he believed defendants were committing fraud).  By analogy, I conclude that the same meaning of "discovery" governs in the context of § 9(e).

---

[23] Although the two statutes employ slightly different phraseology, they function in the same way: the claim must be timely under the shorter period of limitations, while also satisfying the longer statute of repose.

This standard differs from that of "inquiry notice," under which the claim accrues when a plaintiff learns facts sufficient "to spur a reasonably diligent person to investigate." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007) (discussing inquiry notice standard with respect to antitrust claims). As the Supreme Court explained in *Merck*, "[i]f the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered . . . 'facts constituting the violation.'" 130 S. Ct. at 1797. In other words, inquiry notice precedes by definition the point at which a reasonably diligent plaintiff would discover the alleged violation. *Id.*; *GO Computer*, 508 F.3d at 178 ("Full knowledge often awaits discovery, and the very notion of 'inquiry notice' implies something less than that."). Nonetheless, the two standards are intimately related: "The objective standard of due diligence requires reasonable investigation of the possibility of misrepresentation once an individual has been placed on inquiry notice of wrongdoing." *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993).

It is rarely appropriate to resolve the affirmative defense of limitations based on a pre-discovery motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). The application of a limitations period often entails a fact intensive inquiry. *See id.* at 465-66 (reversing dismissal of claim on limitations grounds, on motion to dismiss, because plaintiff's complaint "d[id] not provide facts sufficient to apply the discovery rule"); *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1130-31 (4th Cir. 1970) ("It is sufficient for us to say that when, as here, a jury has been demanded and the facts give rise to conflicting inferences on the issue of reasonable diligence, the question must be submitted to the

jury.").   Further, a defendant bears "the burden of establishing the affirmative defense" predicated on limitations.  *Goodman*, 494 F.3d at 464 (citing Fed. R. Civ. P. 8(a)).

Consequently, "a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred."  *Id.*  Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" can a limitations defense be addressed by a 12(b)(6) motion.  *Id.*   In that circumstance, "all facts necessary to the affirmative defense [must] 'clearly appear[] *on the face of the complaint*.'"  *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) (alteration and emphasis in *Goodman*).  Indeed, "[t]o require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised."  *Goodman*, 494 F.3d at 466.

Here, the Complaint was filed on February 14, 2012.  *See* ECF 1.  Accordingly, defendants contend that plaintiffs' claims under Count I are barred because, well before February 14, 2010, plaintiffs had discovered or, through the exercise of reasonable diligence, should have discovered the facts constituting the alleged violations.  *See* SH Memo at 59-64.  O&D Memo at 32-35.  Defendants also argue that plaintiffs' claims in Count III are barred because the facts constituting the violations were discovered, or should have been discovered with reasonable diligence, before February 14, 2011.  *See* SH Memo at 59 n.6; O&D Memo at 38-39.

Defendants insist that, at the latest, limitations began to run in January 2009, when Burt sent a detailed letter and statistical analysis to Bill Comfort regarding his belief about

manipulative trading in Lyris stock.  They claim that, by that time, Burt was apprised of all the material facts upon which these claims are based or, with reasonable diligence, he should have discovered those facts.  In particular, defendants note:

(1) Ty Comfort and Urry allegedly told Burt as early as 2006 that they wanted to control Lyris, *see* Compl. ¶¶ 81-82;

(2) Burt has known of the Comforts' daily conference calls since before 2009;

(3) Burt has known that Ty Comfort, Stuyvesant Comfort, and Urry "jointly manage" their investments since before 2009;

(4) According to plaintiffs' calculations, set forth in Exhibit 6 to the Complaint, defendants controlled over 50 percent of the stock of Lyris by June 2008, and therefore, with reasonable diligence, Burt should have known that defendants held a majority of Lyris stock by that time;

(5) Burt was CEO of Lyris between 2000 and 2007, and therefore had an insider's knowledge of Lyris and defendants' actions, including the fact that Lyris was not marketing itself to investors and members of the Lyris board did not want additional financing;

(6) Burt compiled data on market manipulation from 2006 through 2009, when he sent the letter and statistical analysis to Bill Comfort, indicating that Lyris stock was being manipulated.

In response, plaintiffs contend that they only discovered in February 2011, through McDonald, that "the Comforts had secretly amassed control of 80% of the stock of Lyris."  *See* Opp. at 18-20.  They state: "At that point – and not before – the falsity of defendants' statements

to the SEC and others denying any intent to take control of Lyris became evident." *Id.* at 18. Moreover, plaintiffs maintain that Burt's awareness of manipulative stock trading did not suggest that he "had determined *who* was behind the manipulation." *Id.* at 19.  For that reason, Burt wrote to Bill Comfort and the Lyris board to request an investigation.  Plaintiffs also argue that their claims are not time barred because they sold Lyris stock in March 2010 and May 2011, and their claims could not accrue until those sales took place.

The Complaint does not contain sufficient facts, on its face, to resolve defendants' contention.  Based on the Complaint, I cannot determine that a reasonably diligent person in Burt's position would have been alerted to the possibility of wrongdoing by the allegedly deflated value of Lyris stock and manipulative trades.  Similarly, I cannot conclude that Lyris's failure to market itself to investors, and the conduct of defendants after Burt left the Company, would have alerted a reasonably diligent person to the fact that *defendants* were the responsible parties.  As CEO, Burt had access to information about Lyris prior to 2007.  But, he lacked such access after leaving the Company.

Discovery may well establish that limitations expired prior to the filing of the lawsuit. But, it would be premature to rule here that limitations bars plaintiffs' § 10(b) and § 14(a) claims.[24]

---

[24] As noted, plaintiffs also argue that their claims could not accrue until they sold their Lyris stock.  Defendants have not responded to this argument.

In *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011), the Second Circuit explained that, "in the limitations context, it makes sense to link the standard for 'discovering' the facts of a violation to the plaintiff's ability to make out or plead that violation." *Id.* at 175.  In other words, "[o]nly after a plaintiff can adequately plead his claim can that claim be said to have accrued, and only after a claim has accrued can the statute of limitations on that claim begin to run." *Id.*; *see also In re Mun. Mortg. & Equity*, *supra*, 876 F.

2. Released Claims

Defendants contend that plaintiffs' claims are barred by the Release that Burt and Addison LP executed in March 2007.  The Release states, in relevant part, at ¶ 2:

> Each Director, on behalf of himself and each of the other Director Parties, and Addison, hereby generally releases and forever discharges the Company Parties from any and all Claims, known or unknown, of any kind and every nature whatsoever, and whether or not accrued or matured, which any of them may have, arising out of or relating to any transaction, dealing, relationship, conduct, act or omission, or any other matters or things occurring or existing at any time prior to and including the time of the Closings . . . in all cases arising out of or relating to Director's employment by the Company or any subsidiary thereof or Director's or Addison's investment in the Company or any subsidiary thereof.

The Release defines Burt as "Director," *id.* at 2, and "Director Parties" as "Director and his family, attorneys, heirs, estate, agents, executors, representatives, administrators, the successors and assigns of each of the foregoing, and Addison and its partners and affiliates." *Id.* ¶ 1(c).  The Release defines "Company Parties" as "the Company and its predecessors, successors, assigns, parents, subsidiaries, affiliates and each of the foregoing entities' respective past, present and future stockholders, members, partners, managers, directors, officers, employees, agents, representatives, principals, insurers, attorneys . . . and LDN and its partners

---

Supp. 2d at 653-54 (explaining that the statute of limitations begins to run when the plaintiff possesses, or a reasonably diligent plaintiff would possess, "sufficient information about the facts of the claims to adequately plead them in a complaint").  The Second Circuit went on to suggest that "[a] securities fraud claim does not accrue until after the plaintiff actually purchases (or sells) the relevant security," and therefore the "statute of limitations cannot begin to run until after the plaintiff's transaction." *City of Pontiac*, 637 F.3d at 176 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734-35 (1975) (requiring connection between misrepresentation and purchase or sale of a security)); *see Dura Pharms*, 544 U.S. at 344 (discussing requirement of loss causation, *i.e.*, that a plaintiff "suffered actual economic loss" connected to a transaction in securities).  Because I have concluded that dismissal is not appropriate based on limitations, I need not address the argument that limitations did not begin to run prior to plaintiffs' sales of Lyris stock.

and affiliates." *Id.* ¶ 1(b).   Each defendant qualifies as a "Company Party," either as stockholders in Lyris or as Lyris officers or directors.

The Complaint indicates that some of the fraudulent conduct of defendants predated the execution of the Release.   However, plaintiffs claim they were unaware of the defendants' alleged plan to gain control of Lyris at the time the Release was signed.   Moreover, plaintiffs seek to recover damages only for events after the Release was executed.   *See* Compl. ¶ 257. Nevertheless, defendants contend that, pursuant to the Release, plaintiffs are precluded from asserting their claims.   *See* SH Memo at 51-54.   In a footnote, the SH Defendants "also assert that the March 2007 release [] applies to the Count IV Maryland Securities claims and the Count VIII Intentional Infliction of Emotional Distress claim."   SH Memo at 54 n.7.

The Release provides that it "shall be governed by and construed in accordance with the laws of the State of Delaware."   Release ¶ 18.   "Delaware courts recognize the validity of general releases.   A clear and unambiguous release 'will [only] be set aside where there is fraud, duress, coercion, or mutual mistake concerning the existence of a party's injuries.'"   *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010) (quoting *Parlin v. DynCorp Int'l, Inc.*, C.A. No. 08c-01-136 FSS, 2009 WL 3636756 (Del. Sup. Ct. 1981)) (alteration in *Deuley*).   The Court of Chancery of Delaware explained, in *Seven Investments, LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) (quotation marks and citations omitted):

> [A]n effective release terminates the rights of the party executing and delivering the release and . . . is a bar to recovery on the claim released.   When determining whether a release covers a claim, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document.   [W]here the language of the release is clear and unambiguous, it will not lightly be set aside.   If the claim falls within the plain language of the release, then the claim should be dismissed.

Absent evidence that plaintiffs knew of the alleged fraudulent scheme at the time the Release was signed, the Release does not necessarily bar claims based on events that occurred after its execution.  In other words, the language of the Release does not encompass prospective fraudulent conduct.  In particular, the Release pertained to claims relating to "any transaction, dealing, relationship, conduct, act, omission, or any other matters or things occurring or existing *at any time prior to and including* the time of the Closings."   Release ¶ 2 (emphasis added). Plaintiffs' claims relate to acts, omissions, and transactions that allegedly occurred after the signing of the Release, such as market manipulation and fraudulent misrepresentations that allegedly caused plaintiffs' injuries after the date of the Release.  *Cf. Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 58 (3d Cir. 2001) ("[A] release usually will not be construed to bar a claim which had not accrued at the date of its execution or a claim which was not known to the party giving the release.") (citing *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 895-96 (3d Cir. 1975)).

To be sure, to the extent that plaintiffs' claims are for losses caused by conduct prior to the date of the Release, the claims may be barred.  A plaintiff who is on notice of fraud at the time he enters into a general release will be barred from subsequently asserting a claim based on such fraud.  *See Seven Investments*, 32 A.3d at 398.  In the present posture of the case, however, the facts must be construed in the light most favorable to plaintiffs.  I cannot conclude at this juncture that the Release encompasses plaintiffs' claims arising out of fraudulent acts or omissions that allegedly occurred after the Release was executed.

## IV.    Personal Jurisdiction

Defendants contend that, if plaintiffs fail to allege viable federal claims, this Court lacks

personal jurisdiction over defendants with respect to plaintiffs' state law claims. *See* SH Motion at 64-66; O&D Motion at 32-33.  Plaintiffs do not contest this argument.  Rather, they state: "Because plaintiffs have adequately pleaded each of their federal claims, the Court need not address whether defendants would independently be subject to the personal jurisdiction of this Court with respect to plaintiffs' state law claims."  Opp. at 47.

As noted, a court may exercise personal jurisdiction over defendants with respect to a claim under the federal securities laws if they have sufficient contacts with the United States.  15 U.S.C. § 78aa ("Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."); *see Mates v. N. Am. Vaccine, Inc.*, 53 F. Supp. 2d 814, 820 (D. Md. 1999) ("[T]he relevant question under [15 U.S.C. § 78aa] becomes whether the party has sufficient contacts with the United States, not any particular state."); *accord Sec. Inv. Protection Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985); *Fitzsimmons v. Barton*, 589 F.2d 330, 333 (7th Cir. 1979); *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974).

Ordinarily, however, a two-step inquiry governs the exercise of personal jurisdiction over an out-of-state defendant: "(1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment."  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  In Maryland, "the statutory inquiry necessarily

merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *accord ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).

Personal jurisdiction over a non-resident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Courts must first determine whether the threshold of "minimum contacts" is met, and then consider whether the exercise of jurisdiction on the basis of those contacts is "constitutionally reasonable." *ALS Scan*, 293 F.3d at 712; *see Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278-79 (4th Cir. 2009). The "minimum contacts" test is satisfied where the defendant has "purposefully avail[ed] himself of the privilege of conducting business under the laws of the forum state." *Consulting Eng's*, 561 F.3d at 278. A determination that the defendant has established minimum contacts with the forum state amounts to a conclusion that "'it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477.

Consequently, a court's exercise of personal jurisdiction under 15 U.S.C. § 78aa is not coextensive with the more restrictive constitutional due process analysis. The Fourth Circuit has acknowledged the jurisdictional issue that arises out of these divergent standards:

> Even though the district court has personal jurisdiction over the defendants to adjudicate the [federal] claim because of its authorization for nationwide service of process, the question remains whether that service authorizes the district court to assert personal jurisdiction over the defendants to adjudicate the state law claims against them.  If a defendant's conduct in the forum state provides insufficient contacts with the state to justify specific long-arm jurisdiction, two questions arise: First, whether the defendant has reasonable expectations not to be tried there on the state claims, which may not even arise under the laws of the forum state; and second, whether the defendant in these circumstances has a constitutional protection against adjudication of the state claims against him in a state which is not authorized to assert personal jurisdiction over him.

*ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 627 (4th Cir. 1997).

In *ESAB*, adopting a doctrine of supplemental, or "pendant," personal jurisdiction, the Fourth Circuit said that, "so long as the facts of the federal and state claims arise from a common nucleus of operative fact," then a "district court has authority over the defendants to decide both the federal and state claims alleged against them."   *Id.* at 628.  However, supplemental personal jurisdiction is only available "so long as the federal claim is not wholly immaterial or insubstantial."  *Id.* at 629 (citing *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942, 951 & n.6 (11th Cir. 1997)).

I am not aware of a Fourth Circuit opinion indicating when a federal claim will be considered "wholly immaterial or insubstantial," such that pendant personal jurisdiction is inappropriate.  But, in *ESAB*, the Fourth Circuit cited *Republic of Panama*, 119 F.3d at 951 & n.26, apparently as an example of a case where supplemental personal jurisdiction was not available for purposes of a plaintiff's state law claims.

In *Republic of Panama*, the plaintiff brought civil RICO claims against defendants, along with companion state law claims.  *See id.* at 938.  The Eleventh Circuit affirmed the district court's dismissal of the plaintiff's federal RICO claims for failure to state a claim under Fed. R.

Civ. P. 12(b)(6), and concluded, as to the companion state law claims: "After dismissing [plaintiff's] federal claims against the . . . defendants, the district court correctly dismissed its remaining state law claims against the[] defendants" for lack of personal jurisdiction. *Id.* at 951 n.26. District courts in the Fourth Circuit have reached a similar conclusion. *See D'Addario v. Geller*, 264 F. Supp. 2d 367, 387-88 (E.D. Va. 2003) ("[I]f the court were later to determine that the federal claim(s) should be dismissed against a defendant, the state claims against that defendant would also have to be dismissed, unless another basis for asserting personal jurisdiction exists."). Indeed, the Tenth Circuit has held that a district court abuses its discretion by retaining claims for which it lacks an independent basis to exercise personal jurisdiction over a defendant, after the claim providing the initial basis for personal jurisdiction is dismissed. *See United States v. Botefuhr*, 309 F.3d 1263, 1274 (2002).

Based on the Complaint's allegations, no defendant appears to be a citizen of Maryland. *See* Compl. ¶¶ 35-46. The Complaint avers that: Maasberg is "a resident of California," *id.* ¶ 35; Blair is "a resident of the State of Pennsylvania," *id.* ¶ 36; Bill Comfort "is a resident of: New York, New York; (2) Locust Valley, New York; and (3) Hobe Sound, Florida," *id.* ¶ 37; Stuyvesant Comfort "is a resident of London, England," *id.* ¶ 40; Ty Comfort "is a resident of London, England," *id.* ¶ 41; Urry "is a resident of New York, New York and Locus Valley, New York," *id.* ¶ 42; Blair "is a resident of Pawley's Island, South Carolina," *id.* ¶ 43; LDN is "an Oklahoma partnership," *id.* ¶ 44; Meudon is "a New York partnership," *id.* ¶ 45; and the "Hidden Comfort Entities" are "based in and/or incorporated in an off-shore financial and tax haven," *id.* ¶ 46. Additionally, defendants have offered affidavits in support of their contention that personal jurisdiction does not comport with Maryland's long-arm statute or constitutional due process. In

particular, each defendant has averred that he lacks the requisite contacts with Maryland to serve as the basis for personal jurisdiction, and that the corporate defendants—Meudon and LDN—similarly lack sufficient contacts with Maryland.  *See* O&D Exhs. 14-17; SH Exhs. G-J.  As indicated, plaintiffs have not responded to defendants' argument with respect to personal jurisdiction for purposes of plaintiffs' state law claims.

"When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).  Discovery and an evidentiary hearing are not required to resolve a motion under Rule 12(b)(2).  *See generally* 5B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1351, at 274-313 (3d ed. 2004, 2012 Supp.).  Rather, the district court may address the question of personal jurisdiction as a preliminary matter, ruling solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint. *Consulting Eng'rs*, 561 F.3d at 276.  "The plaintiff . . . has the burden to establish that personal jurisdiction exists over the out-of-state defendant." *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002).  But, the plaintiff need only make "a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Consulting Eng'rs*, 561 F.3d at 276.

Further, "[i]n deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Carefirst*, 334 F.3d at 396.  However, "'[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal

jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n. 5 (4th Cir. 2005) (citation omitted).

Having granted defendants' motion to dismiss as to plaintiffs' federal claims, with leave to amend, I see no need at this juncture to reach the potentially thorny jurisdictional questions posed by defendants' motions.   If plaintiffs file an amended complaint stating viable claims under the federal securities laws, it would not be necessary to resolve defendants' jurisdictional arguments as to the supplemental state law claims.   I also decline to address the viability of the state law claims, unless and until I conclude that plaintiffs' federal securities claims pass muster. Therefore, I will dismiss, without prejudice, Counts IV, V, VI, VII, and VIII of the Complaint.

**Conclusion**

For the foregoing reasons, defendants' motions to dismiss will be granted, with leave to amend.   A separate Order follows, consistent with this opinion.


Date: March 31, 2013                                      /s/
                                         Ellen Lipton Hollander
                                         United States District Judge