IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID R. BURT, *et al.*,

    *Plaintiffs,*

v.

WOLFGANG MAASBERG, *et al.*,

    *Defendants.*

Civil Action No.: ELH-12-0464

**MEMORANDUM OPINION**

Plaintiffs David R. Burt ("Burt"), a former Chief Executive Officer ("CEO") of Lyris, Inc. ("Lyris" or the "Company"), and his wife, Janet Burt, shareholders of Lyris, filed suit against nine defendants, alleging that, between April 2007 and December 2012 (the "Fraud Period"), the defendants engaged in a fraudulent scheme to take control of Lyris. *See* Amended Complaint ("Am. Comp.," ECF 33) ¶ 1. In particular, plaintiffs allege that defendants, who are officers, directors, and/or stockholders of Lyris, amassed 95 percent of Lyris's stock through various manipulative actions, without disclosing their plan to other stockholders or to the Securities and Exchange Commission ("SEC"). Plaintiffs claim, *inter alia*, that, as a result, they sold a significant percentage of their Lyris stock to defendants at artificially depressed prices.

Of the nine defendants named in the suit, five served as officers and/or directors of Lyris during the Fraud Period (collectively, the "O&D Defendants"). They are Wolfgang Maasberg, former CEO and former director of Lyris, *id.* ¶ 30; William T. Comfort, III ("Ty Comfort"), the former Chairman of the Lyris Board of Directors, *id.* ¶ 24–25; James Urry, a former Lyris director, *id.* ¶ 26; A. Richard Blair, a former Lyris director and the "exclusive stock broker" for several other defendants, *id.* ¶ 32; and Richard McDonald, the Director of Investor Relations at

Lyris since approximately 2005, *id.* ¶ 31. Four defendants are alleged to be Lyris stockholders (collectively, the "SH Defendants"). They are William T. Comfort, Jr. ("Bill Comfort"), *id.* ¶ 22; Stuyvesant ("Stuyvie")[1] Pierpont Comfort, who served as a director of Lyris between 2000 and 2002, *id.* ¶ 27; LDN Stuyvie Partnership ("LDN Stuyvie"), an Oklahoma partnership in which Stuyvesant and Ty Comfort are partners, *id.* ¶ 28;[2] and Meudon Investments Partnership ("Meudon"), a New York partnership allegedly controlled by Urry, *id.* ¶ 29.

Bill Comfort, Ty Comfort, Stuyvesant Comfort (collectively, the "Comforts"), and Urry are members of the same family. In particular, Ty and Stuyvesant Comfort are brothers and the sons of Bill Comfort; Urry is Bill Comfort's son-in-law and the brother-in-law of Ty and Stuyvesant Comfort. *See id.* ¶¶ 24–27.

Plaintiffs filed their initial Complaint on February 14, 2012. ECF 1. Both groups of defendants filed motions to dismiss, ECF 13–14, which were fully briefed.[3] By a Memorandum Opinion ("Memo Op.," ECF 29) and Order (ECF 30), I granted the motions to dismiss, without prejudice and with leave to amend. Thereafter, plaintiffs filed an Amended Complaint, containing seven claims. ECF 33. The first two claims allege violations of federal securities laws and regulations.[4] In Count I, plaintiffs allege that defendants, by engaging in a scheme to take control of Lyris and misrepresenting or failing to disclose their plan to do so, violated §

---

[1] Plaintiffs sometimes refer to Stuyvesant Comfort by his nickname, "Stuyvie." I shall sometimes do the same.

[2] Their sister, Nathalie Comfort Urry, is also an alleged partner. *See* Am. Comp. ¶ 28.

[3] Plaintiffs filed their Complaint *pro se*, but retained counsel prior to filing their opposition to the motions to dismiss.

[4] The parties have referred to the claims as counts and, for convenience, I have delineated each claim as a count. For example, the "First Claim" is identified as Count I.

10(b) of the Exchange Act of 1934 ("§ 10(b)"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. *See* Am. Comp. ¶¶ 118–120. Count II alleges that the O&D Defendants violated § 14(a) of the Exchange Act of 1934 ("§ 14(a)"), 15 U.S.C. § 78n(a), and SEC Rules 14a-3 and 14a-9 ("Rule 14a-3" and "Rule 14a-9"), 17 C.F.R. §§ 240.14a-3 & 240.14a-9, by causing Lyris to issue false proxy statements that failed to disclose the defendants' plan. Am. Comp. ¶¶ 121–124.

The remaining five counts allege violations of Maryland and Delaware law.[5] In Count III, plaintiffs allege that defendants violated the Maryland Securities Act, § 11-703 of the Corporations & Associations Article ("C.A.") of the Maryland Code (2007 Repl. Vol., 2012 Supp.). Am. Comp. ¶¶ 125–127. Count IV alleges that the O&D Defendants breached their duty of loyalty under Delaware law. *Id.* ¶¶ 128–131. In Count V, plaintiffs allege that the O&D Defendants engaged in self-dealing, by purchasing shares of Lyris stock at artificially depressed prices, in violation of their fiduciary duties under Delaware law. *Id.* ¶¶ 132–142. Count VI alleges that the O&D Defendants breached their duty of care under Delaware law. *Id.* ¶¶ 143–146. In Count VII, plaintiffs allege that Bill Comfort, Ty Comfort, Urry, Blair, and McDonald are liable for intentional infliction of emotional distress, based on their purchase of Lyris stock from plaintiffs at artificially depressed prices, when they knew that the Burts needed the proceeds for Janet Burt's medical care. *Id.* ¶¶ 147–154. Plaintiffs claim damages "in excess of

---

[5] Plaintiffs assert that Maryland state law is applicable because the Burts were residents of Maryland throughout the Fraud Period; defendants targeted plaintiffs knowing they were residents of Maryland; and plaintiffs suffered harm in Maryland. Plaintiffs aver that their claims under Delaware law are proper because Lyris is a Delaware corporation and, as a result, the O&D Defendants owed plaintiffs fiduciary duties under Delaware law. At this juncture, defendants have not contested the applicability of Maryland or Delaware law.

"$1,000,000" for each of Counts I through VI, *id.* ¶¶ 120, 124, 127, 131, 142, 146, and an

unspecified amount of damages for Count VII. *Id.* ¶ 154.[6]

The SH Defendants and the O&D Defendants filed motions to dismiss, *see* ECF 36 ("SH

Motion"); ECF 37 ("O&D Motion"), along with supporting memoranda. *See* ECF 36-1 ("SH

Memo"); ECF 37-1 ("O&D Memo"). They claim that, pursuant to Fed. R. Civ. P. 12(b)(6) and

the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(3)(A), plaintiffs have failed to

state a claim as to each count. The defendants also argue that, because plaintiffs have failed to

state a claim under the federal securities laws, this Court lacks personal jurisdiction over

defendants as to the remaining state law claims.[7] And, defendants argue that, even if personal

jurisdiction exists as to the state law claims, those claims are defective.

Plaintiffs filed a consolidated response in opposition ("Burt Memo" or "Opp.," ECF 45),

to which the SH Defendants and the O&D Defendants replied. *See* ECF 51 ("SH Reply"); ECF

---

[6] The Amended Complaint incorporates the eighteen exhibits that were attached to the original Complaint. *See* Am. Comp. at 2 n.1; Local Rule 103(6)(b). It also includes six additional exhibits. They are: (1) a table setting forth the purchases of Lyris stock allegedly executed by defendants, *see* Ex. 19; (2) Schedule 13Ds filed by various defendants, *see* Ex. 20; (3) an April 2012 Proxy Statement filed by Lyris, *see* Ex. 21; (4) a 2012 Form 10-K filed by Lyris, *see* Ex. 22; (5) a 2012 Form 10-Q filed by Lyris, *see* Ex. 23; and (6) an email conversation between Mr. Burt and an individual named Rick Faulk, *see* Ex. 26. As explained, *infra*, I may consider these exhibits in resolving the motions.

[7] Subject matter jurisdiction under plaintiffs' federal claims is proper pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction may be exercised over plaintiffs' state law claims under 28 U.S.C. § 1367.

Section 78aa of 15 U.S.C. has been interpreted as authorizing a federal court to exercise personal jurisdiction over defendants if they have "sufficient contacts with the United States." *Mates v. N. Am. Vaccine, Inc.*, 53 F. Supp. 2d 814, 820 (D. Md. 1999); *accord Sec. Investor Protection v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). Defendants do not dispute the existence of such contacts. Therefore, as long as plaintiffs' federal claims are viable, supplemental personal jurisdiction may be exercised with respect to plaintiffs' state law claims, which arise from the same nucleus of operative facts. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 627–29 (4th Cir. 1997).

48 ("O&D Reply").  No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons set forth below, I will deny defendants' motions, in part, and will grant defendants' motions, in part.  To summarize, plaintiffs may proceed with their federal securities claims against all defendants; they may proceed with their state law securities claim against Bill Comfort, Ty Comfort, Urry, Meudon, and Blair; and they may proceed with their state law breach of fiduciary duties claims, as pled.  However, I will dismiss plaintiffs' claim for intentional infliction of emotional distress.

### Factual Background

<u>The Company</u>

Lyris is a technology company that "develops and sells Internet marketing technology and services to small- and medium-sized businesses in the United States and around the world." Am. Comp. ¶ 33.  Lyris was acquired in 2005 by a healthcare company operating under the name NovaCare, Inc.  *Id.* ¶ 36.  Prior to that acquisition, NovaCare had gradually sold off its healthcare businesses and accumulated cash reserves through litigation and claims activities, as well as sales of its business assets.  *Id.* ¶¶ 34–35.  NovaCare also "had" a valuable asset, consisting of a "net operating loss ['NOL'] carry-forward of approximately $180 million," which "would allow NovaCare to buy a company and not pay federal corporate income tax" on $180 million dollars of federal income.  *Id.* ¶ 35.  After NovaCare acquired Lyris, the combined company was renamed "Lyris, Inc." and sold the brand name "NovaCare" to another company.  *Id.* ¶ 36.

<u>The Parties</u>

David Burt served as CEO of NovaCare, and then Lyris, from approximately June 2000 to January 2007.  Am. Comp. ¶ 18.  During his tenure as CEO, Burt oversaw much of

NovaCare's transition to its present business, including identifying and acquiring Lyris. *Id.* ¶ 36. Lyris's proxy statements reflect that, as part of Burt's compensation package as CEO, he acquired 20,850,000 shares of Lyris common stock in 2002. *See* Ex. 12 to ECF 1. Janet Burt "has been receiving treatment for severe depression and other mental illnesses since at least 2000," and the Burts have incurred "more than $1 million in medical expenses to treat these illnesses." Am. Comp. ¶ 19.

Bill Comfort is the Managing Partner of Court Square Capital Partners ("Court Square"), a private equity investment firm, and the former Chair of Court Square's predecessor, Citicorp Venture Capital. *Id.* ¶ 22. His son, Ty Comfort, "was Chairman of the Board of Directors of Lyris from 2003 through August 2012. At the end of the Fraud Period, Ty Comfort personally owned 10% of Lyris's outstanding stock, or approximately 17 million shares." *Id.* ¶ 24. Ty Comfort also "directly controls at least two investment vehicles that acquired substantial amounts of Lyris stock during the Fraud Period," including 65 BR Trust and Lyr, Ltd. ("Lyr"), which, at the end of the Fraud Period, owned 13% and approximately 17% of Lyris's outstanding stock, respectively. *Id.* ¶ 25. He is also the general partner of defendant LDN Stuyvie, which, at the end of the Fraud Period, owned 25% of Lyris's outstanding stock, making it the largest single shareholder of Lyris stock. *Id.* ¶ 28.

Urry, Bill Comfort's son-in-law, is a "professional investor" and was a member of Lyris's Board of Directors during the Fraud Period. *Id.* ¶ 26. He also "controls" defendant Meudon, which is a New York partnership that owns "approximately 6% of the common stock of Lyris, or just over 10 million shares." *Id.* ¶ 29. Stuyvesant Comfort, Bill Comfort's "youngest son," is a "professional investor and partner of Stirling Square Capital Partners, a private equity

buyout firm." *Id.* ¶ 27. He served on the Lyris Board of Directors from "approximately 2000 until 2002," and "shares voting and dispositive power over [LDN Stuyvie's] common stock with Ty Comfort" and Urry's wife, Nathalie Comfort Urry, who is Bill Comfort's daughter. Am. Comp. ¶ 28.

Maasberg served as CEO of Lyris and was a member of its Board of Directors from August 2010 to March 2013. In February 2011, Maasberg "acquired approximately 625,000 shares of Lyris stock at $0.19 per share." *Id.* ¶ 30. McDonald "became Lyris's Director of Investor Relations" in 2005. *Id.* ¶ 31. In February 2011, McDonald acquired approximately 200,000 shares of Lyris stock at $0.19 per share, bringing his total ownership to approximately 1%. *Id.* Blair became a member of Lyris's Board of Directors in 2004 and was a director throughout the Fraud Period. According to plaintiffs, "Blair told Mr. Burt that [Blair] was the exclusive stock broker for Bill Comfort, Ty Comfort, Stuyvie Comfort, and Urry, and was involved in facilitating and executing their purchases of Lyris stock." *Id.* ¶ 32.

According to plaintiffs, the Comforts and Urry "work together to invest in and run all their businesses." *Id.* ¶ 39. In particular, they allege that "Bill Comfort demanded approval of all the family's major investment decisions," including those involving Lyris, and that Ty Comfort, Stuyvie Comfort, and Urry cannot make major investment decisions without the express consent of Bill Comfort. *Id.* ¶¶ 38–39. Further, plaintiffs allege that Bill Comfort has held an early morning teleconference with Ty Comfort, Stuyvie Comfort, and Urry "nearly every workday to discuss managing the family's investments." *Id.* ¶ 39. Additionally, "Ty Comfort and Stuyvie Comfort share an office and regularly discuss their joint investment plans, as did Bill

Comfort and Urry." *Id.* And, Ty Comfort "made it explicitly clear to Mr. Burt" that he, Bill Comfort, Stuyvie Comfort, and Urry jointly managed their investment in Lyris. *Id.*

<u>The Alleged Take-Over Scheme</u>

Plaintiffs allege that between April 2007 and December 2012, defendants "surreptitiously" "orchestrated a scheme" to depress the stock price of Lyris and then acquire large amounts of the stock. *Id.* ¶¶ 1, 78. Specifically, plaintiffs aver that "defendants secretly drove down Lyris's stock price so they could acquire a dominant stake in Lyris at bargain-basement prices without disclosing their plans to do so to the market, the SEC, or the IRS." *Id.* By the end of the Fraud Period, the price per share plummeted from over $1.50 to under $.20, *see id.* ¶¶ 43, 104, while defendants' holdings in Lyris stock – in their own name or through investment vehicles they directly control – rose from 18% to 95%. *Id.* ¶¶ 1, 63.

According to plaintiffs, defendants executed their fraudulent scheme to gain control of Lyris through a variety of means, discussed below.

*Market Manipulation*: The Amended Complaint alleges that Blair executed manipulative stock trades intended to depress the price of Lyris stock, which involved "hitting the bid" and "hitting the ask." Am. Comp. ¶¶ 44–53. "Hitting the bid" involves selling shares immediately upon market opening, at the best available "bid" price, *i.e.*, the highest price that an investor is offering to pay at that time. *Id.* ¶ 47; *see* NASDAQ.com Glossary of Stock Market Terms, Hit the Bid, http://www.nasdaq.com/investing/glossary/h/hit-the-bid ("A dealer who agrees to sell at the bid price quoted by another dealer is said to 'hit' that bid. Antithesis of take the offer.") (last visited February 26, 2014). "Hitting the ask" involves buying "a small sum of shares" of stock at the "ask" price, which is generally a high price. Am. Comp. ¶ 48; *see* NASDAQ.com Glossary

of Stock Market Terms, Take the Offer, http://www.nasdaq.com/investing/glossary/t/take-the-offer ("Buy stock by accepting a floor broker's (listed) or dealer's (OTC) offer at an agreed-upon volume. Antithesis of hit the bid.") (last visited February 26, 2014). According to plaintiffs, by repeatedly "hitting the bid" each morning over a period of time, defendants signaled to the market that Lyris stock was an unattractive investment. Am. Comp. ¶ 47. By "hitting the ask," defendants could "provide cover to the earlier down trades and to manage the decline of the price of the stock."[8] *Id.* ¶ 48.

According to plaintiffs, Mr. Burt noticed these irregular trading patterns and, in January 2009, sent to Bill Comfort a detailed analysis of the trading of Lyris stock over much of the previous 18 months. *Id.* ¶ 46. After Mr. Burt sent the letter to Bill Comfort, Blair directly contacted Mr. Burt to discuss the letter. *Id.* ¶ 51. According to Mr. Burt, Blair "admitted" that "he believed that at least the afternoon trades had been manipulated" and that "*the only reason* why someone would engage in this pattern of trading would be to buy large blocks of stock at cheap prices." *Id.* ¶ 51 (emphasis added). And, plaintiffs allege that no entity or individual, other than defendants, owns more than 10% of Lyris stock. *Id.* ¶ 53. Thus, according to plaintiffs, an inference arises that defendants were the ones manipulating the price of Lyris's stock. Plaintiffs allege that this inference was confirmed in February 2011, when McDonald "admitted [to Mr. Burt] that Defendants had a common understanding to depress the price of Lyris's stock and were responsible for doing so." *Id.* ¶¶ 53, 68–69. Further, plaintiffs assert that

---

[8] To illustrate, plaintiffs attached to the original Complaint diagrams of "Square S patterns" from the daily trading of Lyris stock. *See* Exs. 15–18.

Blair told Mr. Burt "that one of the most important things he had learned in his career as a stock trader . . . is 'that the buyers are the sellers and the sellers are the buyers.'" *Id.* ¶ 52.

*Marketing of Lyris*: Plaintiffs allege that defendants failed to market Lyris stock to potential investors. *Id.* ¶¶ 54–61. They claim that during the Fraud Period "Ty Comfort, Urry, Maasberg, McDonald, and Blair intentionally and recklessly refused to promote Lyris to investors and refused to raise capital for the company from the public." *Id.* ¶ 54. Moreover, plaintiffs allege that those defendants "did so at the express direction of, and in agreement with, Bill Comfort, and, on information and belief, with the mutual understanding and approval of Stuyvie Comfort." *Id.* For example, Ty Comfort, Urry, McDonald, Blair, and Maasberg "did not participate in investor conferences, while their public company counterparts made dozens of presentations." *Id.* ¶ 56. And, although McDonald was Lyris's Director of Investor Relations, he "has not presented or marketed Lyris at a single investor conference in more than five years on the job, even though he made several purchases of Lyris stock for himself during the Fraud Period." *Id.* ¶ 57.

Further, plaintiffs allege that this activity is particularly suspect in light of the fact that both Ty Comfort and "McDonald repeatedly admitted to Mr. Burt (in 2009, 2010, and 2011) that Lyris's stock price would be significantly higher if Lyris were to market its stock." *Id.* ¶ 58; *see id.* ¶¶ 59–61. According to plaintiffs, McDonald's "awareness and admission that Lyris's stock price would be higher if it were marketed amounts to reckless conduct with deliberate intent to mislead the market and harm non-Defendant Lyris stockholders." *Id.*

Additionally, plaintiffs allege that various defendants told Mr. Burt that "small-cap companies such as Lyris do not attract investors in the same way as large companies . . . .

Instead, these companies' executives and investor-relations directors must present and market themselves at investor conferences and other events likely to attract attention and interest." *Id.* ¶ 55. And, "McDonald, Ty Comfort, and Blair each stated to Mr. Burt on separate occasions in 2006 and 2008 that stocks like Lyris 'are sold, they are not bought.'" *Id.* Plaintiffs assert: "Ty Comfort's admission that marketing Lyris would raise its price, combined with his refusal to take any such actions, amounted to reckless conduct deliberately designed to depress Lyris's stock price and harm non-Defendant stockholders." *Id.* ¶ 60.

Plaintiffs recount that Maasberg served as head of U.S. sales for a company called Omniture prior to becoming CEO of Lyris. *Id.* ¶ 61. They allege that "Omniture's management team, including Maasberg, grew that company's U.S. revenues from approximately $40 million to $240 million during his tenure, after which Adobe bought the company for approximately $1.8 billion." According to plaintiffs, Maasberg's background with Omniture "could have been a big draw for tech investors looking for new investments," but "Maasberg never presented at any investor conference as CEO of Lyris, even though he made several purchases of Lyris stock during the Fraud Period." *Id.* Plaintiffs aver that Maasberg's failure to promote Lyris is explained by his involvement in "the scheme set in place by Bill Comfort, Ty Comfort, Urry, Stuyvie Comfort, Blair, and McDonald," and that "Maasberg's failure to market Lyris was a result of reckless and deliberate conduct designed to depress the stock price of Lyris and harm non-Defendant stockholders." *Id.*

*Accumulation of Lyris Stock*: According to the Amended Complaint, defendants owned roughly 18% (or 16 million shares) of Lyris stock in 2007. By the end of the Fraud Period, defendants had accumulated 95% (or 167 million shares) of Lyris stock. Am. Comp. ¶ 1; *see* Ex.

19. Some of that stock was purchased from plaintiffs. In particular, plaintiffs allegedly owned between 4% and 7% of Lyris's stock, either directly or indirectly through Addison LP, their investment vehicle. *Id.* ¶ 20.[9] However, the Burts sold "nearly all" of these shares to the various defendants. *Id.* Specifically, in March 2010, Addison LP sold 3,000,000 shares of Lyris stock to Meudon and Ty Comfort for $0.33 per share, totaling $1,000,000. *See id.* ¶ 71. And, in or about May 2011, Addison LP sold 5,000,000 shares to Ty Comfort and Meudon "at a low price." *Id.* ¶ 72; *see id.* ¶¶ 73–75; Am. Comp. Ex. 19. Plaintiffs claim they sold these shares to finance medical treatment for Ms. Burt, who suffers from "multiple severe psychiatric illnesses, including major depressive disorder." *Id.* ¶¶ 73, 112. These sales form the basis of plaintiffs' claims that they were victimized by defendants' conduct in "depressing Lyris's stock price, squeezing out every other large owner of Lyris shares, and reducing liquidity of Lyris stock through failures to market the company," thereby leaving Mr. Burt with no alternative buyer who would be interested in purchasing his Lyris shares. *Id.* ¶ 73.

The Amended Complaint also describes several other purchases of Lyris stock by defendants. For example, in April 2010 "Defendants Bill Comfort, Ty Comfort, Jamie Urry, Stuyvie Comfort, Blair, and McDonald, arranged to have the Company sell them 18 million shares of Lyris stock for a price equal to 33 cents per share," knowing that the price was "artificially low." *Id.* ¶ 64. In February 2011, McDonald "bragged" to Burt, stating that he, Ty Comfort, Urry, Maasberg, and Blair had purchased Lyris stock from Raging Bull Capital for 19

---

[9] According to plaintiffs, David Burt "is the President of Texas Barrington LLC, which is the general partner of Addison LP." Am. Comp. ¶ 18. On January 5, 2012, Addison assigned to plaintiffs all of its equitable and legal rights related to its ownership of Lyris stock (including the right to bring suit for past and future damages). *Id.* ¶ 21.

cents per share, even though the stock was "worth at least $1 per share." *Id.* ¶ 68. In November 2011, Ty Comfort, through an entity he controls called 65 BR Trust, purchased 20 million shares of Lyris stock directly from the Company at a price of 10.5 cents per share. *Id.* ¶ 65. And, in late 2012, "Ty Comfort arranged for Lyris to sell 30 million shares to 65 BR Trust . . . at a price equal to 22 cents per share, implying a total enterprise valuation of only $24 million." *Id.* ¶ 105. In all, from 2010 to 2012, "[d]efendants arranged to have the Company sell them 72 million shares for a total of $15 million." *Id.* ¶¶ 64–66.

According to plaintiffs, several of the defendants purchased additional amounts of Lyris stock through "off-shore entities owned or controlled by Bill Comfort, Ty Comfort, Stuyvie Comfort, and Urry ("Comfort Shell Entities") . . . based in or incorporated in off-shore financial and tax havens such as Bermuda, the Cayman Islands, or Madeira, Portugal. *Id.* ¶ 78. And, plaintiffs allege that "Each of the Comfort Shell Entities' purchases was likely small enough to avoid the SEC's 5% ownership stake reporting requirements." *Id.*[10]

In addition, plaintiffs allege that, just prior to the sale of 30 million shares to 65 BR Trust, defendants declined an opportunity to sell Lyris at a price significantly above market value and, in particular, significantly above the price charged to 65 BR Trust. In August 2012, officers of a company called J2 Global "had several conversations with Ty Comfort and Maasberg regarding a sale of Lyris to J2 Global." *Id.* ¶ 103. Plaintiffs allege that, during these discussions, "Maasberg and Ty Comfort separately stated that the current trading price of approximately 16 cents per share was not even close to the true value of Lyris as a company and that Lyris's other

---

[10] The Comfort Shell Entities were named as defendants in the original Complaint, but they are not named as defendants in the Amended Complaint.

officers and directors were aware that the value of the company far exceeded its current stock price." *Id.* ¶ 104. Eventually, J2 Global offered to buy Lyris for a price of $100 million in cash, which is "over four times greater than Lyris's market value of approximately $22 million at the time." *Id.* ¶ 105. According to plaintiffs, Maasberg and Ty Comfort rejected this offer and replied that Lyris was worth $150 million. *See* Ex. 24 to Am. Comp., E-mail from Rick Faulk, Landslide, to David Burt (Aug. 31, 2012, 9:02:55 AM EDT). However, "[w]ithin sixty days of rejecting this offer," Ty Comfort allegedly arranged the above-described purchase for 65 BR Trust that implied that Lyris had a total value of "only $24 million." Am. Comp. ¶ 105. Plaintiffs claim that this series of events confirms that defendants sought to dilute the value of Lyris's stock, rather than to increase its value for the benefit the Company's other shareholders.

*Misleading Public Filings*: As discussed more fully, *infra*, § 13(d) of the Exchange Act of 1934 requires any investor or group of investors holding or acquiring beneficial ownership of more than five percent of an issuer's stock to file a "Schedule 13D," disclosing, *inter alia*, any plans with respect to the stock, including any intent to assume control of the company. *See* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-101; *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009). The Amended Complaint alleges that, during the Fraud Period, defendants either filed false and misleading Schedule 13Ds that disclaimed any intent as a group to take over Lyris, or failed to file required Schedule 13Ds. *See* Am. Comp. ¶¶ 79, 81–90. Plaintiffs identify the following Schedule 13Ds as false:

a. *Ty Comfort*: March 10, 2008; March 19, 2010; April 12, 2010; May 20, 2011; June 3, 2011; November 9, 2011; November 21, 2011; November 29, 2011; October 17, 2012, *id.* ¶ 81;

b. *LDN Stuyvie*: March 10, 2008; March 19, 2010; April 12, 2010; June 3, 2011, *id.* ¶ 83;

    c.  *Urry*: April 12, 2010; August 28, 2010; June 8, 2011, *id.* ¶ 82;

    d.  *Meudon*: April 12, 2010; August 27, 2010; June 8, 2011, *id.* ¶ 84.

Further, the Amended Complaint alleges that Bill and Stuyvesant Comfort, Blair, McDonald, and

Maasberg failed to file Schedule 13Ds during the Fraud Period, despite being a part of the group.

*See id.* ¶¶ 89–90.

    Further, the Amended Complaint avers that defendants caused Lyris to issue false public

filings.  Section 14(a) of the Exchange Act of 1934, 15 U.S.C.A. § 78n(a), and Rules 14a-3 and

14a-9 thereunder, 17 C.F.R. §§ 240.14a-3 & 240.14a-9, require the filing of an annual "Proxy

Statement" and its dissemination to stockholders.  According to the Amended Complaint, "none

of the agreements or understandings among defendants set forth herein were disclosed by Lyris

in any of the 10-Qs [quarterly financial reports filed with the SEC, *see* 17 C.F.R. § 249.308a] or

10-Ks [annual financial reports filed with the SEC, *see* 17 C.F.R. § 240.310], or Proxy

Statements it filed during the Fraud period."  *Id.* ¶ 91.  The Amended Complaint sets forth the

"materially false filings" as follows, *id.* ¶ 92:

    a.  Proxy Statements (filed April 2008, April 2009, April 2010, April 2011, and
        April 2012) (Exs. 12, 21).

    b.  Forms 10-K (for Fiscal Years ending June 30, 2008, June 30, 2009, June 30,
        2010, June 30, 2011, and June 30, 2012) (Exs. 13, 22).

    c.  Report on Forms 10-Q (filed November 2007, February 2008, May 2008,
        November 2008, February 2009, May 2009, November 12, 2009, February 10,
        2010, May 12, 2010, November 12, 2010, February 9, 2011, May 15, 2011,
        September 30, 2011 (with amendment), December 31, 2011 (with
        amendment), March 31, 2012 (with amendments), September 30, 2012, and
        December 31, 2012).

*Defendants' Alleged Motives*: According to plaintiffs, defendants had two motives to conceal their intentions to work together to acquire the vast majority of Lyris stock. First, concealing their intentions allowed them to keep the stock price low, facilitating their acquisition of more shares of Lyris stock. Plaintiffs explain that if the market learns that a major investor intends to buy more stock or to obtain a controlling share of the company, the market reacts favorably and the price of the company's stock increases. *Id.* ¶ 99. Moreover, "stockholders become aware that a takeover attempt may be underway, and it enables them to demand a 'control premium' for their shares from the individual or group seeking to gain control." *Id.*[11] According to plaintiff, defendants' actions "drove away all other major holders of Lyris stock such that the only buyers were Defendants themselves, and by withholding their intentions, Plaintiffs were unable to sell their shares for a fair value or at a 'control premium.'" *Id.* ¶ 110. Second, if Lyris experienced an "ownership change" pursuant to Section 382 of the Internal Revenue Code—which plaintiffs allege would have occurred if a group reported that it had acquired 95% of the Company's stock—"the value of the $180 million NOL would fall dramatically." *Id.* ¶ 101.

---

[11] "Control premium" means the "premium paid for shares carrying the power to control a corporation." *Black's Law Dictionary* 1300 (9th ed. 2009); *see, e.g.*, *Paramount Commc'ns Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994) ("Once control has shifted, the current . . . stockholders will have no leverage in the future to demand another control premium. As a result, the . . . stockholders are entitled to receive, and should receive, a control premium and/or protective devices of significant value."). "The control premium is often computed by comparing the aggregate value of the controlling block of shares with the cost that would be incurred if the shares could be acquired at the going market price per share." *Black's Law Dictionary* 1300–01.

No facts are alleged indicating that any defendants, individually or collectively, misused their "control" of the Company. Further, plaintiffs do not allege that the price of Lyris stock has appreciated since plaintiffs sold their shares.

New Allegations

Most of the allegations in the Amended Complaint were also contained in the original Complaint, which I dismissed, without prejudice. However, plaintiffs have added new factual allegations, some of which were included in the summary above. Plaintiffs claim that the new allegations are sufficient to overcome the shortcomings of the original Complaint.

The following factual allegations were among those added to the Amended Complaint:[12]

- "In February 2011, McDonald admitted that Defendants had a common understanding to depress the price of Lyris's stock and were responsible for doing so." Am. Comp. ¶ 53; *see id.* ¶ 68.

- "McDonald explained that Defendants were responsible for the decline in Lyris's stock price pursuant to a plan to depress the value of Lyris's stock in order to purchase it for themselves." *Id.* ¶ 69.

- "Bill Comfort demanded approval of all the family's major investment decisions" and "had to review and approve each material decision regarding Lyris." *Id.* ¶ 38.

- "Ty Comfort, Urry, and Stuyvie Comfort must obtain sign-off from Bill Comfort before making major investment decisions, and Bill Comfort regularly dictates the terms of such investments, including the structure and price of any stock purchase." *Id.* ¶ 3.

- 5 million of the shares of Lyris stock purchased from Raging Bull Capital were purchased by Ty Comfort and Urry, who "placed them in off-shore entities to evade any disclosure requirements – including SEC and IRS reporting requirements – in part to protect the value of Lyris's NOL. To date, no person or entity has claimed that it owns the 5 million

---

[12] Because of the extensive structural, organizational, and stylistic changes made to plaintiffs' allegations, it was particularly challenging to identify the "new" substantive allegations in the Amended Complaint. The list is not intended to be exhaustive, but it includes all the allegations identified by the Burt Memo as "new," as well as any I have relied upon in this Memorandum Opinion.

shares of Lyris stock that Ty Comfort and Urry purchased from Raging Bull Capital in February 2011." *Id.* ¶ 69.

- Maasberg and Ty Comfort rejected an offer from J2 Global to buy Lyris for a price of $100 million in cash, which is "over four times greater than Lyris's market value of approximately $22 million at the time." *Id.* ¶ 105. And, "[w]ithin sixty days of rejecting this offer . . . Ty Comfort arranged for Lyris to sell 30 million shares to 65 BR Trust, an entity he controls, at a price equal to 22 cents per share, implying a total enterprise valuation of only $24 million." *Id.*

- During negotiations preceding Mr. Burt's sale of 5 million shares of Lyris stock in May 2011, "Blair would not reveal which persons or entities would be acquiring the shares. Instead, he stated that 'the Comforts' would determine later how to distribute the shares among the entities participating in the acquisition." *Id.* ¶ 76.

- During the same negotiations, Blair also informed Mr. Burt that he "required Bill Comfort's direction on how to structure the deal." *Id.* ¶ 75.

- In connection with the May 2011 sale of Lyris shares, and prior to the institution of this lawsuit, Bill Comfort and Urry demanded that plaintiffs release "*all* defendants from liability for any causes of action Plaintiffs may have relating to Defendants' conduct concerning Lyris and its stock." *Id.* ¶ 77.

## Standard of Review

1. Fed. R. Civ. P. 12(b)(6)

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *see Aschroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

Whether a complaint adequately states a claim for relief is judged by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Twombly*, 550 U.S. at 554-55. Rule 8(a)(2)

provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a plaintiff need not include "detailed factual allegations," the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555. To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (brackets in original) (internal quotation marks omitted). A complaint is insufficient if it provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555.

In considering a Rule 12(b)(6) motion, the court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009). And, a court "owe[s] no allegiance to 'unwarranted inferences, unreasonable conclusions, or arguments' drawn from those facts." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (quoting *Monroe*, 579 F.3d at 385-86). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted).

Typically, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178

F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

Ordinarily, in resolving a motion under Rule 12(b)(6), a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). But, under Fed. R. Civ. P. 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion [to a summary judgment motion], or to reject it or simply not consider it." 5C Wright & Miller, Fed. Prac. & Pro. § 1366, at 159 (3d ed. 2004); *see Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012).

Generally, if a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). There are some limited exceptions, however. For instance, the court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss,

so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citations omitted). Thus, I may consider the various exhibits appended to the Complaint and the Amended Complaint, which include, *inter alia*, each of the allegedly false Schedule 13Ds filed by defendants and the Proxy Statements and other public filings made by Lyris. Additionally, facts and documents subject to judicial notice may be considered by a court, without converting the motion under Rule 12(d). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle*, 637 F.3d at 466; *see, e.g.*, *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering stock analyst reports cited in complaint); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n. 4 (4th Cir. 2004) (taking judicial notice of published stock prices). Furthermore, I may consider the public filings submitted to the SEC that defendants have included as exhibits, "because 'no serious question as to their authenticity can exist,'" but "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)) (emphasis in *Roth*).[13]

### 2. Fed. R. Civ. P. 9(b)

Plaintiffs' allegations of fraud implicate the heightened pleading standard under Fed. R. Civ. P. 9(b). *Cozzarelli*, 549 F.3d at 629. The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents

---

[13] Defendants' motions also rely, in part, on Fed. R. Civ. P. 12(b)(2), in that they claim that the Court lacks personal jurisdiction over defendants with regard to plaintiffs' state law claims. And, defendants have attached affidavits in support of their 12(b)(2) motions. Although the Court generally may consider affidavits in support of 12(b)(2) motions, my disposition of the motions makes it unnecessary to consider the affidavits submitted by defendants.

of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted); *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

As the Fourth Circuit has said, Fed. R. Civ. P. 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

*Harrison*, 176 F.3d at 784 (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).

By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind. It states, in part: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle Int'l*, Civ. No. AW-10-1057, 2011 WL

1231311, at * 9 (D. Md. Mar. 30, 2011). Thus, "[i]n cases involving concealment or omissions of material facts, . . . meeting Rule 9(b)'s particularity requirement will likely take a different form." *Piotrowski v. Wells Fargo Bank, N.A.*, Civ. No. DKC 11-3758, 2013 WL 247549 (D. Md. Jan. 22, 2013) (citing *Shaw*, 973 F. Supp. at 552). And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

### 3. Private Securities Litigation Reform Act

Although Fed. R. Civ. P. 9(b) already imposes a heightened pleading standard upon a plaintiff seeking to bring a claim of fraud, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), sets forth a "special pleading standard" for "certain elements of a securities fraud claim brought under Section 10(b) of the Exchange Act." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 625 (D. Md. 2012). The PSLRA was enacted to discourage frivolous securities claims by imposing stringent pleading requirements with regard to allegations of securities fraud. *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 171–72 (4th Cir. 2007); *cf.* H.R. Rep. 104-369, at 31 (1995), *reprinted at* 1995 U.S.C.C.A.N. 730, 730 (criticizing "abusive" practices in securities fraud litigation, including "the routine filing of lawsuits . . . with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action"). In other words, "[t]hrough the '[e]xacting pleading requirements' of the PSLRA, Congress charged courts to be vigilant in preventing meritless securities fraud claims from reaching the discovery phase of litigation." *Cozzarelli*, 549 F.3d at 623 (quoting *Tellabs*, 551 U.S. at 313).

First, the PSLRA requires that a plaintiff asserting a violation of the federal securities laws based on a false or misleading statement "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, state with particularity *all facts* on which that belief is formed."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  By using the words "all facts," the PSLRA departs from the pleading standard of Fed. R. Civ. P. 8(a).  *See generally Hunter*, 477 F.3d at 170-74.

Ordinarily, "consideration of a motion to dismiss must account for the possibility that a noticed claim could become legally sufficient if the necessary facts were to be developed during discovery."  *Id.* at 170.  As the *Hunter* Court explained, "under the generally applicable notice pleading rules, . . . the court [must] ask whether *any conceivable set of facts* could be proved consistent with the complaint's allegations that would permit relief to be granted."  *Id.* at 173.  In contrast, under the PSLRA, a court should evaluate the sufficiency of the claim by "assum[ing] that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission."  *Id.* at 171.  The standard is "whether the complaint states *sufficient facts* to permit a *reasonable* person to find that . . . the defendant made a false or misleading statement."  *Id.* at 173 (emphasis in original).  Thus, "[i]f the plaintiff fails to allege *all* facts but does allege *sufficient facts* to support a *reasonable belief* in the allegation that defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element."  *Id.* at 174 (citing *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000)) (emphasis in *Hunter*).

As noted, under the PSLRA, a complaint must "specif[y] the statements alleged to have been misleading and the reasons why they were misleading." *Hunter*, 477 F.3d at 174; *see* 15 U.S.C. § 78u-4(b)(1). Additionally, "specific statements must be attributed to specific individuals." *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 960 (D. Md. 1995). And, the facts alleged must also "support a reasonable belief that the statements were in fact misleading." *Hunter*, 477 F.3d at 175. The Fourth Circuit has explained, *id.* at 174, that applying this standard

> necessarily entails a case-by-case assessment of the complaint as a whole. [A court] will consider the number and level of detail of the facts; the plausibility and coherence of the facts; whether sources of the facts are disclosed and the apparent reliability of those sources; and any other criteria that inform how well the facts support the plaintiff's allegation that defendant's statements or omissions were misleading.

Second, the PSLRA requires that "in any private action . . . in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission . . . , state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The PSLRA requires a showing that each defendant—or, in the case of a corporate defendant, at least one authorized agent of the corporation—acted "intentionally or with 'severe recklessness.'" *Hunter*, 477 F.3d at 184 (citation omitted); *see Cozarelli*, 549 F.3d at 623. A "strong inference" under the PSLRA arises "'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 131 S. Ct. 1309, 1324 (2011) (quoting *Tellabs*, 551 U.S. at 323). Reviewing "'all the allegations holistically,'" a court must therefore "take into account 'plausible opposing inferences.'" *Matrixx*, 131 S. Ct. at 1324 (quoting *Tellabs*, 551 U.S. at 323, 326). Allegations

supporting the presence of a motive are relevant, but not dispositive. *Matrixx*, 131 S. Ct. at 1324 (citing *Tellabs*, 551 U.S. at 325).

Notably, the PSLRA does not allow for "group pleading." Rather, plaintiffs "must allege facts supporting a strong inference of scienter as to *each* defendant." *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009) (emphasis added); *see Lefkoe v. Jos. A. Bank Clothiers*, Civil No. WMN-06-1892, 2008 WL 7275126, at *6 (D. Md. May 13, 2008) ("[T]he Fourth Circuit has rejected group pleading under the PSLRA . . . ."); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 234, 370 (D. Md. 2004) (rejecting "group pleading" doctrine as "inconsistent with particularity and specificity required by the PSLRA and Rule 9(b)"). And, the allegations must show "how the individual Defendants were involved in any alleged schemes . . . or, assuming such . . . scheme[s] existed, how each individual Defendant knew of the alleged fraud." *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 573 (D. Md. 2005); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001) ("[U]nder the [PSLRA], we disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the statute.").

If a complaint does not meet these pleading requirements, the PSLRA provides that a district court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). However, the PSLRA does not mandate dismissal with prejudice.

### Discussion

### I.    Count I: Section 10(b) and Rule 10b-5

In Count I, plaintiffs assert claims against all defendants for violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Section

10(b) prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

Section 10(b) is implemented by way of Rule 10b-5, 17 C.F.R. § 240.10b-5. *Matrix*, 576 F.3d at 181 (citing *Tellabs*, 551 U.S. at 318). Plaintiffs allege that defendants have violated Rule 10b-5(a), (b), and (c), which provide:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

a. Rule 10b-5(b)

The elements of a private § 10(b) action premised on a violation of Rule 10b-5(b) are:

> "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission).

*Matrix*, 576 F.3d at 181 (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008)) (emphasis in *Matrix* omitted); *see Katyle*, 637 F.3d at 466 n.1. As indicated, the PSLRA's heightened pleading standards apply to the first two elements of such a

claim.  *See In re Mun. Mortg. & Equity*, 876 F. Supp. 2d at 625-26.  The remaining elements of a

securities claim sounding in fraud are governed by Fed. R. Civ. P. 9(b).  *Cozzarelli*, 549 F.3d at

629; *see Katyle*, 637 F.3d at 471 & n.5 (applying Rule 9 to element of loss causation).

Plaintiffs contend that each defendant violated Rule 10b-5(b) by knowingly making

material misrepresentations or omissions in required public filings, thereby causing the trading

value of Lyris's stock to remain artificially low and causing a loss to plaintiffs when they sold

their Lyris stock.  Defendants counter that plaintiffs have failed adequately to allege (1) a

material misrepresentation or omission; (2) scienter; and (3) loss causation.  I will address each

element, in turn.

### 1.  Material Misrepresentation or Omission

Plaintiffs allege that each defendant either filed a Schedule 13D without disclosing his

membership in a "group" or failed to file a required Schedule 13D, despite his membership in a

"group."  Burt Memo at 10.[14]  Schedule 13Ds are governed by the Williams Act of 1968,

codified at 15 U.S.C. § 78m(d)(1), which amended the Securities Exchange Act of 1934 to add

§ 13(d).  *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 51 & n.1 (1975).  The statute requires

certain disclosures, such as the filing of a Schedule 13D, by "any person" who "is directly or

indirectly a beneficial owner" of more than five percent of the securities of an issuer.  15 U.S.C.

§ 78m(d)(1).  Under the Williams Act and its implementing rules, 17 C.F.R. § 240.13d-101, a

Schedule 13D

---

[14]  In addition to these allegations relating to a "group", plaintiffs also allege that Ty Comfort and Urry "intentionally omitted disclosing on their Schedule 13D forms that they had purchased five million shares of Lyris stock from Raging Bull Capital."  Burt Memo at 16. Defendants fail to address this allegation in their motions to dismiss and, accordingly, I will not address it here.

> "requires the filer to (1) state the purpose of the acquisition of the covered securities, including any purpose to acquire control and (2) certain specifically listed 'plans or proposals' which relate to or would result in (a) the acquisition or disposition of additional shares; (b) any change in the board of directors or management; or (c) any material change in the business or corporate structure of the issuer."

*Vladimir*, 606 F. Supp. 2d at 491 (quoting *Rosen v. Brookhaven Capital Mgmt. Co., Ltd.*, 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000)). Under SEC regulations, "[t]he term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

Schedule 13D's disclosure obligations are triggered by a person's initial acquisition of beneficial ownership of more than five percent of an issuer's securities, in which case a Schedule 13D must be filed within ten days of the acquisition. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1(a). If a person already holds beneficial ownership of more than five percent of an issuer's securities, an amended Schedule 13D must be filed "promptly" upon any material change in the purpose of ownership, per 17 C.F.R. § 240.13d-2(a). Disclosure is intended "to insure that public shareholders who are confronted with a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party." *Rondeau*, 422 U.S. at 59; *see Mates*, 53 F. Supp. 2d at 823 (citing *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26 (1977)).

The disclosure obligations imposed by the Williams Act extend to both individual investors and "groups." *See* 15 U.S.C. § 78m(d)(3). This "prevent[s] a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provision of the statute because no one individual owns more than [5 percent] of the securities."

H.R. Rep. No. 90-1711 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2811, 2814.  And, under SEC regulations, "beneficial ownership" of the securities held by any group member will be attributed to all members of the group.  17 C.F.R. § 240.13d-5(b)(1) ("When two or more persons agree to act together . . . , the group formed thereby shall be deemed to have acquired beneficial ownership . . . as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.").  Consequently, the Williams Act "requires a group that has acquired, directly or indirectly, beneficial ownership of more than five percent of a class of registered equity securities, to file a [Schedule] 13D . . . with the issuer, with the exchanges on which the security is traded, and with the SEC, disclosing, among other things, *the identity of its members and the purpose of its acquisition*."  *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617 (2d Cir. 2002) (citing 15 U.S.C. § 78m(d)(3)) (emphasis added); *see, e.g.*, *Rondeau*, 422 U.S. at 51-53 & n.1; *Vladimir*, *supra*, 606 F. Supp. 2d at 491.

    The failure to file or amend a Schedule 13D, as required, serves as a predicate for liability under § 10(b) and Rule 10b-5(b).  *Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15, 18 (2d Cir. 1995); *Vladimir*, 606 F. Supp. 2d at 491.  If a duty to disclose arises under the Williams Act, the failure to file or disclose information in a Schedule 13D is actionable.  *Vladimir*, 606 F. Supp. 2d at 491 ("As with any alleged 10b-5 violation, the touchstone is the existence of a duty to disclose.") (citing *Azurite*, 52 F.3d at 18).

    Plaintiffs allege that each of the defendants was a member of a group, and therefore each was required to file a Schedule 13D disclosing the group's plan to depress the price of Lyris's stock and then to "amass 95% of Lyris's stock at bargain-basement prices."  Burt Memo at 16. According to plaintiffs, Ty Comfort, Urry, LDN Stuyvie, and Meudon each filed a Schedule 13D

disclosing his/its ownership of more than five percent of Lyris stock,[15] but none also disclosed his/its membership in a "group" and the group's "agreements or understandings" about depressing the price of Lyris stock and acquiring control of the Company. Plaintiffs allege that these omissions were made "with the intent to mislead other investors, including Plaintiffs, the SEC and the IRS." Am. Comp. ¶ 86. With regard to McDonald, Blair, Maasberg, and Bill and Stuyvie Comfort, plaintiffs allege that each had "agreements or understandings with Ty Comfort and Urry" and that each "failed to file a Schedule 13D." *Id.* ¶ 90. These failures to file, according to plaintiffs, "were made knowingly and with the intent to defraud others." *Id.*

The Burts' allegations thus rise and fall on the contention that the defendants formed a "group." If there was no group, then the failure to disclose the existence of a group on Schedule 13Ds was not a misrepresentation or omission. Therefore, the critical issue here is whether plaintiffs have adequately alleged the existence of a group.

A "group" exists when "two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3). "'The touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective.'" *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007) (quoting *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982)). Under § 13(d), "a court evaluating an allegation of the existence of a group must 'determine whether there is sufficient direct or circumstantial evidence to support the inference

---

[15] For example, Schedule 13Ds and amendments thereto disclose that, as of May 20, 2011, "Ty Comfort (directly or indirectly through LDN) 'may be deemed to beneficially own in the aggregate 58,574,388 shares of [Lyris common stock], representing approximately 48.3% of the outstanding shares . . . .'" O&D Memo at 12 (citing Am. Comp. Exs. 8, 20).

of a formal or informal understanding between [the defendants]' for the purpose of acquiring, holding, or disposing of securities." *Hallwood*, 286 F.3d at 617 (quoting *Wellman*, 682 F.2d at 363); *see Corenco Corp. v. Schiavone & Sons*, 488 F.2d 207, 217 (2d Cir. 1973) ("[A]bsent an agreement between them a group would not exist.").

Because the existence of a group requires an agreement, "'there must be evidence that indicate[s] an intention to act in concert over and above the prior and continuing relationships between the various parties.'" *Torchmark Corp. v. Bixby*, 708 F. Supp. 1070, 1083 (W.D. Mo. 1988) (quoting *K-N Energy, Inc. v. Gulf Interstate Co.*, 607 F. Supp. 756, 765 (D. Colo. 1983)). And, of import here, to allege the existence of an agreement, it is not enough that the defendants are "related through blood, marriage, business or social relationships." *Bixby*, 708 F. Supp. at 1083; *accord Texasgulf, Inc. v. Can. Dev. Corp.*, 366 F. Supp. 374, 403 (S.D. Tex. 1974) ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person. There must be agreement to act in concert."). Moreover, the existence of a group will not be inferred solely because defendants explored business dealings or exchanged information related to the issuer. *See Vladimir*, 606 F. Supp. 2d at 493–94; *K-N Energy*, 607 F. Supp. at 767 (finding that sharing of information regarding issuer, among alleged members of group, "provides little support" for claim that alleged group members "agreed to act in concert with others to acquire [issuer's] stock").

To be sure, a group need not formally memorialize its objective in writing, and direct evidence, let alone a "smoking gun," is not required. *Hallwood*, 286 F.3d at 617. Rather, the existence of a group may be shown by circumstantial evidence, including "prior relationships and trading patterns," "discussions between the defendants," and evidence of "a particular *modus*

*operandi*." *Id.* at 617–18.  Courts have also recognized that "[m]atters of group purpose are . . . difficult to discern, for intent may not always be fully formed, but may mature and manifest at any point in a continuum." *Rosen*, 113 F. Supp. 2d at 632.  To this end, a plaintiff need not allege "every term of a 13D filer's plan or purpose." *Vladimir*, 606 F. Supp. 2d at 491.  And, of import here, at the motion to dismiss stage, "courts may find that 'purpose and intent may not be divined without some investigation and discovery.'" *Id.* (quoting *Rosen*, 113 F. Supp. 2d at 632).

The contours of defendants' plan, as described by plaintiffs, is that Blair, at the direction of Bill Comfort, engaged in manipulative stock trades designed to decrease the price of Lyris's stock.  At the same time, and also at the direction of Bill Comfort, McDonald and Maasberg refused to market Lyris's stock to potential buyers.  Then, Ty Comfort, Urry, LDN Stuyvie, and Meudon—again at the direction of Bill Comfort—purchased Lyris's stock at depressed prices, eventually accumulating 95% of the Company.

As I explain below, the Amended Complaint "states *sufficient facts* to permit a *reasonable* person to find" that defendants formed a group for the purposes described by plaintiffs. *Hunter*, *supra*, 477 F.3d at 173 (emphasis in original).

In my prior Memorandum Opinion, concerning the original Complaint, I addressed at length the question of whether plaintiffs adequately alleged the existence of a group.  I concluded that they had not.  In my view, "plaintiffs offer[ed] only speculation and surmise—not facts—as to an agreement to take control of Lyris, predicated on the close familial ties among the Comforts and the business relationships of all the defendants." Memo Op. at 39.  Ultimately, I concluded that "the facts alleged are not sufficient to permit a 'reasonable belief' that defendants

acted as a group to take control of Lyris, such that they were obligated to disclose the group's existence and its purpose." *Id.* at 36.

The Amended Complaint rectifies the shortcomings of the original Complaint. It adequately alleges sufficient facts as to defendants' formation of a group with the intention of driving down the price of Lyris stock to facilitate the acquisition of a controlling share in the Company. These factual allegations, if true, would permit a reasonable person to find that defendants joined a group.

Like the original Complaint, the Amended Complaint alleges that the price of Lyris's stock was manipulated in various ways, including through a pattern of small-sum morning sales followed by small-sum afternoon acquisitions; that Blair admitted that the only reason anyone would engage in this trading behavior would be to drive down the price of a stock in order to acquire large amounts of that stock; that the Comforts, Urry, and/or the entities they control were the only individuals or entities to acquire a meaningful stake in Lyris after the period of manipulative trading; and that Blair was the exclusive stockbroker for those defendants. Previously, as to the original Complaint, I found those allegations, standing alone, to be insufficient, because no facts were alleged to support the inference that defendants were responsible for the manipulative trading, rather than merely opportunistic buyers of Lyris stock. *See, e.g.*, Memo Op. at 42 ("There is no allegation that Blair admitted that he or any of the defendants were the ones who engaged in the manipulation."). In other words, the original Complaint only contained factual allegations that manipulative trades were conducted and that several defendants capitalized on the resulting decline in the price of Lyris's stock. But, it did

not contain any factual allegations connecting the dots; *i.e.* that those same defendants were responsible for the manipulative trading.

Similarly, with regard to the failure of McDonald and Maasberg to promote Lyris to investors, both the original Complaint and the Amended Complaint allege that Ty Comfort and McDonald admitted that the value of Lyris's stock would increase if it were promoted to investors, and yet Maasberg "never presented at any investor conference as CEO of Lyris," and McDonald "has not presented or marketed Lyris at a single investor conference in more than five years on the job." Am. Comp. ¶ 57. However, as was the case with regard to the manipulative trading, the original Complaint failed to allege facts to support the inference that McDonald's and Maasberg's failure to promote the Company to investors was because they had joined a group whose goal it was to drive down the price of Lyris's stock.

In contrast, the Amended Complaint ties together the loose ends dangling in the original Complaint. In the Amended Complaint, plaintiffs allege that "McDonald explained [to Burt] that Defendants were responsible for the decline in Lyris's stock price pursuant to a plan to depress the value of Lyris's stock in order to purchase it for themselves." Am. Comp. ¶ 69. In other words, whereas the original Complaint alleged suspect trading patterns and then *speculated* that defendants might be responsible, and it further alleged a failure to market Lyris and *speculated* that the reason might be the existence of a group, the Amended Complaint rises above speculation by alleging that McDonald made a crucial admission. This admission, taken as true, supports the notion that defendants formed a group that orchestrated and executed a plan to assume control of Lyris. Although a "smoking gun" is not required to plead the existence of a group, plaintiffs included one in the Amended Complaint.

Moreover, the original Complaint alleged that Ty Comfort, Stuyvie Comfort, and Urry jointly manage their investments, and that members of the Comfort family held daily conference calls to discuss their investments. With regard to those allegations, I noted in my prior Memorandum Opinion that "the Comforts hold significant investments outside of Lyris," and therefore discussions and joint management of investments did not "warrant the belief that defendants orchestrated a plan to gain control of Lyris." Memo Op. at 40. However, the Amended Complaint alleges more than mere discussions among family members about their investment portfolios. It specifically alleges that Ty Comfort "made it explicitly clear to Mr. Burt that he, Bill Comfort, Stuyvie Comfort, and Urry jointly managed *their investment in Lyris*." Am. Comp. ¶ 39 (emphasis added). Moreover, the Amended Complaint alleges that Ty Comfort and Urry do not make *any* "major investment decisions," including those regarding Lyris, unless Bill Comfort affirmatively approves the transaction. *See* Am. Comp. ¶¶ 3, 38, 75–76. Thus, plaintiffs have alleged not just that some defendants jointly manage *some* of their investments, but that these defendants confer specifically about Lyris and that defendant Bill Comfort directed the others to acquire shares of Lyris.[16]

Other newly added allegations, which must be taken as true at this juncture, would provide further circumstantial evidence that defendants acted in concert with regard to their shares of Lyris stock. For example, the Amended Complaint alleges that Blair told Mr. Burt that

---

[16] The SH Defendants also suggest that the claims against Bill Comfort should be dismissed because "[t]here is no allegation that Bill Comfort actually owned, purchased, or sold any shares of Lyris during the alleged Fraud Period." SH Memo at 4. Similarly, they argue that Stuyvie Comfort is not alleged to be a beneficial owner of any Lyris stock. *Id.* at 11 n.5. However, all members of a group are "deemed to have acquired beneficial ownership . . . of all equity securities" owned by other members of the group. 17 C.F.R. § 240.13d-5(b)(1), and plaintiffs have adequately alleged that both Bill and Stuyvie Comfort were members of a group.

"the Comforts would determine later how to distribute the shares" of Lyris that they purchased from Mr. Burt in May 2011, *id.* ¶ 76 (internal quotation marks omitted), suggesting that two or more of the defendants had formed or would form an agreement "for the purpose of acquiring . . . securities." 15 U.S.C. § 78m(d)(3). Additionally, plaintiffs allege that as part of that May 2011 transaction Bill Comfort and Urry demanded that plaintiffs release "*all* defendants from liability for any causes of action Plaintiffs may have relating to Defendants' conduct concerning Lyris and its stock." *Id.* ¶ 77 (emphasis added). If true, this demand for a joint release of all defendants is circumstantial evidence that all defendants acted in concert with regard to their Lyris stock.

In short, the original Complaint's factual allegations were only that several individuals and entities with familial relations purchased large amounts of the stock of Lyris, which appeared to be undervalued. In contrast, the Amended Complaint, construed as a whole, alleges facts supporting plaintiffs' claim that several of those individuals and entities worked together to depress the value of the Company and then, at the direction of Bill Comfort, acted jointly to amass the vast majority of shares of the Company.

Defendants' motions to dismiss largely parrot the findings of this Court with regard to the original Complaint. But, they fail to grapple with the new allegations of the Amended Complaint. For example, the O&D Defendants' brief dismisses the new allegations regarding McDonald's admission of concerted behavior by defendants to depress the stock price of Lyris as "conclusory and inconsistent." O&D Memo at 21. But, they overlook the posture of the case, where I must assume the truth of the well-pleaded allegations. And, they do not explain why they believe the allegations to be inconsistent or why an admission of wrongdoing by a

defendant is improper solely because it includes the "conclusion" that defendants "were responsible for the decline in Lyris's stock price." Am Comp. ¶ 69.

Similarly, the O&D Defendants dismiss the allegations relating to plaintiffs' May 2011 sale of Lyris stock as "isolated details" that do not show that defendants engaged in a common plan "during the alleged six-year 'Fraud Period.'" O&D Memo at 21. To be sure, the May 2011 transaction, standing alone, does not prove that defendants engaged in a common plan over the entire six-year period. However, each brick of evidence need not form the complete wall. Plaintiffs' allegations regarding the May 2011 sale, taken as true, are direct evidence that Bill Comfort, Meudon, and Urry formed a group to acquire Lyris stock, and if proven, would constitute circumstantial evidence that multiple defendants acted together in accumulating Lyris stock during the Fraud Period.

The Stockholder Defendants similarly fail to address the new allegations of the Amended Complaint. For example, they merely claim: "Other than repeating what the Court has already found to be legally insufficient, Plaintiffs plead no other facts . . . suggesting or creating the necessary factual inferences that any of the Stockholder Defendants were part of any 'group' which was required to be disclosed in a Schedule 13D filing or amendment." SH Memo at 15 (internal citation omitted). Elsewhere in their Memo, the Stockholder Defendants assert: "[T]he mere allegation that [Bill and Stuyvie Comfort] wanted others to purchase Lyris stock is insufficient to state a claim for a violation of section 13(d)." SH Memo at 11 (citation omitted).

As an initial matter, plaintiffs allege that Bill and Stuyvie Comfort actually purchased shares of Lyris stock through various offshore "shell" entities. *See* Am. Comp. ¶ 64. Moreover, plaintiffs' allegations go far beyond the notion that Bill Comfort *wanted* others to purchase

stock. To the contrary, plaintiffs allege that Bill Comfort affirmatively directed the purchases of Lyris stock by Ty Comfort, Urry, LDN Stuyvie, and Meudon. Likewise, plaintiffs' allegations regarding Stuyvie Comfort, although perhaps less detailed than those regarding Bill Comfort, also allege more than a mere desire for others to purchase stock. Plaintiffs allege in multiple places that Stuyvie Comfort controls LDN Stuyvie, which purchased shares of Lyris stock as part of the group, *see* Am. Comp. ¶ 28, and that Stuyvie joined other members of the group in affirmatively carrying out the multi-faceted plan to take control of Lyris. *See id.* ¶¶ 38–39, 54–61.

Equally unavailing are the Stockholder Defendants' denials of the truth of the allegations in the Amended Complaint. *See, e.g.*, SH Memo at 13 ("Each of LDN Stuyvie's subsequent purchases of Lyris stock were . . . entirely consistent with LDN Stuyvie's stated purpose of simply acting as an investor in Lyris."). As discussed, plaintiffs' allegations must be taken as true at this juncture; defendants' denials are of no moment in a motion to dismiss.[17]

In sum, the Amended Complaint adequately alleges the existence of a group. And, it is undisputed that none of the defendants disclosed on Schedule 13Ds their membership in the group. Accordingly, plaintiffs have adequately alleged that each defendant made a misrepresentation or omission that would subject him/it to liability under Rule 10b-5(b).

---

[17] To be sure, the factual allegations regarding LDN Stuyvie and Meudon are somewhat sparse. *See* SH Memo at 7–8. But, this is to be expected considering that they are both business entities unable to make statements or join in conference calls. At this juncture, it is sufficient that plaintiffs have alleged that these entities purchased stock as part of a group plan to take control of Lyris.

2.  Scienter

Under the PSLRA, scienter requires "'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Cozzarelli*, 549 F.3d at 623; *see Yates v. Municipal Mortgage & Equity*, No. 12-2496, slip op. at 13–14 (Mar. 7, 2014).  As discussed, a complaint must create a "strong inference" of scienter; this standard is satisfied if "'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Matrix*, 576 F.3d at 182 (quoting *Tellabs*, 551 U.S. at 324); *see Yates*, slip op. at 14–16; *In re GLG Life Tech Corp. Sec. Litig.*, Civ. No. 11-9150, 2014 WL 464762, at *4–*5 (S.D.N.Y. Feb. 3, 2014).

One way "in which a plaintiff may prove scienter is by alleging facts 'that show both motive and an opportunity to commit fraud.'"  *In re GLG Life Tech Corp. Sec. Litig.*, 2014 WL 464762 at *5 (quoting *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996)).  It is clear that defendants had the opportunity to execute the alleged plan.  Defendants are stockholders, officers, and directors of Lyris, and plaintiffs have alleged that defendants have extensive resources with which to purchase large amounts of Lyris's stock.  *See, e.g.*, Am. Comp. ¶ 39.  Indeed, large purchases of stock were made.  The question, then, concerns "motive."

"'[M]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"  *Chill*, 101 F.3d at 267 (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994)); *accord In re Visual Networks, Inc. Sec. Litig.*, 217 F. Supp. 2d 662, 668 (D. Md. 2002).  Plaintiffs have extensively alleged the group's motive to hide its accumulation of Lyris's stock.  First, the group's concealment of its

intentions allowed it to depress the price of Lyris's stock, facilitating the acquisition of more shares of the stock at prices far below Lyris's true value. *See id.* ¶¶ 99–100. As noted, plaintiffs explain that if the market learns that a major investor intends to buy more stock or to obtain a controlling share of the company, the market "reacts favorably" and "the price of the company's stock increases." *Id.* ¶ 99. Moreover, "stockholders become aware that a takeover attempt may be underway," which enables those stockholders to demand a 'control premium' for their shares from the individual or group seeking to gain control." *Id.* Another alleged motive for the group's concealment of its plan was so that the Company could retain its $180 million NOL. Plaintiffs allege that the value of the NOL "would fall dramatically if the acquired company experienced a change of control, which occurs when one or more 5-percent shareholders increases their stock-holdings in the company in a manner constituting an 'ownership change' as set forth in 26 U.S.C. § 382(g)."[18] *Id.* ¶ 35. Thus, plaintiffs allege that by not disclosing the

---

[18] 26 U.S.C. § 382(g) provides:

Ownership change. For purposes of this section

(1) In general. There is an ownership change if, immediately after any owner shift involving a 5-percent shareholder or any equity structure shift

(A) the percentage of the stock of the loss corporation owned by 1 or more 5-percent shareholders has increased by more than 50 percentage points, over

(B) the lowest percentage of stock of the loss corporation (or any predecessor corporation) owned by such shareholders at any time during the testing period.

(2) Owner shift involving 5-percent shareholder. There is an owner shift involving a 5-percent shareholder if

(A) there is any change in the respective ownership of stock of a corporation, and

ownership change caused by the group's activities, the group was able to retain the value of the $180 million NOL.

Plaintiffs have clearly pled that defendants had the motive and the opportunity to make material misrepresentations and omissions in their public filings. And, taking as true plaintiffs' allegations that defendants formed a group to take control of Lyris, "the danger of misleading investors" by not disclosing the existence of the group surely was "either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it." *Cozzarelli*, 549 F.3d at 623. Thus, scienter has been adequately pled.

### 3. Loss Causation

A plaintiff asserting a claim under § 10(b) bears the burden of proving "loss causation," *i.e.*, "that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see Katyle*, 637 F.3d at 465. Reading this provision of the PSLRA in conjunction with Fed. R. Civ. P. 9(b), the Fourth Circuit "requires that a plaintiff, as a precursor to proof, allege loss causation in the complaint 'with sufficient specificity to enable the court to evaluate whether the necessary causal link exists.'" *Katyle*, 637 F.3d at 465-66 (quoting *Hunter*, 477 F.3d at 186). In other words, "the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Katyle*, 637 F.3d at 472 (citing *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004)).

---

        (B) such change affects the percentage of stock of such corporation owned by any person who is a 5-percent shareholder before or after such change.

Notably, a plaintiff need only allege facts to "show that the defendant's conduct was a *substantial* cause of its injury; other contributing forces to the loss will not bar recovery under the loss causation requirement." *In re Mun. Mortg. & Equity*, 876 F. Supp. 2d at 645 (citing *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 119 (4th Cir. 2009), *rev'd on other grounds*, *Janus Capital Grp., Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296 (2011)); *see Miller*, 364 F.3d at 232 (explaining that loss causation requires a showing that "defendant's misrepresentation was a *substantial* cause of the loss," not that it was the "sole cause"). But, "'if the [alleged] connection is attenuated . . . a fraud claim will not lie. That is because the loss causation requirement—as with the foreseeability limitation in tort—is intended to fix a legal limit on a person's responsibility, even for wrongful acts.'" *Katyle*, 637 F.3d at 472 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)). In *Miller*, 364 F.3d at 230, the Fourth Circuit explained: "For purposes of liability in a Rule 10b-5 case, a plaintiff's proof of damages proximately caused by the defendant seems to function as a gate-keeping requirement designed to forestall attenuated, and difficult to prove, claims."

Here, plaintiffs have pled loss causation with the requisite specificity. Their theory of loss causation is not "attenuated" or "difficult to prove." Rather, it is simply that defendants' actions artificially depressed the price of Lyris's stock and, as a result, plaintiffs suffered a loss when Mr. Burt sold his stock at an artificially reduced price. In particular, and as discussed, plaintiffs allege that defendants engaged in market manipulation, Am. Comp. ¶¶ 44–50; failed to promote Lyris to any investors, *id.* ¶¶ 54–62; failed to disclose their group intentions to take control of Lyris, *id.* ¶¶ 99–100; and arranged the issuance of new Lyris shares to themselves for prices far below the Company's actual value, which vastly diluted the value of stock held by

other Lyris shareholders.  *Id.* ¶¶ 64–66.

That these actions would decrease the price of Lyris's stock is either self-evident or clearly explained by plaintiffs in their Amended Complaint.  Indeed, plaintiffs allege that some defendants *admitted* that some of these actions would cause a decline in the price of Lyris's stock.  *See, e.g.*, *id.* ¶ 51.  Thus, plaintiffs have adequately alleged a "direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct."  *Katyle*, 637 F.3d at 472.[19]

The O&D Defendants argue that the *actual* reason for Lyris's decline in trading value was not defendants' actions; instead, it was the Company's flat revenues, combined with negative net income in fifteen consecutive quarters.  Conversely, plaintiffs maintain that Lyris's financial performance was not as poor as defendants suggest, pointing out that the Company experienced positive cash earnings during the Fraud Period.  Burt Memo at 26–27.  Regardless of who has the better of that particular argument, plaintiffs are not required to plead that defendants' actions were the *sole* cause of plaintiffs' injuries, but rather that they were a *substantial* cause.  Lyris's trading value may have declined for multiple reasons; the crucial point is that plaintiffs have alleged that defendants' actions were a substantial cause of the decline.

Indeed, the Amended Complaint's allegations regarding the J2 Global offer suggest that, even after taking into account Lyris's purportedly poor financial performance, the trading value of Lyris was still artificially low.  If Lyris's trading value had declined only because of its poor financial performance, then Ty Comfort's rejection of J2 Global's offer to pay four times the

---

[19] The SH Defendants' claim that plaintiffs' "'loss causation' allegations are confined to only four separate paragraphs in the Amended Complaint," SH Memo at 18, is disingenuous, at best.  The Amended Complaint explains, in explicit detail and in dozens of paragraphs, the manner in which defendants' alleged actions caused a decline in the price of Lyris stock.

company's trading value would be quite peculiar. *See Keener v. Exxon Co., USA*, 32 F.3d 127, 132 n.5 (4th Cir. 1994) ("[W]hen a third party makes an offer in cash, or its equivalent . . . a 'court can justifiably infer that the amount of an arms' length offer represents the value of the [asset]'") (quoting *Ellis v. Mobil Oil*, 969 F.2d 784, 786 (9th Cir. 1992)). On the other hand, if the trading value had been artificially reduced, then his rejection of the offer is understandable. So, even if defendants are correct that some of Lyris's decrease in trading value was because of the Company's financial performance, plaintiffs have still alleged facts suggesting that they suffered losses because of defendants' conduct.

For these reasons, defendants' motions to dismiss plaintiffs' claims under Rule 10b-5(b) will be denied.

b. Rules 10b-5(a) and (c)

Plaintiffs allege that the defendants, acting together, violated Rules 10b-5(a) and (c) by engaging in manipulative trading; failing to promote Lyris; secretly purchasing Lyris at depressed prices; and filing false 13D statements and/or failing to file 13D statements. Unlike a claim under Rule 10b-5(b), "a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004) (citing, *inter alia*, *Affiliated Ute*, 406 U.S. at 152-53; *S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002)). However, such claims still "must include some element of deception." *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 245 (4th Cir. 1988).

The elements of a claim based on manipulative conduct under 10b-5(a) and (c) are:

"(1) [Plaintiffs] were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially

> affected by defendants' deceptive or manipulative conduct; and (5) the defendants
> engaged in the manipulative conduct with scienter."

*In re Royal Ahold*, 351 F. Supp. 2d at 372 (quoting *In re Global Crossing*, 322 F. Supp. 2d at 335).

Claims under Rule 10b-5(a) and Rule 10b-5(c), like claims under Rule 10b-5(b), "are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA[] and, as a result, the plaintiffs must specify, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *In re Royal Ahold*, 351 F. Supp. 2d at 372 (footnote omitted) (quoting *In re Belch Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y.1997)).

Defendants have not offered any arguments specifically pertaining to plaintiffs' claims under Rules 10b-5(a) and 10b-5(c). Accordingly, for the reasons discussed, *supra*, the motions to dismiss plaintiffs' claims under Rules 10b-5(a) and 10b-5(c) will be denied.

## II.     Count II: Section 14(a) and Rule 14a-9

In Count II, plaintiffs allege that the O&D Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.154a-9(a), through Lyris's issuance of false or misleading proxy statements. Section 14(a)-9, provides, at 15 U.S.C. § 78n(a):

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title.

Rule 14a-9, codified at 17 C.F.R. § 240.14a-9(a), applies to misrepresentations or omissions in proxy statements. It provides, *id.*:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

"A shareholder establishes a violation of Rule 14a-9, which is promulgated under Section 14(a) of the Securities Exchange Act by establishing: (1) the proxy statement contains a material misrepresentation or omission; (2) the defendants were [at least] negligent; and (3) the proxy was the essential link in completing the transaction in question." *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 701 (M.D.N.C. 1992); *see Hayes v. Crown Central Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curia) (listing same elements of § 14(a) claim under Rule 14a-9).

Courts have treated claims under § 14(a) based on a misrepresentation or omission as subject to the pleading requirements of the PSLRA. *See, e.g.*, *Cal. Pub. Empts. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144-45 (3d Cir. 2004); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) ("[P]laintiffs' Section 14(a) claim rests on the same charges of fraudulent conduct as their Section 10(b) claim. . . . When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to the heightened pleading requirements [of the PSLRA] even if they disclaim reliance on a fraud theory.") (citations omitted). This approach comports with the plain language of the PSLRA, which applies "[i]n *any private action arising under this chapter* in which the plaintiff alleges that the defendant . . .

made an untrue statement of a material fact; or . . . omitted to state a material fact necessarily in order to make the statements made . . . not misleading." 15 U.S.C. § 78u-4(b)(1) (emphasis added).

Defendants urge dismissal of Count II on the same grounds on which they urged dismissal of Count I; namely, that plaintiffs failed adequately to allege that defendants joined a "group" and that plaintiffs failed to allege that they suffered harm from defendants' alleged misrepresentations. *See* O&D Memo at 26 ("[T]he O&D Defendants incorporate by reference the arguments in § V.A.2 of this memorandum [regarding Count I]"); SH Memo (not specifically addressing claims under Section 14(a)). For the reasons discussed, *supra*, defendants' motions to dismiss Count II will be denied.

## III.  Personal Jurisdiction

Defendants contend that, if plaintiffs fail to allege viable federal claims, this Court lacks personal jurisdiction over defendants with respect to plaintiffs' state law claims.[20] *See* SH Motion at 29–33; O&D Motion at 27–33. However, they concede that if plaintiffs have alleged viable federal claims, the Court may exercise pendent personal jurisdiction over the defendants with respect to the state law claims. *See* SH Memo at 29; O&D Motion at 27; *see also* Memo

---

[20] If plaintiffs allege viable federal claims, this Court may exercise personal jurisdiction over defendants with respect to a claim under the federal securities laws, so long as defendants have sufficient contacts with the United States. 15 U.S.C. § 78aa ("Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."); *see Mates v. N. Am. Vaccine, Inc.*, 53 F. Supp. 2d 814, 820 (D. Md. 1999) ("[T]he relevant question under [15 U.S.C. § 78aa] becomes whether the party has sufficient contacts with the United States, not any particular state."). The sufficiency of defendants' contacts with the United States is not in issue.

Op. at 68 ("If plaintiffs file an amended complaint stating viable claims under the federal securities laws, it would not be necessary to resolve defendants' jurisdictional arguments as to the supplemental state law claims."). As discussed, plaintiffs assert viable federal securities claims against all defendants. Therefore, the Court may exercise pendent personal jurisdiction over all defendants with respect to plaintiffs' state law claims.

## IV.    Count III: Maryland Securities Act[21]

Count III of plaintiffs' Amended Complaint alleges, against all named defendants, violations of Md. Code (2007 Repl. Vol., 2013 Supp.), § 11-703 of the Corporations and Associations Article ("C.A."). C.A. § 11-703 provides, in relevant part:

> (a)(2) A person is civilly liable to the person selling a security to him if he offers to purchase or purchases the security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, the seller not knowing of the untruth or omission, and if he does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.
> . . .
>
> (b)(2) A seller may sue either at law or in equity:
>
>> (i) On tender of the consideration paid for the security, to recover the security, together with the amount of any income received on the security, costs, and reasonable attorneys' fees; or
>>
>> (ii) If the buyer no longer owns the security, for damages.

Defendants urge dismissal of Count III on various grounds. *See* SH Memo at 21–25; O&D Memo at 33–35. In particular, they argue that plaintiffs have not adequately alleged an

---

[21] The Maryland Securities Act is often referred to as the "Blue Sky Law." *See, e.g.*, *Sherwood Brands, Inc. v. Levie*, No. 06-1509, 2007 WL 4622915 (4th Cir. Dec. 28, 2007); *Mathews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 80 A.3d 269, 281 (2013).

untrue statement or omission (as defendants argued with respect to Counts I and II); that plaintiffs have not pled that they "did not know of" any untruth or omission; and that the relief they seek (*i.e.* damages) is not permitted by C.A. § 11-703. Moreover, the SH Defendants argue that plaintiffs fail to allege that Bill or Stuyvie Comfort purchased any securities from them. *Id.*

In response, plaintiffs reiterate the arguments they made in relation to Counts I and II; aver that the allegations in the Amended Complaint "make clear that plaintiffs did not know . . . that Defendants were secretly driving the stock price down to enable them to seize control of a majority stake in Lyris," Burt Memo at 33; and contend that their request for damages, even if improper, does not warrant dismissal of the Amended Complaint. They also claim that their allegations against Bill and Stuyvie Comfort are sufficient to state a claim for joint and several liability.

For the reasons that follow, I will dismiss Count III with regard to Stuyvie Comfort, LDN Stuyvie, Maasberg, and McDonald. Further, to the extent that plaintiffs' claim is premised on Mr. Burt's May 2011 sale of Lyris's stock, I will dismiss Count III with regard to the remaining defendants.

Because my analysis turns on the text of the statute, it is helpful to begin with the principles of statutory construction. In *Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 26–27, 59 A.3d 509, 516 (2013), the Maryland Court of Appeals set forth the well settled "basic rules" for statutory interpretation in Maryland, *id.* (citations omitted):

> A court's primary goal in construing statutes is to discern the legislative purpose—the ends to be accomplished, the evils to be remedied. The most common expression of that principle is that we look to the intention of the Legislature "in enacting the statute." That, necessarily, has been construed to mean the intent of the Legislature "at the time it enacted the statute." We thus look at the "ends to be accomplished" or the "evils to be remedied" known to, or

at least within the reasonable contemplation of, the legislative body when it enacted the statute.

*** 

We begin with the plain language of the statute, reading it as a whole to ensure that no word, clause, sentence, or phrase is rendered meaningless. If the language is clear and unambiguous, we need go no further. In determining whether the language is clear and unambiguous, we interpret each provision in the context of the entire statutory scheme. Statutes must, however, be given a reasonable interpretation, not one that is illogical or incompatible with common sense, and statutes on the same subject are to be read together and harmonized, to the extent possible.

*See also Miller v. Manias*, 428 Md. 419, 450-51, 52 A.3d 53, 72 (2012); *Montgomery County v. FOP Lodge 35,* 427 Md. 561, 572, 50 A. 3d 579, 585-86 (2012); *120 W. Fayette v. Baltimore*, 413 Md. 309, 331, 992 A.2d 459, 472 (2010) (applying to municipal ordinances the same rules of construction that apply for state statutes). Additionally, "Maryland courts examine federal case law when interpreting state securities statutes which . . . are worded similarly to their federal counterparts." *Sherwood Brands, Inc. v. Levee*, 2006 WL 827371 (D. Md. Mar. 24, 2006), *aff'd,* 2007 WL 4622915 (4th Cir. Dec. 28, 2007) (citing *Mossman v. Van Leer*, 263 F.3d 129, 133 (4th Cir. 2001), *cert. denied*, 534 U.S. 1128 (2002); *Usher v. Emmett A. Larkin Co., Inc.*, 205 F. Supp. 2d 475, 479 (D. Md. 2002); *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md. App. 145, 620 A.2d 356, 369–70 (Md. 1993)).

Under the plain text of C.A. § 11-703(a)(2), the buyer of a security may be held directly liable only to "the person selling a security *to him*." *Id.* (emphasis added). Thus, with one exception detailed *infra*, a plaintiff may only bring a claim under C.A. § 11-703(a)(2) against someone who purchased a security directly from him. This plain-text reading of the statute is confirmed by the two statutory remedies available to a plaintiff alleging a violation of C.A. § 11-703(a)(2). The first available remedy is rescission of the transaction, *see* C.A. § 11-703(b)(2)(i),

which would be impossible to effectuate unless the defendant had previously bought the security from the plaintiff. The second available remedy is for damages, but that remedy is only available if the seller "no longer owns the security." *Id.* § 11-703(b)(2)(ii). The statute's use of the term "no longer owns" clearly implies that, at some point, the defendant must have owned the security that was sold by the plaintiff. Thus, the two available remedies both presume a transaction between the plaintiff and the defendant, confirming that a claim under C.A. § 11-703(a)(2) is only viable against a defendant who bought a security from the plaintiff.

Viewing the allegations of the Amended Complaint through the prism of C.A. § 11-703, it is clear that the only persons who may be held directly liable under that section are Ty Comfort and Meudon. Although the Amended Complaint alleges numerous purchases of Lyris stock, it only alleges two transactions during the Fraud Period in which plaintiffs sold securities to any of the defendants. Specifically, in March 2010 Addison LP sold 3,000,000 shares of Lyris stock to Ty Comfort and Meudon. *Id.* ¶ 71; *Id.* Ex. 19. And, in or about May 2011 Addison LP sold 5,000,000 shares to Ty Comfort and Meudon. *Id.* ¶ 74; *see id.* ¶¶ 72–75; *id.* Ex. 19. Accordingly, the only defendants alleged to have purchased securities *from the plaintiff*, as required by C.A. § 11-703(a)(2), are Ty Comfort and Meudon.

The one exception to the rule requiring a transaction between the plaintiff and the defendant is in C.A. § 11-703(c). That section provides for joint and several liability for, *inter alia*, *id.*:

> Every person who directly or indirectly controls a person liable under subsection (a) of this section, every partner, officer, or director of the person liable, . . . and every broker-dealer or agent who materially aids in such conduct . . . unless [he is] able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Thus, a defendant who did not purchase a security from the Burts may still be liable to them under C.A. § 11-703(a)(2) if he "directly or indirectly controls" Ty Comfort or Meudon; is a "partner, officer, or director" of Meudon; or is a "broker-dealer or agent" of Ty Comfort or Meudon who materially aided in the transaction. Fitting that bill are: (1) Urry, who plaintiffs allege directly controls Meudon, *see* Am Comp. ¶ 29; (2) Bill Comfort, who plaintiffs allege controls the investment decisions of both Ty Comfort and Urry, *id.* ¶¶ 3, 38, 75–76; and (3) Blair, who plaintiffs allege was the exclusive stockbroker for Ty Comfort and Urry, *id.* ¶ 4, and who plaintiffs allege brokered defendants' May 2011 purchase of Lyris stock from plaintiffs. *Id.* ¶¶ 72–75. In contrast, there are no allegations that Stuyvie Comfort, LDN Stuyvie, McDonald, or Maasberg directly controlled either Ty Comfort or Meudon, or that they satisfy any of the other grounds of joint and several liability under C.A. § 11-703(c). Accordingly, I will dismiss Count III as to Stuyvie Comfort, LDN Stuyvie, McDonald, and Maasberg.

Both sets of defendants also urge dismissal on the ground that "Plaintiffs have not pled and cannot prove that they did not know of 'the untruth or omission,' as the [Maryland Securities Act] requires." O&D Memo at 34; *see* SH Memo at 22–23. As noted, an element of a claim under C.A. § 11-703(a)(2) is that "the seller [did not know] of the untruth or omission" when he sold his security. In my view, the Amended Complaint adequately alleges that plaintiffs were unaware of defendants' scheme when plaintiffs sold their Lyris stock in March 2010, but not when plaintiffs sold additional Lyris stock in May 2011.

Plaintiffs detail several instances in which particular defendants assured Mr. Burt that Lyris "would 'soon' or 'next quarter' be promoted to investors." Am. Comp. ¶ 59, *see id.* ¶¶ 60–61. But, despite these assurances and Mr. Burt's apparent belief in them, defendants never

promoted Lyris's stock to outside investors. Similarly, plaintiffs allege that, although Mr. Burt recognized abnormalities in the trading patterns of Lyris's stock, Blair "denied that he and the Comforts were responsible." *Id.* ¶ 53. Thus, plaintiffs have alleged that, for much of the Fraud Period, they were unaware of defendants' alleged takeover scheme.

However, plaintiffs also allege that in February 2011, "McDonald admitted [to Mr. Burt] that Defendants had a common understanding to depress the price of Lyris's stock and were responsible for doing so." *Id.* This allegation, which serves as the linchpin of plaintiffs' federal securities claims, is also a concession of Mr. Burt's knowledge of defendants' common plan prior to his May 2011 sale of 5 million shares of Lyris's stock. Thus, with regard to the May 2011 sale, plaintiffs have failed to allege that they "did not know, and in the exercise of reasonable care could not have known of the untruth or omission" about which they complain. *See* C.A. § 11-703(a)(2). Accordingly, I will grant defendants' motions to dismiss Count III with respect to the May 2011 sale.

Defendants' remaining arguments for dismissal of Count III are unpersuasive. The Stockholder Defendants argue that the claims against Bill Comfort under C.A. § 11-703(c) must fail because "there is nothing in the plain language of Count III . . . that could be construed as placing [Bill Comfort] on notice of any 'controlling person' claim against [him]." SH Memo at 8. I disagree. Although it is true that the Amended Complaint does not explicitly reference C.A. § 11-703(c), the Amended Complaint is replete with allegations that Bill Comfort controlled and directed the Lyris-related investments of Ty Comfort and Urry. Accordingly, the allegations of the Amended Complaint provided Bill Comfort "fair notice of what the . . . claim is and the

grounds upon which it rests." *Twombly*, *supra*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in *Twombly*).

Both sets of defendants argue that "the sole remedy sought [by plaintiffs] – damages – is not available to Plaintiffs in this case based on their own pleadings." SH Memo at 24 (citation omitted); *see* O&D Memo at 34–35. As discussed, C.A. § 11-703(b)(2) specifies two sorts of remedies available to the seller of a security: rescission and damages. The Amended Complaint requests only damages. *See* Am. Comp. ¶ 127 ("[Defendants] are liable to Plaintiffs for damages suffered in connection with Defendants' wrongful conduct."). But, C.A. § 11-703(b)(2)(ii) permits recovery of damages only if "the buyer no longer owns the security." Plaintiffs have failed to allege that defendants no longer own the securities they purchased from plaintiffs. And, they have affirmatively pled that defendants continue to own the securities. Thus, damages are not available to plaintiffs on the facts they have alleged.

I agree with defendants that, under the facts alleged by plaintiffs, they may not recover damages as to Count III. But, this fact does not warrant dismissal of Count III. It is well established that a court "should not dismiss a complaint so long as it sets out facts sufficient to support a reasonable inference that the plaintiff is entitled to any relief the court can grant, even if that relief is not specifically requested." *Int'l Fid. Ins. Co. v. Mahogany, Inc.*, Civ. No. 11-1708, 2011 WL 3055251, at *2 n.1 (D. Md. June 25, 2011) (citing *Bontkowski v. Smith,* 305 F.3d 757, 762 (7th Cir. 2002)); *see* Fed. R. Civ. P. 54(c) ("[A] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); 5 Wright & Miller, Fed. Prac. & Pro. § 1255, at 509 (3d ed. 2004) ("[T]he selection of an improper remedy in the Rule 8(a)(3) demand for relief will not be fatal to a party's pleading if the

statement of the claim indicates the pleader may be entitled to relief of some other type."); *cf.*

*Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65 (1978) ("[A] federal court should not

dismiss a meritorious constitutional claim because the complaint seeks one remedy rather than

another plainly appropriate one."). Thus, dismissal of Count III for plaintiffs' selection of an

improper remedy is inappropriate, so long as some other remedy is available. And, rescission is

plainly available to plaintiffs "[o]n tender of the consideration paid for the security," C.A. § 11-

703(b)(2)(i), which "may be made at any time before entry of judgment." C.A. § 11-703(d).

In sum, I will dismiss Count III in its entirety as to McDonald, Maasberg, Stuyvesant

Comfort, and LDN Stuyvie. And, I will dismiss Count III as to the remaining defendants with

respect to the allegations related to the May 2011 sale. However, as to Bill and Ty Comfort,

Urry, Meudon, and Blair, I will not dismiss Count III in regard to the sale of Lyris stock in

March 2010.

## V.       Counts IV, V, and VI: Delaware State Law Claims

Plaintiffs have asserted three claims against the O&D Defendants relating to their alleged

breaches of fiduciary duties under Delaware law. Specifically, plaintiffs allege that the O&D

Defendants breached their duty of loyalty, duty of care, and duty not to engage in self-dealing.

The O&D Defendants have moved to dismiss the claims, arguing that such claims may only be

brought as derivative claims on behalf of Lyris and not as direct claims by plaintiffs as

individuals.

Under Delaware law, "the plaintiff must have suffered some individualized harm not

suffered by all of the stockholders at large" in order to bring a direct claim against the directors

of a company for breach of fiduciary duty. *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

A derivative claim, on the other hand, "is one that is brought by a stockholder, on behalf of the corporation, to recover for harms done to the corporation." *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999). Thus, as a general matter, a claim "alleging corporate mismanagement, and a resulting drop in the value of a company's stock, is a classic derivative claim [because] the alleged wrong harms the corporation directly and all of its stockholders indirectly." *Id.*

However, plaintiffs point out that an exception to this general rule applies to certain "equity dilution" claims, wherein "a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration." *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) *aff'd,* 951 A.2d 727 (Del. 2008); *see Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006). This exception exists because in such a situation, the harm resulting "is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders . . . of a portion of the economic value and voting power embodied in the minority interest." *Gentile*, 906 A.2d at 100. And, the "controlling shareholder" for purposes of this exception can be either an individual or "a number of shareholders [who] collectively form a control group." *Dubroff v. Wren Holdings, LLC*, Civ. No. 3940-VCN, 2009 WL 1478697 (Del. Ch. May 22, 2009).

Plaintiffs argue that their claim fits into this exception because they allege that "Defendants worked together, as a group, to take control of Lyris from the company's other shareholders." Burt Memo at 35. In their Reply, The O&D Defendants acknowledge the

exception but claim that plaintiffs may not avail themselves of it because they have not adequately pled the existence of a "control group". O&D Reply at 14. Thus, the viability of plaintiff's claims under Delaware law are tied to the adequacy of their allegations that defendants acted as a group.

Plaintiffs adequately alleged that each of the O&D Defendants joined a group to take control of Lyris. *See supra*. Therefore, plaintiffs have also adequately alleged violations of Delaware law in Counts IV, V, and VI. Accordingly, the O&D Defendants' motion to dismiss those counts will be denied.

### VI.    Count VII: Intentional Infliction of Emotional Distress

Plaintiffs allege that, under Maryland law, Bill Comfort, Ty Comfort, Urry, McDonald, and Blair are liable for the tort of intentional infliction of emotional distress ("IIED"). According to plaintiffs, these defendants "intentionally, or at minimum, recklessly, inflicted emotional distress on Ms. Burt by knowingly depressing the value of Plaintiffs' investment in Lyris, an investment that, as Defendants knew, Plaintiffs planned to use to pay for Janet Burt's medical expenses for treating her severe depression." Am. Comp. ¶ 149.

In particular, plaintiffs allege that in May 2011 "Mr. Burt was forced to sell most of his remaining shares in Lyris to fund his wife's medical treatment." *Id.* ¶ 115. Further, they aver that defendants' successful scheme to depress the price of Lyris stock left Mr. Burt with no choice but to sell his Lyris stock at an artificially low price. As a result, plaintiffs lacked the funds for "prolonged inpatient treatment" for Ms. Burt, forcing her to stay at an "inexpensive hotel" near the hospital. *Id.* ¶ 116. "One evening, Mrs. Burt was found in her hotel room and rushed to the hospital for emergency treatment" to save her life. *Id.*

The tort of IIED was first recognized by the Maryland Court of Appeals in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977). In order to prevail in Maryland on a claim for IIED, plaintiffs must show that (1) the defendants' conduct was intentional or reckless; (2) their conduct was extreme and outrageous; (3) there was a causal connection between the defendants' wrongful conduct and the emotional distress suffered; and (4) the emotional distress was severe. *Id.* at 566, 380 A.2d at 614; *accord Caldor, Inc. v. Bowden*, 330 Md. 632, 641–42, 625 A.2d 959, 963 (1993); *Mixter v. Farmer*, 215 Md. App. 536, 548, 81 A.3d 631, 637 (2013); *Lasater v. Guttmann*, 194 Md. App. 431, 448, 5 A.3d 79, 89 (2010); *see also Gantt v. Sec., USA*, 356 F.3d 547, 552 (4th Cir. 2004); *Brengle v. Greenbelt Homes, Inc.*, 804 F. Supp. 2d 447, 452 (D. Md. 2011); *Farasat v. Poulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997).

Claims for intentional infliction of emotional distress are disfavored and difficult to establish and, as such, are "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011). Indeed, the Maryland Court of Appeals has said that this "tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Ky. Fried Chicken Nat'l Mgmt. v. Weathersby*, 326 Md. 663, 670, 607 A.2d 8, 11 (1992).

For conduct to be considered "intentional or reckless," a plaintiff "must allege and prove that the defendant either *desired* to inflict severe emotional distress, *knew* that such distress was *certain or substantially certain* to result from his conduct, or acted recklessly in deliberate disregard *of a high degree of probability* that the emotional distress will follow." *Foor v. Juvenile Servs. Admin.*, 78 Md. App. 151, 175, 552 A.2d 947, 959 (1989) (emphasis in original); *see Brengle*, 804 F. Supp. 2d at 452. Moreover, "[t]he 'extreme and outrageous' standard is

quite high." *Respess*, 770 F. Supp. 2d 751, 758 (D. Md. 2011); *see also Lasater*, 194 Md. App. at 448, 5 A.3d at 89. In particular, the defendants' conduct "must completely violate human dignity, and strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008) (quotation marks omitted).

Although plaintiffs allege that defendants were aware of Ms. Burt's illness and the substantial associated medical costs, Am. Comp. ¶¶ 113–114, plaintiffs' allegations do not support the notion that defendants, in forming a group to take control of Lyris, acted with the intent to cause Ms. Burt emotional harm or acted "recklessly in deliberate disregard *of a high degree of probability*" that Ms. Burt would suffer severe emotional distress from their actions. *See Foor*, 78 Md. App. at 175, 552 A.2d at 959 (emphasis in original). Indeed, plaintiffs allege that they ran out of money for Ms. Burt's medical treatment in May 2011, which is well after defendants' alleged scheme began in 2007. And, the Amended Complaint does not allege that defendants had any interactions or personal contact with Ms. Burt. Defendants could not have foreseen, with the requisite high degree of probability, that their actions beginning in 2007 would eventually cause the Burts to run out of money, which would in turn deprive Ms. Burt of necessary medical treatment, which would in turn cause Ms. Burt severe emotional distress in 2011. Put differently, the purported nexus between defendants' alleged scheme and Ms. Burt's health is far too attenuated to support an IIED claim.

In essence, plaintiffs' claim is simply that they lost money as a result of defendants' scheme and that as a result, they could not afford medical treatment for Ms. Burt. But, they have not alleged that defendants directed any conduct toward Ms. Burt, or that they acted with the

requisite intent to support a claim for IIED as to Ms. Burt.  Accordingly, defendants' motions to dismiss Count VII will be granted.

## Conclusion

For the foregoing reasons, defendants' motions to dismiss will be granted, in part, and denied, in part.  A separate Order follows, consistent with this Memorandum Opinion.


Date: March 28, 2014                                          _____/s/_____
                                                                          Ellen Lipton Hollander
                                                                          United States District Judge