IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| David R. and Janet H. Burt<br>714 Hawkshead Road<br>Timonium, MD 21093<br><br>Texas Addison Limited Partnership<br>714 Hawkshead Road<br>Timonium, MD 21093<br><br>and<br><br>Texas Barrington LLC<br>714 Hawkshead Road<br>Timonium, MD 21093<br><br>        Plaintiffs,<br><br>    v.<br><br>Wolfgang Maasberg<br>Lyris, Inc.<br>6401 Hollis Street, Ste. 125<br>Emeryville, CA  94608<br><br>Richard McDonald<br>Lyris, Inc.<br>P.O. Box 542<br>Wayne, PA  19087<br><br>Andrew Richard Blair<br>1 Rice Bluff Road<br>Pawley's Island, SC  29585<br><br>William T. Comfort, Jr.<br>Court Square Capital Partners<br>Park Avenue Plaza<br>55 East 52nd Street, 34th Floor<br>New York, NY<br><br>William T. Comfort, III<br>Stirling Square Capital Partners LLP<br>Liscartan House, 4th Floor | Civil Action No.: 1:12-cv-00464-ELH<br><br>JURY TRIAL DEMANDED |

127-131 Sloane Street
London SWIX 9AS, United Kingdom

Stuyvesant Pierpont Comfort
Stirling Square Capital Partners LLP
Liscartan House, 4th Floor
127-131 Sloane Street
London SWIX 9AS, United Kingdom

James Urry
19 Meudon Drive
Locust Valley, NY 11560

LDN Stuyvie Partnership
Liscartan House, 4th Floor
127-131 Sloane Street
London SWIX 9AS, United Kingdom

Meudon Investments Partnership
19 Meudon Drive
Locust Valley, NY 11560

Defendants.

## AMENDED COMPLAINT

Plaintiffs David R. and Janet H. Burt ("Mr. Burt" and "Mrs. Burt"), Texas Addison

Limited Partnership ("Addison"), and Texas Barrington LLC ("Texas Barrington") (collectively,

"Plaintiffs") hereby allege as follows against the Defendants named above:

## SUMMARY OF CASE

1.      This is an action to recover damages for a fraud perpetrated by a close-knit group

of sophisticated investors who orchestrated a scheme to depress the stock price of Lyris, Inc.

("Lyris"), a small-cap technology company, at the expense of Lyris's other shareholders.

Defendants secretly drove down Lyris's stock price so they could acquire a dominant stake in

Lyris at bargain-basement prices without disclosing their plans to do so to the market, the SEC,

or the IRS.  Defendants' fraudulent scheme was enormously successful:  from April 2007 to

December 1, 2012 (the "Fraud Period"), Defendants' holdings in Lyris stock – in their own name or through investment vehicles they directly control – rose from 18% to 95%.  *See* Ex. 19.[1] Throughout the Fraud Period, Defendants ignored SEC rules and regulations requiring the disclosure of their intention to acquire and their acquisition of such large percentages of Lyris stock.

2.      Defendants William T. Comfort, III ("Ty Comfort"), James Urry ("Urry"), Richard McDonald ("McDonald"), Andrew Richard Blair ("Blair"), and Wolfgang Maasberg ("Maasberg") were officers or directors of Lyris during the Fraud Period.  Defendants William T. Comfort, Jr. ("Bill Comfort") and Stuyvesant Pierpont Comfort ("Stuyvie Comfort") are shareholders of Lyris who make major investment decisions in concert with Ty Comfort and Urry.  Defendants LDN Stuyvesant Partnership ("LDN Stuyvie") and Meudon Investments Partnership ("Meudon"), are investment vehicles individually or jointly controlled by Defendants and are nominal owners of Lyris stock.

3.      As set forth in detail below, Bill Comfort, Ty Comfort, Urry, and Stuyvie Comfort jointly make major investment decisions, including investments in public companies. Since as early as 2003, these Defendants have held conference calls every weekday morning to discuss their investments.  Ty Comfort, Urry, and Stuyvie Comfort must obtain sign-off from Bill Comfort before making major investment decisions, and Bill Comfort regularly dictates the terms of such investments, including the structure and price of any stock purchase.  Blair, McDonald, and Maasberg knowingly participated in the execution of the scheme by taking

---

[1] Pursuant to Local Rule 103(6)(b), Plaintiffs have not attached any exhibits to this Second Amended Complaint.  Plaintiffs' initial Complaint included Exhibits 1-18, and the Amended Complaint includes Exhibits 19-24.

actions to depress the stock of Lyris so Defendants could acquire the majority of Lyris's stock for prices far below the company's actual value.

4.     The first aspect of Defendants' plan involved a careful scheme to manipulate the market into believing that demand for Lyris stock – and thus the price of that stock – was steadily declining.  Mr. Burt spotted an odd pattern of small-sum morning sales of Lyris stock, followed by small-sum afternoon acquisitions, executed day after day, over a period of months and years, as Lyris's stock price declined.  Mr. Burt reported this pattern to Bill Comfort in 2009.  Shortly thereafter, at Bill Comfort's request, Blair – the exclusive broker for Bill Comfort, Ty Comfort, Urry, and Stuyvie Comfort – contacted Mr. Burt regarding his finding.  Blair admitted that the pattern indeed appeared to be the result of manipulation, and he stated that the only reason why someone would go through such an effort would be to purchase large blocks of stock of the company at a low price.  No other investor or group of investors gained a meaningful stake in Lyris stock during the Fraud Period, whereas Defendants' holdings rose to 95% of the company's stock.  On information and belief, Blair was responsible for these manipulative trades.

5.     The second aspect of Defendants' scheme involved a concerted effort not to promote or market Lyris to investors at any time during the Fraud Period.  As a small-cap company, Lyris attracts minimal interest from the investing public absent efforts to market the company at conferences or other events followed by investors.  Ty Comfort and McDonald, who served as Lyris directors, told Mr. Burt that Lyris's stock price would trade at or above $1.00 per share if the company was marketed, but not once did any officer or director of Lyris engage in marketing efforts during the Fraud Period.  As a result, liquidity and interest in Lyris's stock remained low, causing further downward pressure on its price.

6.      As their plan to artificially depress Lyris's stock price succeeded, Defendants acquired large sums of Lyris stock over the course of the Fraud Period without disclosing their intentions to buy more stock or gain ownership of Lyris to the SEC or the IRS for two reasons. First, a change in ownership would jeopardize the status of a $180 million net operating loss ("NOL") owned by Lyris.  Second, such disclosure would have attracted significant attention, and Lyris stockholders would have been able to demand a control premium for selling their shares.  Defendants kept some of these acquisitions secret by placing Lyris stock with various offshore entities.

7.      In early 2011, after Defendants made a substantial purchase of Lyris stock from a third party investment firm, McDonald called Mr. Burt to brag about the success of Defendants' scheme.  He admitted to Mr. Burt that Defendants had sought to keep Lyris's stock price low so they could cheaply acquire more stock in the company.  Three months later, Mr. Burt sold nearly all of his remaining Lyris shares in order to pay for Mrs. Burt's medical treatment for severe depression.  Blair confirmed to Mr. Burt that Bill Comfort was dictating the terms of the purchase, and McDonald told Mr. Burt that Bill Comfort and Urry demanded a release of all legal claims against Defendants as a condition of payment for Mr. Burt's shares.

8.      Recent events confirm the success of Defendants' scheme.  Several times throughout the Fraud Period, Defendants told Mr. Burt that Lyris's stock should be valued at or above $1.00 per share, even though it was trading at prices below $.25 cents per share.  In August 2012, representatives from J2 Global, a large technology company with substantial cash on hand, contacted Ty Comfort and Maasberg to offer to acquire Lyris.  J2 Global offered $100 million in cash for the company, but Ty Comfort and Maasberg stated that the company was worth $150 million and would not be sold for any lower price.  At the time, Lyris's stock was

- 5 -

trading at a value implying a total value of just $22 million.  Less than two months later, Ty Comfort arranged for Lyris to issue stock to a trust that he controls at a price implying a value of $24 million.  These actions show that Defendants profited enormously from their scheme to drive out Lyris's other investors and acquire their stock at prices representing a fraction of the company's actual value.

9.      Defendants' actions in executing their fraudulent scheme inflicted severe economic losses on Plaintiffs.  Even more, Mrs. Burt's depression – a condition Defendants were aware of but openly disregarded – worsened substantially once she learned the details of Defendants' scheme because she faced the realization that the scheme had destroyed Mr. and Mrs. Burt's ability to pay for her medical treatments.

10.      Defendants are liable to Mr. and Mrs. Burt for violating federal and Maryland securities laws, as well as fiduciary duties imposed by Delaware law.  Defendants are further liable because their extreme and outrageous actions amounted to intentional infliction of emotional distress on Mrs. Burt.

## JURISDICTION

11.      Plaintiffs' federal claims arise under sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a), and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5, 240.154a-9(a).  *See* 15 U.S.C. § 78u-4(b).

12.      Plaintiffs' state claims arise under the Maryland Securities Anti-fraud Statute, § 11-703 of the Corporations & Associations Article of the Maryland Code, Delaware corporate law, and Maryland law.

13.     This court has subject matter jurisdiction over the federal claims pursuant to section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

14.     This court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because Plaintiffs' federal and state claims are part of the same case or controversy.

15.     Venue is proper in this district because Plaintiffs are residents of Maryland and were residents throughout the Fraud Period; Defendants targeted Plaintiffs knowing they were residents of Maryland; and Plaintiffs have suffered harm in Maryland due to Defendants' fraudulent actions.

16.     In particular, McDonald placed numerous calls to Mr. Burt admitting to the fraud detailed in this complaint, and knowing that Mr. Burt was in Maryland.  Urry directed McDonald to make several of those phone calls knowing that Mr. Burt was in Maryland.  Ty Comfort also called Mr. Burt to discuss Lyris and the subject matter of this suit knowing that Mr. Burt was in Maryland.  Blair made statements that are part of the fraudulent scheme detailed in this Complaint during phone calls to Mr. Burt and knowing that Mr. Burt was in Maryland.  Blair also called Plaintiffs' stockbroker regarding Plaintiffs' fraudulently induced sale of Lyris stock to Defendants knowing that the stockbroker was in Maryland at the time.  Bill Comfort sent a letter to Mr. Burt in Maryland that is part of the fraud set forth in this Complaint.  Maasberg signed some of the SEC statements containing false and material misstatements and omissions sent to Plaintiffs in Maryland.  And Bill Comfort, Ty Comfort, Urry, McDonald, and Blair directed their intentional infliction of emotional distress upon Mrs. Burt while she was a resident in Maryland.

17.     In addition, McDonald and Ty Comfort engaged in the fraudulent activities described in this Complaint while they themselves were in Maryland.  McDonald made some of

the fraudulent statements detailed in this Complaint to Mr. Burt while McDonald was on his cell phone driving through Maryland from his home in Pennsylvania to see his son in North Carolina. Ty Comfort participated in the fraudulent scheme described in this Complaint while managing Lyris from St. Michaels and Easton, Maryland in July of 2008, 2009, and 2010.

## PARTIES

18.     Plaintiff David R. Burt was the Chief Executive Officer of Lyris and its predecessor companies (hereinafter "Lyris" unless otherwise stated) from approximately June 2000 until January 2007.  He is the President of Plaintiff Texas Barrington LLC ("Texas Barrington"), the general partner of Plaintiff Addison, a Lyris stockholder during the Fraud Period.

19.     Plaintiff Janet H. Burt is David Burt's wife.  She has been receiving treatment for severe depression and other mental illnesses since at least 2000.  From 2002 to the present, Mr. and Mrs. Burt have incurred more than $1 million in medical expenses to treat these illnesses. As known by Richard McDonald, Richard Blair, Ty Comfort, and Bill Comfort, Mr. and Mrs. Burt had planned to use proceeds from their Lyris holdings to fund Mrs. Burt's ongoing medical treatment.

20.     Plaintiff Texas Addison Limited Partnership is a limited partnership originally incorporated in Texas in January 2002.  Texas Barrington is the general partner of Addison, and David Burt and Janet Burt are the sole limited partners of Addison.  Addison was a Lyris stockholder during the Fraud Period.

21.     Plaintiff Texas Barrington is a limited liability corporation incorporated in Texas in January 2002.  Texas Barrington is the general partner of Addison, which was a Lyris stockholder during the Fraud Period.  David Burt is President of Texas Barrington.

22.     Plaintiffs David Burt and Janet Burt, directly and through Texas Barrington and Addison, owned between 4% and 7% of the outstanding stock of Lyris during the Fraud Period before selling nearly all their shares to Defendants.  At the end of the Fraud Period, Mr. Burt still owned 10,000 shares of Lyris stock.

23.     On January 5, 2012, Addison assigned to Plaintiffs all of its equitable and legal rights related to its ownership of Lyris stock (including the right to bring suit for past and future damages).

24.     Defendant Bill Comfort is a resident of New York, New York; Locust Valley, New York; and Hobe Sound, Florida.  He is the Managing Partner of Court Square Capital Partners ("Court Square"), a private equity investment firm in New York City that manages approximately $6 billion of aggregate capital commitments.  Court Square was established in 2006 by former members of Citicorp Venture Capital ("CVC"), the private investment arm of Citibank for which Bill Comfort served as Chairman for more than 25 years.

25.     Bill Comfort's ownership stake in Lyris was sufficient to bring Defendants' total ownership stake of the company to approximately 95% by the end of the Fraud Period.

26.     Defendant Ty Comfort is a U.S. citizen residing in London, England, and Bill Comfort's middle son.  He is a professional investor and was Chairman of the Board of Directors of Lyris from 2003 through August 2012.  At the end of the Fraud Period, Ty Comfort personally owned 10% of Lyris's outstanding stock, or approximately 17 million shares (not including his stake in LDN Stuyvie).

27.     Ty Comfort directly controls at least two investment vehicles that acquired substantial amounts of Lyris stock during the Fraud Period.  One such entity, 65 BR Trust, is a trust established under the laws of New York.  Ty Comfort is the investment advisor of 65 BR

Trust and has voting and dispositive power over its investment in Lyris.  In his Schedule 13D

filings to the SEC, Ty Comfort claimed that his children are the beneficial owners of 65 BR

Trust's Lyris stock.  At the end of the Fraud Period, 65 BR Trust owned over 13% of Lyris's

outstanding stock, or approximately 22.5 million shares.  Another entity Ty Comfort controls,

Lyr, Ltd. ("Lyr"), is a company established under the laws of Bermuda.  Ty Comfort has sole

voting power with respect to shares of Lyris owned by Lyr.  On October 17, 2012, Lyr acquired

2,000,000 shares of Lyris's Series A Preferred Stock, which is convertible into 30,000,000 shares

of common stock of the issuer and is entitled to 30,000,000 votes.[2]

29.    Defendant Urry is a resident of New York, New York and Locust Valley, New

York.  He is married to Bill Comfort's daughter, Nathalie Comfort Urry, and manages her

investment decisions as well as his own.  Urry is a professional investor and was a partner at

Court Square until Fall 2011, where he worked alongside his father in law (Bill Comfort) for 20

years.  He left Court Square in Fall 2011 to form another partnership.  Urry was a member of

Lyris's Board of Directors during the Fraud Period.

29.    Defendant Stuyvie Comfort is a U.S. citizen residing in London, England, and

Bill Comfort's youngest son.  He is a professional investor and partner of Stirling Square Capital

Partners, a private equity buyout firm based in London, England with approximately $1 billion in

total committed capital.  Stuyvie Comfort served on the Lyris Board of Directors from

approximately 2000 until 2002.

30.    Defendant LDN Stuyvie is a partnership established under the laws of Oklahoma.

Ty Comfort is the general partner of LDN Stuyvie, and he shares voting and dispositive power

---

[2] On March 2, 2012, Lyris's Board of Directors announced a reverse split of Lyris's stock,
effective March 12, 2012, through which stockholders received one share for every fifteen shares
of pre-existing Lyris stock that they possessed.  For consistency, this Amended Complaint refers
to the pre-split totals.

over all its common stock with his brother (Stuyvie Comfort) and sister (Nathalie Comfort Urry, James Urry's wife). At the end of the Fraud Period, LDN Stuyvie owned 25% of Lyris's outstanding stock, or approximately 43 million shares.

31. Defendant Meudon is a New York partnership controlled by Urry, who has sole voting and dispositive power over all its common stock. From March 2010 through the end of the Fraud Period, Meudon acquired approximately 6% of the common stock of Lyris, or just over 10 million shares.

32. Defendant Maasberg is a resident of California. He was the Chief Executive Officer of Lyris and a member of Lyris's Board of Directors from August 2010 to March 2013. In February 2011, Maasberg acquired approximately 625,000 shares of Lyris stock at $0.19 per share.

33. Defendant McDonald is a resident of Pennsylvania. In 2005 McDonald became Lyris's Director of Investor Relations. McDonald and Mr. Burt developed a close personal and professional relationship through their work at Lyris. In February 2011, McDonald acquired approximately 200,000 shares of Lyris stock at $0.19 per share, bringing his total ownership to approximately 1%.

34. Defendant Blair is a resident of Pawley's Island, South Carolina. He became a member of Lyris's Board of Directors in 2004 and was a director throughout the Fraud Period. Blair has been trading stocks for 50 years and is a founding partner of the brokerage firm Freimark Blair. Blair told Mr. Burt that he was the exclusive stock broker for Bill Comfort, Ty Comfort, Stuyvie Comfort, and Urry, and was involved in facilitating and executing their purchases of Lyris stock.

# FACTS

### A.    LYRIS BACKGROUND

35.    Lyris develops and sells Internet marketing technology and services to small- and medium-sized businesses in the United States and around the world.

36.    Lyris's predecessor was a healthcare company named NovaCare, Inc. ("NovaCare").  NovaCare was a national leader in physical rehabilitation, orthotics, prosthetics, and employee medical services.  Due to changes in Medicare reimbursement regulations in the late 1990s, the company's stockholders voted to sell NovaCare's operating businesses to raise cash and to repay its creditors.  NovaCare hired Mr. Burt as CEO in June of 2000 to help fulfill that plan.

37.    By the end of 2004, NovaCare had resolved nearly all of its outstanding claims and litigation and had generated a cash reserve of approximately $27 million.  The company had also generated a valuable asset: a net operating loss ("NOL") carry-forward of approximately $180 million based on the substantial losses the company incurred in its last few years as a healthcare company.  This NOL would allow NovaCare to buy a company and not pay federal corporate income tax on any federal income up to the value of the NOL ($180 million).  Pursuant to Section 382 of the Internal Revenue Code, however, the value of the NOL would fall dramatically if the acquired company experienced a change of control, which occurs when one or more 5-percent shareholders increases their stock-holdings in the company in a manner constituting an "ownership change," as set forth in 26 U.S.C. § 382(g).

38.    The directors of NovaCare, including Mr. Burt and Ty Comfort, along with head of investor relations McDonald, identified and acquired Lyris Technologies, Inc., and Uptilt, Inc.'s EmailLabs service in 2005.  Upon acquiring Lyris, the combined company was renamed

"Lyris, Inc." and the company sold the brand name NovaCare to another company in the physical rehabilitation business.  Mr. Burt became CEO of Lyris and Luis Rivera ("Rivera"), who had been the General Manager, became Chief Operating Officer.

### B. THE COMFORT FAMILY'S INVESTING ACTIVITIES AND PRACTICES

39.     Prior to the acquisition of Lyris, Stuyvie Comfort had resigned as a director and his brother Ty Comfort became Chairman of the Board of the new entity.

40.     As CEO, Mr. Burt became familiar with the Comforts' management and investment style.  He quickly learned that Bill Comfort demanded approval of all the family's major investment decisions.  Ty Comfort told Mr. Burt that Bill Comfort – along with Ty Comfort, Stuyvie Comfort, and Urry – had to review and approve each material decision regarding Lyris.  Before proceeding with any material corporate matters, Mr. Burt needed to wait for agreement from not only Ty Comfort as chairman, but also Bill Comfort, Stuyvie Comfort, and Urry.  Ty Comfort often required Mr. Burt to discuss proposed corporate strategies directly with Bill Comfort (or his corporate attorney), Stuyvie Comfort, or Urry.  Examples of decisions that Mr. Burt needed to clear with all the Comforts included whether to acquire certain businesses, whether to raise capital, at what prices the company should sell capital stock, on what terms any company they owned should issue additional stock, and significant personnel decisions.  The Comforts were jointly making these decisions while Mr. Burt was CEO—when the only entity controlled by a Comfort family member that owned Lyris shares was LDN Stuyvie (the partnership composed of Ty Comfort, Stuyvie Comfort, and Urry's wife) and the only member of the Comfort family that owned shares was Ty Comfort.

41.     The Comforts work together to invest in and run all their businesses.  Since at least 2003, Bill Comfort has held an early morning teleconference with his sons (Ty Comfort and Stuyvie Comfort) and son-in-law (Urry) nearly every workday to discuss managing the family's

investments. Ty Comfort and Stuyvie Comfort share an office and regularly discuss their joint

investment plans, as did Bill Comfort and Urry. Ty Comfort made it explicitly clear to Mr. Burt

that he, Bill Comfort, Stuyvie Comfort, and Urry jointly managed their investment in Lyris. To

promote their investment projects, Ty Comfort, Stuyvie Comfort, and Urry rely on their joint

investment portfolio, which, on information and belief, is worth more than one billion dollars.

42.     The Comforts regularly use offshore and other business entities as conduits for

their investments. For example, Ty Comfort, Stuyvie Comfort, Nathalie Comfort Urry, Blair,

and an entity named 63 BR Partnership (of which Stuyvie Comfort was the general partner)

revealed to the SEC that they and others worked as a group to take control of Sybron Chemical

Company in 1998. *See* Ex. 7. While working together at Lyris, Ty Comfort told Mr. Burt that

the Comforts, including Bill Comfort, often structured their investment activities this way.

## C.     DEFENDANTS' SCHEME TO ENRICH THEMSELVES AT THE EXPENSE OF OTHER STOCKHOLDERS

### 1.     Mr. Burt Resigns as CEO as Defendants Are Positioned To Begin Their Scheme

43.     In July 2006, Defendants filed separate documents with the SEC revealing their

ownership of Lyris stock. Collectively, Defendants owned 18% of Lyris.

44.     Mr. Burt resigned his position as CEO of Lyris in January 2007. Rivera, who had

served as General Manager and Chief Operating Officer of the Lyris, replaced Mr. Burt as CEO.

Rivera served as CEO until 2010, when he was replaced by Maasberg.

45.     At the beginning of the Fraud Period in April 2007, Defendants owned

approximately 18 million shares of Lyris stock or 18%. In the spring and summer of 2007, Lyris

stock traded for prices between $0.75 to $1.74 per share. These prices valued Lyris between

approximately $75 million and $175 million.

**2. Defendants Engage in a Scheme of Manipulative Trading to Depress the Stock Price of Lyris So They Can Secretly Buy Stock at Prices Below Market Value and Acquire Control**

46.     A crucial aspect of Defendants' plan was to depress the stock price of Lyris through manipulative day-trading structured to mislead the market into believing that demand for Lyris stock and its price were declining, thereby artificially lowering the price of Lyris stock.

47.     On information and belief, Blair was responsible for engaging in such manipulative trading, and he acted with reckless intent to depress the stock price of Lyris.

48.     In January 2009, after tracking the performance of Lyris stock and investigating daily trading patterns, Mr. Burt sent to Bill Comfort a detailed analysis of the trading of Lyris stock over much of the previous 18 months.  *See* Ex. 18.  This analysis revealed patterns in the trading of Lyris stock that show a very different and distinct trading action for Lyris stock as compared to other stocks generally and to other tech stocks in particular.

49.     Specifically, Mr. Burt's trading analysis shows that someone was selling a small number of shares (often just 100 or 200 shares) many mornings at a low price – called the "Bid." And some individual would do so repeatedly, at the same time nearly every day, month after month.  The effect of this constant "bidding" is to convey to the market that, day after day, for sustained periods of time, there were willing sellers of Lyris stock – that is, people who wanted out of their Lyris ownership and were willing to take a low price.  They are willing to "Hit the Bid" first thing in the morning.  Investors generally view Hitting the Bid as a bearish signal to other traders and investors, and over time this signal creates an impression that demand for stock is steadily declining.

50.     In afternoon trading, Mr. Burt's analysis of patterns revealed that someone was often buying a small sum of shares (often just 100 or 200 shares) and "Hitting the Ask" – that is,

willing to pay a high price for the stock.  Often this price was near or equal to the closing price of the prior day.  In this way, the buyer of the afternoon trade (the "Hit the Ask" trade) was trying to provide cover to the earlier down trades and to manage the decline of the price of the stock.

51.     Exhibits 15, 16, 17, and 18 to the original Complaint show that these irregular trading patterns began in 2007 and continued through the Fraud Period into 2011.  Exhibit 18 contains charts showing graphical representations of the Square S pattern that can be seen when examining trading in Lyris stock.  Exhibit 18 also contains charts showing trading over the same period of time for other companies.  These charts are called OHLC charts, which stands for Open, High, Low, and Close.  The line pointing to the left is the Open (the first and opening trade of the day).  The line pointing to the right is the Close (the last and closing trade for the day).  The Square S is formed by the morning trade that is low and sticks out to the left and by the afternoon trade that is high and sticks out to the right.

52.     This trading pattern discouraged investors because if any buyer made a purchase of Lyris stock and looked to see how it performed the next morning, he or she would see sustained periods in which the stock was almost always down from the price at which it was bought the day before.  This activity, repeated over the course of days and months and years, significantly reduced the attractiveness of Lyris stock to traders and investors, and caused Lyris's stock price to decline.

53.     After Mr. Burt sent the January 2009 letter documenting these manipulative trades to Bill Comfort, Blair directly contacted Mr. Burt in Maryland to discuss the letter.  Blair admitted on that call that he believed that at least the afternoon trades had been manipulated.  Blair also said that the only reason why an investor or group of investors would engage in a lengthy manipulative trading scheme of the sort described herein would be to buy a large block

of a company at low prices, without signaling to the market that an attempt to buy these large blocks was underway.

54.     Blair further stated that "every stock that has ever been traded has been manipulated." He stated that one of the most important things he had learned in his long career as a stock trader is "that the buyers are the sellers and the sellers are the buyers."

55.     Despite admitting his belief that the afternoon stock trading patterns appeared to be manipulated, and that the only reason why someone would engage in this pattern of trading would be to buy large blocks of stock at cheap prices, Blair denied that he and the Comforts were responsible. But during the course of the Fraud Period, no other individual or entity besides those parties to this suit disclosed to the SEC that it had amassed more than 10% of Lyris stock. To the contrary, by the end of the Fraud Period, Defendants collectively owned 95% of Lyris's stock. In February 2011, McDonald admitted that Defendants had a common understanding to depress the price of Lyris's stock and were responsible for doing so.

**3.     Defendants Fail To Promote or To Market Lyris to Investors So They Will Be the Only Buyers and Can Buy at Cheap Prices**

56.     During the Fraud Period, Defendants Ty Comfort, Urry, Maasberg, McDonald, and Blair intentionally and recklessly refused to promote Lyris to investors and refused to raise capital for the company from the public. They did so at the express direction of, and in agreement with, Bill Comfort, and, on information and belief, with the mutual understanding and approval of Stuyvie Comfort. Together, Defendants agreed to refrain from any such activity. Such promotion or financing would have created wider interest from other buyers who could compete with Defendants for ownership of Lyris stock, which would have undermined the careful scheme of depressing the price that enabled Defendants to acquire 95% of Lyris at sub-market prices.

- 17 -

57.     According to Defendants' statements to Mr. Burt, small-cap companies such as Lyris do not attract investors in the same way as large companies listed on the New York Stock Exchange, which are closely watched by market analysts and attract a steady volume of daily trading activity.  Instead, these companies' executives and investor-relations directors must present and market themselves at investor conferences and other events likely to attract attention and interest.  Defendants Bill Comfort, Ty Comfort, Stuyvie Comfort, Urry, McDonald, Maasberg, and Blair understood this necessity given their lengthy experience as sophisticated investors and corporate executives.  Indeed, McDonald, Ty Comfort, and Blair each stated to Mr. Burt on separate occasions in 2006 and 2008 that stocks like Lyris "are sold, they are not bought."

58.     During the Fraud Period, Ty Comfort, Urry, McDonald, Blair, and Maasberg failed to market Lyris to other investors in contradiction of their duties as officers and directors to do so.  They did not participate in investor conferences (for tech companies or otherwise), while their public company counterparts made dozens of presentations.  *See* Ex. 2 (identifying Constant Contact and LivePerson, Lyris's competitors, who attended dozens of conferences).

59.     In particular, McDonald, Lyris's Director of Investor Relations, failed to market the company, even though his job duties include marketing the company to stockholders and potential stockholders, including attending and presenting at tech investor conferences.  He has not presented or marketed Lyris at a single investor conference in more than five years on the job, even though he made several purchases of Lyris stock for himself during the Fraud Period.

60.     McDonald repeatedly admitted to Mr. Burt (in 2009, 2010, and 2011) that Lyris's stock price would be significantly higher if Lyris were to market its stock.  McDonald stated that the price of Lyris's stock – which, during those years, was trading at or below 40 cents per share

– would be in excess of $1 per share if Lyris marketed it to investors.  He also admitted that Ty Comfort, Urry, and Blair each had stated on multiple occasions during the Fraud Period that the value of Lyris stock was more than $1 per share.  His awareness and admission that Lyris's stock price would be higher if it were marketed amounts to reckless conduct with deliberate intent to mislead the market and harm non-Defendant Lyris stockholders.

61.     McDonald made repeated assurances to Mr. Burt in 2009 and 2010 that Lyris would "soon" or "next quarter" be promoted to investors.   In these conversations, he assured Mr. Burt that Plaintiffs' 8 million shares would be worth $10 to $16 million or more (i.e., $1.25 to $2 per share or higher – which would be at or near the same range as the stock traded before the Defendants' illicit actions – $1.00 to $1.75).  Even after Plaintiffs sold 3 million of their 8 million shares in March 2010, McDonald stated that the remaining 5 million shares would "soon" be worth more than $5 million to $10 million – once the Company began marketing the stock.

62.     On multiple occasions prior to May 2011, Ty Comfort stated to Mr. Burt that Lyris (via Defendants) would "soon" or in the "next quarter" go meet with investors to market the company's stock.  He explained that such presentations would create interest in the stock that would help raise Lyris's stock price above $1.  No such meetings or presentations occurred.  Lyris's stock price continued to fall—and Defendants continued to buy, mostly in secret.  Ty Comfort's admission that marketing Lyris would raise its price, combined with his refusal to take any such actions, amounted to reckless conduct deliberately designed to depress Lyris's stock price and harm non-Defendant stockholders.

63.     In August 2010, Maasberg became CEO of Lyris after serving as head of U.S. sales for Omniture for five years.  Omniture's management team, including Maasberg, grew that

company's U.S. revenues from approximately $40 million to $240 million during his tenure, after which Adobe bought the company for approximately $1.8 billion. Given Maasberg's background with Omniture, which is the leader in selling certain types of online marketing tools for businesses (similar in some respects to the Lyris business), Defendant Maasberg could have been a big draw for tech investors looking for new investments, and Lyris investors such as Plaintiffs expected that Maasberg would apply his experience marketing and increasing the value of an Internet company to his duties as CEO of Lyris. Indeed, McDonald told Mr. Burt that Lyris would use Maasberg to market Lyris stock and push its price back over $1 per share. Despite his first-hand experience, Maasberg never presented at any investor conference as CEO of Lyris, even though he made several purchases of Lyris stock during the Fraud Period. On information and belief, Maasberg never did so because he joined the scheme set in place by Bill Comfort, Ty Comfort, Urry, Stuyvie Comfort, Blair, and McDonald, as set forth herein. Maasberg's failure to market Lyris was a result of reckless and deliberate conduct designed to depress the stock price of Lyris and harm non-Defendant stockholders.

64.     As a result of this inaction and their other actions, Defendants accomplished at least four agreed-upon common understandings and goals. First, this inaction, together with the market manipulation, lowered Lyris's stock price. Second, Defendants reduced liquidity of Lyris stock by chasing away other potential buyers who otherwise would have competed with Defendants to purchase it, which also had an effect in lowering its trading price. Third, Defendants were able to buy stock cheaply—at prices they knew were well below the true value of Lyris. Fourth, Defendants executed on this scheme to such an extent that they bought approximately 95% of Lyris. The actions and inactions of Defendants severely damaged the remaining shares held by other stockholders, including Plaintiffs.

### 4. Defendants Purchase 95% of Lyris Stock

65. From the beginning to the end of the Fraud Period, Defendants' joint stake in Lyris stock rose from 18% in 2007 to 95% in 2012. Defendants purchased shares of Lyris stock in their own names or in the names of off-shore entities under their control.

#### *Stock Purchases by Defendants from Lyris*

66. In April 2010, Defendants Bill Comfort, Ty Comfort, Jamie Urry, Stuyvie Comfort, Blair, and McDonald arranged to have the company sell them 18 million shares of Lyris stock for a price equal to 33 cents per share (a total of about $6 million). As McDonald told Mr. Burt less than a year later, Defendants knew that this price was artificially low and that the stock was worth more than $1 per share.

67. In November 2011, Defendants arranged for Lyris to sell approximately 20 million shares at a price of approximately 10.5 cents per share to 65 BR Trust, an entity controlled by Ty Comfort, who was serving at that time as Lyris's Chairman of the Board. At the time, this sale valued the entire Lyris company at approximately $15 million.

68. In October 2012, Ty Comfort arranged for Lyris to sell to 65 BR Trust 30 million shares of Lyris at a price of approximately 22 cents per share on a pre-split basis. At this price per share, the pre-money valuation of Lyris was approximately $24 million.

#### *Stock Purchase from Raging Bull*

69. In February 2011, Ty Comfort, Urry, Maasberg, Blair, and McDonald purchased approximately 6 million shares of Lyris stock from Raging Bull Capital at a price equal to 19 cents per share. *See* Ex. 4 (Schedule 13D/A filed by Raging Bull).

70. Following this transaction, McDonald bragged to Mr. Burt about Defendants' success in this trade. He stated that he and the other Defendants who bought stock had made $6

million at the expense of the selling stockholder, Raging Bull Capital. He admitted on this call that Defendants shared a common goal to reduce the price of Lyris during the Fraud Period, in order to purchase that stock well below its actual value of at least $1 per share at the expense of the selling stockholders.

71.     McDonald explained that Defendants were responsible for the decline in Lyris's stock price pursuant to a plan to depress the value of Lyris's stock in order to purchase it for themselves. During that call, McDonald stated that he bought 200,000 Lyris shares, Maasberg bought 625,000 shares, Blair bought a small number of shares, and both Ty Comfort and Urry bought the vast amount of shares but placed them in off-shore entities to evade any disclosure requirements – including SEC and IRS reporting requirements – in part to protect the value of Lyris's NOL. To date, no person or entity has claimed that it owns the 5 million shares of Lyris stock that Ty Comfort and Urry purchased from Raging Bull Capital in February 2011.

### *Stock Purchases by Defendants from Addison*

72.     Prior to March 2010, Plaintiffs owned 8 million shares of Lyris stock, both directly and through Addison.

73.     In March 2010, Plaintiffs through Addison sold 3 million shares to Defendants Ty Comfort and Meudon for 33 cents per share.

74.     In early May 2011, Addison's stockbroker contacted Blair regarding a further sale of approximately one million shares of Lyris common stock. Blair called back the Addison broker and stated that he had spoken with Bill Comfort, who said the Comforts would only permit a purchase if Addison sold all 5 million shares that it owned at a low price.

75.     Bill Comfort, Ty Comfort, Urry, McDonald, Blair, and Maasberg understood that Mr. Burt desired to sell his shares in order to fund Mrs. Burt's medical expenses. These

Defendants were aware that due to their activities during the Fraud Period – depressing Lyris's stock price, squeezing out every other large owner of Lyris shares, and reducing liquidity of Lyris stock through failures to market the company – Mr. Burt had no other alternative buyer who would be interested in purchasing his Lyris shares.  In April 2011, McDonald told Mr. Burt "you have no one else to sell to other than the Comforts."

76.     Addison sold 5 million shares to Defendants in May 2011 but kept approximately 10,000 Lyris shares through the duration of the Fraud Period.

77.     During the course of the sales negotiations, Blair stated on multiple phone calls that he required Bill Comfort's direction on how to structure the deal, and after conversing with Bill Comfort, he would convey specific instructions including the sales price.  At one point, Blair stated that Bill Comfort wanted the sale to "cross the wire" – that is, to be effectuated over the NASDAQ system.  After Plaintiffs' stockbroker Tom McGuckian ("McGuckian") explained that his company could not structure the deal in that way, Blair screamed at McGuckian that "I work for Bill Comfort in New York.  Bill Comfort wants the trade to cross the wire."

78.     On other calls Mr. Burt and McGuckian held with Blair during these negotiations, Blair would not reveal which persons or entities would be acquiring the shares.  Instead, he stated that "the Comforts" would determine later how to distribute the shares among the entities participating in the acquisition.

79.     In June 2011, McDonald told Mr. Burt that Urry refused to pay for 50% of the shares that he had already received from his May 2011 purchase, unless Mr. Burt signed a release agreement that released *all* Defendants from liability for any causes of action Plaintiffs may have relating to Defendants' conduct concerning Lyris and its stock.  Defendant McDonald informed Mr. Burt that Bill Comfort and Urry were insisting on this release.  This conduct

- 23 -

amounted to a reckless and intentional attempt to shield Defendants' wrongdoing from liability. Mr. Burt refused to sign the release, Bill Comfort and Urry ultimately relented, and Urry paid for the shares he had already acquired, albeit at a price far below the shares' true value.

### Secret Additional Purchases

80.     McDonald admitted that, as of February 2011, Bill Comfort, Ty Comfort, Stuyvie Comfort, Urry, and Blair owned more than 80% of Lyris's stock.  On information and belief, this 80% figure included direct individual purchases or indirect purchases made by off-shore entities owned or controlled by Bill Comfort, Ty Comfort, Stuyvie Comfort, and Urry ("Comfort Shell Entities"), amounting to approximately 27% of Lyris stock.  One or more of the Comfort Shell Entities is based in or incorporated in off-shore financial and tax havens such as Bermuda, the Cayman Islands, or Madeira, Portugal.  Each of the Comfort Shell Entities' purchases was likely small enough to avoid the SEC's 5% ownership stake reporting requirements.  Between February 2011 and the end of the Fraud Period, Defendants continued buying Lyris stock, and they now own 95% of Lyris.  The purchases were part of the Defendants' scheme to accumulate sufficient Lyris stock to buy Lyris surreptitiously, and thus the undisclosed purchases by the shell entities for the benefit of the Comforts violated SEC rules.  Defendants' use of off-shore shell entities amounted to intentional and reckless conduct designed to conceal their attempt to acquire Lyris.

### 5.     Fraud in Securities Filings

81.     Defendants committed fraud by not disclosing, as required by Sections 13 and 10b of the Securities Act of 1934, that they had any of the following common understandings or agreements:

a.      an agreement to keep the price of Lyris stock low;

b.      to buy stock at low prices;

c.      to benefit from buying stock at low prices at the expense of other stockholders,

including Raging Bull Capital and the Plaintiffs;

d.      to keep buying stock pursuant to this scheme until they acquired 95% of the

total stock of Lyris, thus appropriating any control premium to themselves and

causing a reduction in the value of Lyris stock to the remaining stockholders

e.      to buy stock in offshore entities and hidden entities so that their scheme would not

be disclosed to others and to help them conceal their activities from the SEC and

the IRS to protect the value of the NOLs.

82.     Defendants also committed fraud by not disclosing that they had acted on these

common understandings or agreements by buying Lyris stock, as set forth herein.

### *Misstatements and Omissions in Schedule 13D Filings (Ty Comfort, James Urry, LDN Stuyvie, and Meudon)*

83.     Defendant Ty Comfort filed Schedule 13D/As dated March 10, 2008, March 19,

2010, April 12, 2010, May 20, 2011, June 3, 2011, November 9, 2011, November 21, 2011 (on

behalf of 65 BR Trust), November 29, 2011 (on behalf of 65 BR Trust), and October 17, 2012

(separately on behalf of Lyr and himself) (Exs. 8, 20).

84.     Defendant Jamie Urry filed a Schedule 13D dated April 12, 2010, and Schedule

13D/As dated August 28, 2010, and June 8, 2011 (Ex. 10).

85.     Defendant LDN Stuyvie filed Schedule 13D/As dated March 10, 2008, March 19,

2010, April 12, 2010, and June 3, 2011 (Ex. 9).

86.     Defendant Meudon filed a Schedule 13D dated April 12, 2010, and Schedule

13D/As dated August 27, 2010, and June 8, 2011 (Ex. 11).

87.     Schedule 13D requires that investors who own more than 5% list if they are part

of a group, and list any agreements or understandings that they have by themselves, or with

others, relating to material corporate matters of Lyris. Material corporate matters that Defendants should have disclosed in their 13D filings included plans or agreements to keep the price of Lyris stock low, to reduce the liquidity of the stock, to buy additional stock of Lyris, to benefit at the expense of other stockholders, to keep buying until at least 80% or 95% of the stock has been acquired, and to place stock into off-shore entities to evade detection by the SEC and the IRS.

88.     Defendants Ty Comfort, Urry, LDN Stuyvie, and Meudon never admitted to any common understandings or agreements with any others in the attached filings under Section 13. *See* Ex. 8-11. These were specific omissions by these Defendants with the intent to mislead other investors, including Plaintiffs, the SEC and the IRS. Defendants Ty Comfort, Urry, LDN Stuyvie, and Meudon omitted disclosing the understandings they had with Bill Comfort, McDonald, Stuyvie Comfort, Blair and Maasberg, to engage in the actions set forth herein.

89.     Defendants Ty Comfort, Urry, LDN Stuyvie, and Meudon also failed to disclosure any individual intention to gain control, or to engage in the actions set forth herein, separate and apart from their agreement among each other and with Bill Comfort, McDonald, Stuyvie Comfort, Blair, and Maasberg.

90.     Each of those omissions was materially and knowingly false and made with the intent to defraud.

### *Failure to File 13Ds Disclosing Involvement in Group Plan or Common Understanding (McDonald, Blair, Bill Comfort, Maasberg, Stuyvie Comfort)*

91.     Defendants McDonald, Blair, Bill Comfort, Maasberg and Stuyvie Comfort never acknowledged owning more than 5% of Lyris stock, either individually or as part of a group. Section 13 requires that individuals who reached agreements or understandings with other

individuals who file 13D forms also must file themselves.  Here, McDonald, Blair, Bill Comfort, Stuyvie Comfort, and Maasberg had common agreements or understandings with Ty Comfort and Urry to engage in the actions described herein.

92.     Defendants McDonald, Blair, Bill Comfort, Maasberg and Stuyvie Comfort failed to file a Schedule 13D stating that they had any of the foregoing agreements with Ty Comfort and/or James Urry.  These omissions by McDonald, Blair, Bill Comfort, Maasberg, and Stuyvie Comfort were made knowingly and with the intent to defraud others.

### *Materially False 10-Q, 10-K, and Proxy Statement Filings (Maasberg, McDonald, Ty Comfort, Blair, and James Urry)*

93.     None of the agreements or understandings among defendants set forth herein were disclosed by Lyris in any of the 10-Qs or 10-Ks, or Proxy Statements it filed during the Fraud period.  Under Item 304 of Regulation S-K, the Management Discussion and Analysis (MD&A) section of a 10-Q or 10-K form must disclose to investors any matters that are material to it business, to its efforts to raise capital, its governance, and to the price of its stock.  These rules required Defendants Maasberg, Blair, McDonald, Ty Comfort, and Urry to disclose the agreements and actions set forth herein.

94.     The materially false filings are as follows:

a.      Proxy Statements (filed April 2008, April 2009, April 2010, April 2011, and April 2012) (Exs. 12, 21).

b.      Forms 10-K (for Fiscal Years ending June 30, 2008, June 30, 2009, June 30, 2010, June 30, 2011, and June 30, 2012) (Exs. 13, 22).

c.      Report on Forms 10-Q (filed November 2007, February 2008, May 2008, November 2008, February 2009, May 2009, November 12, 2009, February 10,

2010, May 12, 2010, November 12, 2010, February 9, 2011, May 15, 2011,

September 30, 2011 (with amendment), December 31, 2011 (with amendment),

March 31, 2012 (with amendments), September 30, 2012, and December 31,

2012) (Exs. 14, 23).

95.     McDonald has stated to Mr. Burt on numerous occasions that McDonald was one

of the individuals primarily responsible for preparing and filing the Lyris 10-Qs and 10-Ks, and

Proxy Statements during this period.  McDonald knowingly assisted in preparing and filing 10-

Qs, 10-Ks, and Proxy Statements that omitted material information that was required to be

disclosed.

96.     Ty Comfort, as Chairman of the Board of Lyris, was responsible under Sarbanes-

Oxley for the content of Lyris's 10-Q, 10-K filings, and Proxy Statements, which he personally

signed.  Ty Comfort knew that such filings contained the material omissions described herein.

He submitted those filing with the intent to induce reliance by others and to defraud them.

97.     Blair, as a member of the audit committee of the board of Lyris, was responsible

for ensuring the accuracy of the content of Lyris's 10-Q and 10-K filings, as well as Lyris's

Proxy Statements.  Blair knew that such filings contained the material omissions described

herein.  He knew that these filings contained material omissions when filed and he acted with the

intent to induce reliance by others and to defraud them.

98.     Urry, as a member of the board, was responsible for content of Lyris's 10-Q and

10-K filings, as well as Lyris's Proxy Statements.  Urry knew that such filings contained the

material omissions described herein.  He knew that these filings contained material omissions

when filed and he acted with the intent to induce reliance by others and to defraud them.

99.     Maasberg became CEO in the summer of 2010.  In February 2011, McDonald identified Maasberg as a member of the group, and stated that Maasberg had agreed with and acted upon the plans to keep Lyris's stock price low and to buy stock at low prices and to benefit at the expense of the other stockholders.  Maasberg was responsible for ensuring that the contents of Lyris's 10-Q, 10-K, and Proxy Statement filings made from the time he became CEO were complete and accurate, but those filings omit reference to any of the agreements or actions set forth herein.

**6.     Defendants' Motives in Concealing Their Intentions and Increased Ownership**

100.    Defendants are sophisticated investors who have extensive experience in buyouts of public companies.

101.    Once any individual investor or group of investors acquires a 5% stake or greater in a publicly traded company, they must file a Schedule 13D with the SEC disclosing whether they have any plans or objectives, to buy more stock or to obtain a controlling share of the company (among other things).   The market reacts favorably to such filings and the price of the company's stock increases.  Stockholders become aware that a takeover attempt may be underway, and it enables them to demand a "control premium" for their shares from the individual or group seeking to gain control.

102.    Throughout the Fraud Period, Defendants had a strong motive to avoid disclosing their plans to buy more Lyris stock, because it would have encouraged other investors to buy Lyris stock over the course of a period in which Defendants were able to discourage any competing investors.

103.     Defendants had an additional motive in this instance to avoid revealing that they were seeking to gain control of Lyris because the value of the $180 million NOL would fall dramatically if Lyris experienced an "ownership change" pursuant to Section 382 of the Internal Revenue Code.  An acquisition of at least 95% of Lyris's stock by Defendants would constitute such an "ownership change."

104.     For these reasons, Defendants relied on several off-shore or affiliated investment entities, including LDN Stuyvie, 65 BR Trust, Lyr, and Meudon, under the control of Ty Comfort, Stuyvie Comfort, and Urry.  Through these entities, Defendants increased their collective stake in Lyris.

**7.     Defendants' Rejection of $100 Million Cash Offer for Lyris**

105.     In August 2012, officers of J2 Global had several conversations with Ty Comfort and Maasberg regarding a sale of Lyris to J2 Global, which is a significantly larger company than Lyris and holds a cash balance of approximately $300 million.

106.     During these discussions, Defendants Maasberg and Ty Comfort separately stated that the current trading price of approximately 16 cents per share was not even close to the true value of Lyris as a company and that Lyris's other officers and directors were aware that the value of the company far exceeded its current stock price.

107.     J2 Global offered to buy Lyris for a price of $100 million in cash, over four times greater than Lyris's market value of approximately $22 million at the time.  Defendants Maasberg and Ty Comfort rejected this offer and replied that Lyris was worth $150 million.  *See* E-mail from Rick Faulk, Landslide, to David Burt (Aug. 31, 2012, 9:02:55 AM EDT) (attached hereto as Ex. 24).[3]  Within sixty days of rejecting this offer, however, Ty Comfort arranged for

---

[3] Landslide is a subsidiary of J2 Global.

Lyris to sell 30 million shares to 65 BR Trust, an entity he controls, at a price equal to 22 cents per share, implying a total enterprise valuation of only $24 million.

108.    The value Defendants Maasberg and Ty Comfort attached to Lyris implies a stock price consistent with McDonald's repeated statements to Mr. Burt that the value of Lyris stock was in excess of $1 per share during the duration of the Fraud Period.

### 8.    Defendants' Actions Directly and Substantially Caused Plaintiffs To Suffer Economic Loss on Their Investment in Lyris

109.    Defendants' suppression of Lyris's stock price during the Fraud Period caused Mr. and Mrs. Burt to suffer financial losses.

110.    Defendants' scheme of manipulative trading, carried out by Blair, artificially lowered the price of Lyris stock to levels below which it would have traded absent such manipulation.

111.    Defendants' failure to market Lyris to investors also caused Lyris's stock price to decline.  A small-cap stock such as Lyris does not attract investment unless it markets itself at investor presentations or otherwise.

112.    By amassing 80%, and then 95% of Lyris's stock without making the required disclosures, Defendants reduced the liquidity of Lyris stock, which further reduced its value. The ability to sell stock to a market of willing buyers is a critical component of ownership from which shares derive their value, and demand for shares increases if an individual or group of individuals discloses that they intend to buy virtually all of Lyris's stock.  Defendants' actions drove away all other major holders of Lyris stock such that the only buyers were Defendants themselves, and by withholding their intentions, Plaintiffs were unable to sell their shares for a fair value or at a "control premium."

#### E.       Defendants' Intentional Infliction of Emotional Distress on Janet Burt

113.    Defendants furthered their scheme to defraud Plaintiffs by taking advantage of the fact that Mrs. Burt suffers from depression and related illnesses.  Defendants knew that Plaintiffs relied on the value of their Lyris investments to pay for Mrs. Burt's medical treatment.

114.    In 2004, Mr. Burt told Ty Comfort, McDonald, and Blair that Mrs. Burt suffered from such severe depression that she needed to be hospitalized at McLean Hospital, a psychiatric hospital in Boston renowned for providing close, intensive care to patients with psychiatric afflictions.  Despite a successful career as a public defender, Mrs. Burt was no longer able to function as a lawyer – or in general – due to her illness.  Following six weeks in McLean Hospital, Mrs. Burt entered into the very expensive and intensive outpatient program at McLean in which she would see four different therapists several times per week, often spending an entire day at McLean.  Mrs. Burt was diagnosed with multiple severe psychiatric illnesses, including major depressive disorder.  Mrs. Burt continued in the intensive outpatient program for years.

115.    In 2006, Ty Comfort tried to convince Mr. Burt to "lock up" his wife so that Mr. Burt could move to San Francisco to become the COO as well as CEO of Lyris.  Mr. Burt explained that he could not move because Mrs. Burt was undergoing intensive treatment for depression and other illnesses at McLean Hospital.  Ty Comfort told Mr. Burt that "a good buyout guy can convince people to do what he wants" and that, if Mr. Burt were worth his salt, he would be able to convince his wife's therapist to "lock her up" indefinitely in a psychiatric ward against Mrs. Burt's will.  Mr. Burt informed Ty Comfort that Mrs. Burt's therapist believed such an extreme measure would cause her condition to deteriorate.  Nevertheless, Ty Comfort explained to Mr. Burt that he had discussed the matter with Bill Comfort and Urry, and that both agreed with Ty Comfort's suggestion.  These statements reveal at least Bill Comfort's, Urry's,

and Ty Comfort's knowledge of and willful disregard for Mrs. Burt's medical and financial needs.

116.    On several occasions between 2004 and 2011, Mr. Burt told Ty Comfort, Urry, McDonald, and Blair about the substantial costs of treating Mrs. Burt at McLean Hospital. Inpatient stays cost more than $25,000 per week.  Intensive outpatient bills and indirect costs could average more than $10,000 per month and were often as high as $15,000 per month.

117.    In May 2011, Mr. Burt was forced to sell most of his remaining shares in Lyris to fund his wife's medical treatment.  McDonald informed Mr. Burt that "there was no one else to sell to" but Defendants.  The price Mr. Burt received for his shares was millions of dollars less than their true value, but for Defendants' fraudulent scheme.  In June 2011, Bill Comfort and Urry attempted to withhold payment on half of Urry's shares until Mr. Burt signed a release of legal claims against all Defendants.  Informed of these events, Mrs. Burt faced the despair of knowing that the money for her medical treatments had vanished.  Her emotional health declined dramatically.

118.    Due to Mrs. Burt's declining health, she returned to McLean Hospital for treatment.  Because Plaintiffs could no longer afford prolonged inpatient treatment, Mrs. Burt stayed at an inexpensive hotel nearby, where her worsening condition went unnoticed until it was almost too late.  One evening, Mr. Burt was found in her hotel room and rushed to the hospital for emergency treatment.  Emergency physicians informed Mr. Burt that his wife would have died if she had been brought in a few hours later.

119.    Defendants' actions were extreme and outrageous because they knowingly and intentionally defrauded Plaintiffs out of money that Defendants knew was needed for Mrs. Burt's

medical treatment, thereby intentionally and recklessly inflicting significant emotional distress

on Mrs. Burt.

## FIRST CLAIM[4]

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

**(Defendants Bill Comfort, Ty Comfort, Stuyvesant Comfort, James Urry, Wolfgang Maasberg, Richard Blair, Richard McDonald, LDN Stuyvesant Partnership, and Meudon Investments)**

120.    Paragraphs 1-119 are hereby incorporated by reference and re-alleged herein.

121.    Defendants Bill Comfort, Ty Comfort, Stuyvie Comfort, Urry, Maasberg,

McDonald, LDN Stuyvie, and Meudon Investments, knowingly or recklessly, directly or

indirectly, singly or in concert, in connection with the purchase or sale of securities, by the use of

any means or instruments of transportation or communication in interstate commerce, or of the

mails, or of any facility of a national securities exchange, with scienter:

a. Employed devices, schemes or artifices to defraud;

b. Made untrue statements of material fact, or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and

c. Engaged in acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon any person in connection with the purchase or

sale of Lyris stock.

---

[4] The Court dismissed Plaintiffs' Third Claim in part and Plaintiffs' Seventh Claim in its March 28, 2014 Memorandum Opinion and Order. *See* Dkt. # 54-55.  In its March 28, 2014 Memorandum Opinion and Order, the Court dismissed Plaintiffs' Third Claim in part and Plaintiffs' Seventh Claim in full.  Those allegations are included herein to preserve Plaintiffs' right to appeal their dismissal.

122.    By reason of the foregoing, Defendants Bill Comfort, Ty Comfort, Stuyvie

Comfort, Urry, Maasberg, Blair, McDonald, LDN Stuyvie, and Meudon violated Section 10(b)

of the Exchange Act, 15 U.S.C. § 77j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and

have, by this conduct harmed Plaintiffs in an amount in excess of $1,000,000, and are liable to

Plaintiffs for damages suffered in connection with Defendants' wrongful conduct.

## SECOND CLAIM

### Violation of Exchange Act Section 14(a) and Rule 14a-9 Thereunder

**(Defendants Ty Comfort, James Urry, Wolfgang Maasberg, Richard Blair, and Richard McDonald)**

123.    Paragraphs 1-122 are hereby incorporated by reference and re-alleged herein.

124.    Section 14(a) of the Exchange Act requires registrants that solicit any proxy or

consent or authorization in connection with any security registered pursuant to Section 12 of the

Exchange Act (other than an exempted security), to comply with such rules as the Commission

may promulgate.  Rule 14a-9 makes it unlawful for any person to issue a proxy statement

containing a material misrepresentation or omission if that person is at least negligent and the

proxy was the essential link in completing a transaction.

125.    Defendants Ty Comfort, Urry, Maasberg, Blair, and McDonald, by use of the

mails or by means or instrumentality of interstate commerce or any facility of a national

securities exchange or otherwise, knowingly, recklessly, or negligently solicited or permitted the

use of their names (in the case of Defendants Ty Comfort, Urry, and Maasberg) to solicit by

means of a proxy statement, form of proxy, notice of meeting or other communication, written or

oral, containing statements which, at the time and in light of the circumstances under which they

were made, were false and misleading with respect to material fact, or omitted to state material

facts necessary in order to make the statements therein not false or misleading, or necessary to

correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false and misleading.

126. By engaging in the conduct described herein, these Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rule 14a-9 thereunder, 17 C.F.R. § 240.1a-9, and have, by this conduct, caused harm to Plaintiffs in an amount in excess of $1,000,000, and are liable to Plaintiffs for damages suffered in connection with defendants' wrongful conduct.

## THIRD CLAIM

### Violations of Maryland Securities Anti-fraud Statute Section 11-703

**(Defendants Bill Comfort, Ty Comfort, Stuyvesant Comfort, James Urry, Wolfgang Maasberg, Richard Blair, Richard McDonald, LDN Stuyvesant Partnership, and Meudon Investments)**

127. Paragraphs 1-126 are hereby incorporated by reference and re-alleged herein.

128. Through this conduct, Defendants Bill Comfort, Ty Comfort, Stuyvie Comfort, Urry, Maasberg, Blair, McDonald, LDN Stuyvie, and Meudon Investments knowingly or recklessly, directly or indirectly, in connection with the offer, sale or purchase of securities:

  a.  Employed devices, schemes or artifices to defraud;

  b.  Made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

  c.  Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of Lyris stock.

129. By reason of the foregoing, Defendants Bill Comfort, Ty Comfort, Stuyvie Comfort, Urry, Maasberg, Blair, McDonald, LDN Stuyvie, and Meudon Investments violated Section 11-703 of the Maryland Securities Anti-Fraud Section, Maryland Annotated Code 1957,

art 32A; Section 13; 1975 ch. 311, Sections 1, 2, and 3, and have, by this conduct, caused harm

to Plaintiffs in an amount in excess of $1,000,000, and are liable to Plaintiffs for damages

suffered in connection with Defendants' wrongful conduct.

## FOURTH CLAIM

### Breach of Duty of Loyalty under Delaware Law

**(Defendants Wolfgang Maasberg, Ty Comfort, James Urry, Richard McDonald and Richard Blair)**

130.     Paragraphs 1-129 are hereby incorporated by reference and re-alleged herein.

131.     As alleged herein, Defendants Maasberg, Ty Comfort, Urry, and Blair were

officers and directors of Lyris.  As officers and directors, these Defendants owed to Lyris and its

stockholders the duty of loyalty.

132.     As described herein, these Defendants violated their fiduciary duties to Lyris and

its stockholders.  As McDonald explained, these Defendants profited at the expense of the

interests of Lyris and its stockholders by depressing Lyris's stock price so they could purchase

more stock of Lyris for themselves.  Instead of promoting the interests of all stockholders, these

Defendants intentionally made money at other stockholders' expense.  They therefore received a

personal benefit that was not enjoyed by the shareholders generally.

133.     By their conduct, these Defendants have caused harm to Plaintiffs in an amount in

excess of $1,000,000 and are liable to Plaintiffs for damages suffered in connection with

Defendants' wrongful conduct.

## FIFTH CLAIM

## Breach of Fiduciary Duty Under Delaware Law – Self Dealing In Violation of Entire Fairness Standard

### (Defendants Ty Comfort, James Urry, Richard Blair, Richard McDonald, and Wolfgang Maasberg)

134.    Paragraphs 1-133 are hereby incorporated by reference and re-alleged herein.

135.    Defendants Ty Comfort and Urry were directors of Lyris in April 2010 when they arranged to have Lyris sell them a total of 18 million shares at a price of 33 cents per share.  And in November 2011, these Defendants arranged for Lyris to sell approximately 22 million shares to an entity controlled by Ty Comfort for 10.5 cents per share.  In October 2012, Ty Comfort arranged to have Lyris sell 30 million shares to an entity he controls for a price equal to approximately 17 cents per share.

136.    Defendant Blair was a director of Lyris at the time of these sales and, on information and belief, was the stock broker responsible for these transactions.

137.    Under Delaware law, a transaction between a company and one or more of its directors, or a controlling stockholder, must be "entirely fair" to the company and the other stockholders.

138.    Delaware courts have traditionally looked to determine in these interested party transactions whether the price per share for the stock sold to the insiders was fair and whether the transaction involved fair dealing.

139.    McDonald admitted that part of his, Ty Comfort, Blair, Urry, and Maasberg's plan was to make money at the expense of other stockholders by buying other stockholders' stock at artificially depressed prices.

140.     These Defendants agreed on a plan to engage in manipulative stock trading to lower the value of Lyris's stock and to buy over 95% of Lyris's stock at artificially depressed prices.

141.     The April 2010 transaction (in which Ty Comfort and Urry were buyers), and the November 2011 and October 2012 transactions (in which the buyer was a trust or an off-shore entity controlled by Ty Comfort) constitute "interested party transactions" – that is, deals between the company, Lyris, on one hand, and its boardmembers Ty Comfort and Urry, on the other.  For such transactions, a director (or a controlling stockholder) may not avow himself of the business judgment rule under Delaware law.  Instead, the "entire fairness" test applies, under which a director must prove that the terms of the sale were entirely fair to the company in the sense that it was on terms as favorable as could have been achieved in an arms' length deal subject to market competition.

142.     Ty Comfort and Maasberg's rejection of the offer from J2 Global—which valued the company at many times more than the price at which McDonald, Ty Comfort, Blair, Urry, and McDonald purchased stock from other shareholders—shows that these Defendants were not "entirely fair" to the other stockholders of Lyris.

143.     But for the fraudulent depression of Lyris's stock price, the actual market value of Lyris's stock at the time of these transactions would have been more than $1 per share.  At this actual value of Lyris, the stock purchased by these Defendants in these transactions is valued at $38 million.  Yet these Defendants arranged to have Lyris sell them this stock for only $8 million.

144.     Defendants Ty Comfort, Urry, McDonald, Maasberg, and Blair have injured Plaintiffs by this conduct in excess of $1,000,000.

## SIXTH CLAIM

### Violation of the Duty of Care under Delaware General Corporation Law

**(Defendants Ty Comfort, James Urry, Richard Blair, Richard McDonald, and Wolfgang Maasberg)**

145.    Paragraphs 1-144 are hereby incorporated by reference and re-alleged herein.

146.    As officers and directors of Lyris, Defendants Ty Comfort, Urry, Maasberg, McDonald, and Blair had a fiduciary duty of care to better the company and further its interests on behalf of all stockholders.

147.    These Defendants violated that duty of care by discouraging other investors from buying shares in Lyris and by failing to take steps to market Lyris or its stock to prospective investors.  These Defendants' conduct, as detailed here, amounted to a failure to exercise good business judgment or to use ordinary care in the interests of Lyris's shareholders.

148.    By the conduct set forth herein, these Defendants have breached their duty of care and have caused harm to Plaintiffs in an amount in excess of $1,000,000 and are liable to Plaintiffs for damages suffered in connection with these Defendants' wrongful conduct.

## SEVENTH CLAIM

### Intentional Infliction of Emotional Distress on Plaintiff Janet Burt

**(Defendants Bill Comfort, Ty Comfort, James Urry,
Richard McDonald, and Richard Blair)**

149.    Paragraphs 1-148 are hereby incorporated by reference and re-alleged herein.

150.    Defendants Bill Comfort, Ty Comfort, Urry, McDonald, and Blair have known that Plaintiff Janet Burt suffers from depression and related illnesses.

151.    Defendants have intentionally, or at minimum, recklessly, inflicted emotional distress on Mrs. Burt by knowingly depressing the value of Plaintiffs' investment in Lyris, an

investment that, as Defendants knew, Plaintiffs planned to use to pay for Janet Burt's medical expenses for treating her severe depression.

152.    Defendants' conduct was extreme and outrageous because they made clear by their conduct and Ty Comfort's comments that they were willing to sacrifice Mrs. Burt's emotional health for their own economic interests, including by having her "locked up" in a mental hospital.

153.    Defendants directly caused Mrs. Burt's depressive illness to worsen because she was removed from her existing course of treatment due to Defendants' conduct.

154.    The emotional distress Mrs. Burt suffered as a result of Defendants' actions was so severe that she required extensive psychiatric treatment at a hospital.

155.    Defendants have caused significant pain and suffering to Mrs. Burt.

156.    Defendants are liable to Mrs. Burt for the damages she has suffered in connection with Defendants' wrongful conduct.

## PRAYER FOR RELIEF

**Wherefore,** Plaintiffs pray for damages as follows:

A.    Award Plaintiffs damages, including interest:

B.    Award Plaintiffs reasonable attorneys' fees and costs;

C.    Award punitive damages as the Court may deem appropriate; and

D.    Award such equitable / injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: June 13, 2013.                Respectfully submitted,

                                     _/s/ James M. Webster III_____
                                     James M. Webster III (Bar No. 23376)
                                     KELLOGG, HUBER, HANSEN, TODD,
                                      EVANS & FIGEL PLLC
                                     1615 M Street, NW
                                     Suite 400
                                     Washington, DC 20036
                                     (202) 326-7900 (telephone)
                                     (202) 326-7999 (facsimile)
                                     jwebster@khhte.com

                                     *Attorney for Plaintiffs David R. Burt, Janet
                                     H. Burt, Texas Addison Limited Partnership,
                                     and Texas Barrington LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 13th day of June, 2013, a true and correct copy of this paper

was served via this Court's ECF system on the following counsel of record:

James P. Ulwick
Geoffrey H. Genth
Catherine M. Manofsky
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, MD 21202

Michael J. Schrier
Brian W. Stolarz
JACKSON KELLY PLLC
1875 Connecticut Ave., Suite 1110
Washington, DC 20009

  /s/ James M. Webster III
James M. Webster III (Bar No. 23376)
KELLOGG, HUBER, HANSEN, TODD,
 EVANS & FIGEL PLLC
1615 M Street, NW
Suite 400
Washington, DC 20036
(202) 326-7900 (telephone)
(202) 326-7999 (facsimile)
jwebster@khhte.com
